**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                         )
JUDICIAL WATCH, INC.,                    )
                                         )
                    Plaintiff,           )
                                         )          Civil Action No. 07-1987 (PLF)
          v.                             )
                                         )
U.S. NATIONAL ARCHIVES AND               )
RECORDS ADMINISTRATION,                  )
                                         )
                    Defendant.           )
_____)

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE,**
**FOR A STAY OF THE PROCEEDINGS**

Defendant, the United States National Archives and Records Administration ("NARA"), hereby moves this Court to dismiss this action for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), or for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In the alternative, Defendant moves for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C), and Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976).

In support of this motion, Defendant respectfully submits the attached memorandum of points and authorities with a supporting declaration (attached as Exhibit A), and a proposed Order.  The memorandum sets forth the justification for the motion, as well as NARA's best available time table for processing a portion of the documents responsive to Plaintiff's Freedom of Information Act request.  Plaintiff has been consulted as required by LCvR 7(m) and has indicated that it opposes this motion.

Respectfully submitted this 29th day of January, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

OF COUNSEL                         /s/ Varu Chilakamarri
JASON R. BARON                     VARU CHILAKAMARRI (NY Bar)
(DC Bar No. 366663)                Trial Attorney, Federal Programs Branch
Director of Litigation             U.S. Department of Justice, Civil Division
Office of the General Counsel      Tel: (202) 616-8489
NARA                               Fax: (202) 616-8470
8601 Adelphi Road, Suite 3110      varudhini.chilakamarri@usdoj.gov
College Park, MD 20740
Telephone: (301) 837-1499          Mailing Address:
Fax: (301) 837-0293                Post Office Box 883
jason.baron@nara.gov               Washington, D.C. 20044

                                   Courier Address:
                                   20 Massachusetts Ave., NW, Rm. 7226
                                   Washington, D.C. 20001

                                   *Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
JUDICIAL WATCH, INC.,                   )
                                        )
                    Plaintiff,          )
                                        )         Civil Action No. 07-1987 (PLF)
          v.                            )
                                        )
U.S. NATIONAL ARCHIVES AND              )
RECORDS ADMINISTRATION,                 )
                                        )
                    Defendant.          )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE,
<u>FOR A STAY OF THE PROCEEDINGS</u>**

## **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    Statutory and Regulatory Framework of the Presidential Records Act . . . . . . . . . . . . . . 3

    A.    Statutory Restrictions on the Release of Presidential Records  . . . . . . . . . . . . . . 3

    B.    FOIA Exemptions Applicable to Presidential Records  . . . . . . . . . . . . . . . . . . . . 5

    C.    Requirement for Presidential Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    The Clinton Presidential Library, FOIA Requests, and Queue Structure  . . . . . . 7

    B.    Plaintiff's FOIA Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    Plaintiff's Claims Should be Dismissed Because its Request is Inadequate Under the
    FOIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    A Request is Inadequate Under the FOIA if it Would Require the Agency to
        Expend an Unreasonable Amount of Effort to Satisfy the Request . . . . . . . . . . . 16

    B.    An Overbroad Request Can Require the Expenditure of an Unreasonable Amount
        of Effort by the Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    C.    Plaintiff's FOIA Request for "Any and All Records of the Task Force" Imposes
        an Unreasonable Burden on NARA and Therefore Plaintiff has Failed to Make a
        Proper Request Under the FOIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.   Alternatively, this Court Should Grant a Stay of Proceedings to Permit the Clinton
    Presidential Library to Process its FOIA Requests in a Fair and Orderly Manner  . . . . . 23

    A.    The Clinton Presidential Library Can Demonstrate Exceptional Circumstances
        Warranting a Stay of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1.    The Clinton Presidential Library Has Received an Unprecedented Number
            of FOIA Requests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.    The Clinton Presidential Library Has Limited Resources, Inadequate to
            Process the Flood of FOIA Requests Within 20 Days . . . . . . . . . . . . . . . 27

        3.    The Clinton Presidential Library Is Exercising Due Diligence in
            Processing FOIA Requests and Has Shown Reasonable Progress in
            Reducing its Backlog  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.    Additional Time is Routinely Granted When An Agency Demonstrates, As Here, Exceptional Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## INTRODUCTION

This case concerns a Freedom of Information Act ("FOIA") request for the entire set of records of a Task Force, namely, the Task Force on National Health Care Reform ("Task Force"), which was chaired by First Lady Hillary Rodham Clinton.  This FOIA request is for Clinton Presidential records governed by the provisions of the Presidential Records Act, 44 U.S.C. § 2201, et seq., and it encompasses more than three million pages of potentially responsive documents.  Defendant, the National Archives and Records Administration ("NARA"), which includes the Clinton Presidential Library ("Library"), moves this Court to dismiss the claims brought by Plaintiff, or in the alternative, for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C), and <u>Open America v. Watergate Special Prosecution Force</u>, 547 F.2d 605 (D.C. Cir. 1976).

The Court should dismiss Plaintiff's claims, because they constitute an improper request for records under the FOIA.  Plaintiff's request fails because it is excessively broad in scope and presents an undue burden on the Clinton Presidential Library.  Courts have long recognized that a FOIA request is improper if it imposes so onerous a burden that the agency with reasonable effort cannot comply with the request.  Because the Plaintiff's request is defective, no records have been improperly withheld, and this Court therefore lacks jurisdiction over Plaintiff's claim.  For the same reason, Plaintiff's claim would also be subject to dismissal for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

In the alternative, because exceptional circumstances exist in the present case, this Court should grant a stay of the proceedings, as additional time would be necessary to allow the Library to process Plaintiff's large FOIA request.  Although the Library is exercising due diligence in responding to Plaintiff's request, the large number of pending requests that pre-date Plaintiff's request, the enormous volume of potentially responsive records in this case, and the limited resources currently available to the Library for the processing of FOIA requests, constitute exceptional circumstances necessitating a stay so that the Library may continue to process records in a fair and orderly manner.  In support of this motion, Defendant has provided

a declaration from Emily Robison, the Deputy Director of the Clinton Presidential Library, which explains that the Library intends to process the records in at least three groups.[1]  The Library would require a stay of approximately one year during which it will *begin* processing the first group of records.[2]  The Library would then process the remaining groups of records as they arise under the Library's current FOIA queue system.  Several factors prevent NARA from providing a date certain by which it can compete processing these latter portions of the request, including:  the volume of records that are ahead of Plaintiff's request in the FOIA queue; the massive volume of records that Plaintiff's request itself encompasses; that the Library has only been processing FOIA requests for two years and may experience increases in its rate of processing as its staff gains greater familiarity with the collection and FOIA processing; and that there currently exists uncertainty about funding for additional requested resources that may be appropriated for the Library's FOIA processing.  Given this uncertainty, if this Court grants a stay of proceedings, NARA is prepared to submit a status report within 120 days of the entry of the stay (if deemed necessary by the Court), to provide the Court and Plaintiff with an updated status of where the requested documents fall within the Library's FOIA queue system.

---

[1]  As will be explained in greater detail below, Plaintiff's FOIA request overlaps with two smaller, and more manageable FOIA requests that were submitted by third parties prior to Plaintiff's request:  a request for Ira Magaziner's Task Force files (i.e., the first group), and for Hillary Clinton's Task Force files (i.e., the second group).  These two prior Task Force requests have been moved into the Library's multi-request queue system, for the more efficient and practical processing of records.  The Library intends to process these FOIA requests in the order in which they were received.  The third group of records would then consist of the remainder of documents responsive to Plaintiff's request, which may need to be further divided into multiple segments.

[2]  This is the Library's estimate of how long it will take for the first of the third party requests related to the Task Force to reach the front of the FOIA queue, and for processing to begin on that request.  This estimate does not include the time that it will take the Library to *complete* its processing of that request, nor the time that the representatives of the incumbent and former Presidents are legally entitled to under the Presidential Records Act, 44 U.S.C. § 2204(c)(2) & § 2206, accompanying regulations, and Executive Order 13233, for the review and assertion of any constitutional privileges.

## BACKGROUND

I.    **Statutory and Regulatory Framework of the Presidential Records Act**

The Presidential Records Act of 1978 ("PRA"), sets forth a scheme for the preservation

and disclosure of Presidential and Vice-Presidential records.  The PRA defines "Presidential

records" as:

> [D]ocumentary materials, or any reasonably segregable portion thereof, created or
> received by the President, his immediate staff, or a unit or individual of the
> Executive Office of the President whose function is to advise and assist the
> President, in the course of conducting activities which relate to or have an effect
> upon the carrying out of the constitutional, statutory, or other official or ceremonial
> duties of the President.

44 U.S.C. § 2201(2).  Included among "Presidential records" are documentary materials created

or received by the Office of the First Lady – an office within the Executive Office of the

President – when those materials meet the definition of "Presidential records" set forth in the

PRA. See, e.g., Executive Office of the President, available at

http://www.whitehouse.gov/government/eop.html (last visited January 28, 2008); H.R. Rep. No.

95-1487, at 12 (1978), reprinted at 1978 U.S.C.C.A.N. 5732, 5743 ("When the President's

spouse or other family member or associate serves as a de facto member of the President's staff,

the documents which reflect such service are included in the ambit of presidential records[.]");

cf. Ass'n of Am. Phys. & Surgeons, Inc. v. Clinton, 997 F.2d 898, 904, 911 (D.C. Cir. 1993)

(noting that "*Congress* itself *has* recognized that the President's spouse acts as the functional

equivalent of an assistant to the President," and finding that the Federal Advisory Committee

Act's "full-time officer or employee of the government" phrase applied to Mrs. Clinton's

membership in the Task Force) (emphasis in original).  Thus, Plaintiff's FOIA request

encompasses Presidential records.

A.    **Statutory Restrictions on the Release of Presidential Records**

Presidential records are the property of the United States, 44 U.S.C. § 2202, and upon

conclusion of a President's term in office, the Archivist of the United States ("Archivist")

assumes responsibility for the custody, control, and preservation of the Presidential records.  Id.

§ 2203(f)(1). The Archivist has an affirmative duty to make Presidential records available to the

public as rapidly and completely as possible consistent with limitations under the PRA. Id. Subject to several exceptions discussed below, Presidential records are to be generally administered in accordance with the provisions of the FOIA. Id. § 2204(c)(1).

As an initial matter, there is no public access to Presidential records under the FOIA until the earlier of (a) five years after the date on which the Archivist obtains custody of the records, or (b) the Archivist's completion of processing and organization of the records or an integral file segment thereof. Id. § 2204(b)(2). In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories: (1) classified information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. See 44 U.S.C. §§ 2204(a)(1) - (6). Thus, Presidential records falling into one of these six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA request during that time. The PRA provides that the Archivist's decision to categorize a record as falling under one of the six enumerated, restricted categories, and then to withhold the record within the 12 year period, "shall not be subject to judicial review." 44 U.S.C. § 2204(b)(3); see also H.R. Rep. No. 95-1487, at 4, 16 ("The subsection also provides that when a presidential restriction is in effect, a determination by the archivist regarding access is not subject to judicial review . . .."); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1294 (D.C. Cir. 1993).

Pursuant to 44 U.S.C. § 2204(a), during his time in Office, President Clinton asserted his right to apply the six enumerated restrictions in the PRA for the full 12 year period to all

Presidential records.[3]  See Declaration of Emily Robison ("Robison Decl.") ¶ 8, attached hereto as Exhibit A.  Any documents covered by one of the six categories as currently defined in consultation with the former President are therefore not releasable until January 22, 2013, at which time those records not also subject to a FOIA exemption may be proposed for release.  See id.  The five-year moratorium on public disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests for documents on that date.  Id. ¶ 15.

### B.      FOIA Exemptions Applicable to Presidential Records

In addition to the aforementioned restrictions of the PRA, the PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b), except the (b)(5) exemption covering "privileged" records. See 44 U.S.C. § 2204(c)(1).  Thus, the documents responsive to Plaintiff's request must also be examined under the applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. § 552(b)(2) & (b)(7), respectively.  The Archivist may therefore withhold Presidential records under the FOIA exemptions, even if those records are not otherwise covered by one of the six enumerated restrictions of the PRA, or if those PRA restrictions have expired under the 12-year PRA restriction period.  See 44 U.S.C. § 2204(c)(1). Given the requirements of the PRA, as well as those of the FOIA which have been adopted by the PRA, the Clinton Library archivists must engage in a page-by-page, line-by-line review of all records responsive to Plaintiff's request before any disclosure of those records can be made.  See Robison Decl.  ¶ 18.

---

[3]  In 2002, President Clinton provided additional guidance to the Archivist, explaining that he intended to ease, for NARA's review and processing purposes, the application of two of the enumerated restrictions of the PRA, namely:  § 2204(a)(2), which concerns documents relating to appointments to Federal office; and § 2204(a)(5), which concerns confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers.  President Clinton did not, however, waive these two restrictions in their entirety.  See Declaration of Emily Robison ¶ 8.

## C.     Requirement for Presidential Review

The PRA further provides that none of its provisions "shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." 44 U.S.C. § 2204(c)(2).  Consistent with those constitutionally-based privileges, the incumbent President and the former President (whose records are at issue) are both afforded an opportunity to review all Presidential records prior to their public disclosure. See 36 C.F.R. § 1270.46; see also Exec. Order No. 13233, 66 FR 56025 (2001).  Specifically, once the Archivist has made an initial determination to disclose Presidential records, he must provide notice of the Presidential records to be disclosed to the former and incumbent Presidents, as well as an opportunity for them to review the records so that they may assert any constitutionally-based privileges.  See 44 U.S.C. §§ 2204(c)(2), 2206(3); C.F.R. § 1270.46; Exec. Order No. 13233.[4]

The legislative history of the PRA explains the rationale behind the delayed disclosure of restricted Presidential records and the mechanisms for ensuring Presidential review.  In passing the bill that became the PRA, Congress recognized that "premature disclosure" of Presidential records could have a "'chilling effect' on presidents and the frankness of advice they could expect from their staffs." H.R. Rep. No. 95-1487, at 8.  It was felt, in fact, that the failure to recognize that potential "might eventually diminish the completeness of the written record created and left by chief executives." Id.  Congress acknowledged, in passing the PRA, the need to consider the "expectation of confidentiality of executive communications to avoid the

---

[4] In American Historical Association v. National Archives and Records Administration, 516 F. Supp. 2d 90 (D.D.C. 2007), the court enjoined NARA from relying on section 3(b) of Executive Order 13233, but left intact all other provisions of the Executive Order.  The court held that after providing the former President with the minimum 30 days of notice that is provided for under NARA's regulations implementing the PRA, "the Archivist may make a discretionary decision with respect to the release of such documents though they are pending the former president's review." Id. at 110.  NARA will not take any action that is inconsistent with the court's Order.  As will be made clear below, however, the role that Executive Order 13233 may play with respect to the records responsive to Plaintiff's FOIA request is an issue that is neither ripe, nor relevant at this time, given the current status of Plaintiff's FOIA request in NARA's FOIA queue structure.

prospect of a constitutional infirmity." Id.  Thus, the PRA sought to balance these considerations against the desire for "ready availability" of Presidential records.  Id.; see also id. at 15 (Congress sought to balance "the objectives of assuring early availability with the concern that the premature disclosure of sensitive presidential records will eventually result in less candid advice being placed on paper and a depleted historical record").

## II.     Factual Background

### A.     The Clinton Presidential Library, FOIA Requests, and Queue Structure

The Clinton Presidential Library is a component of NARA and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.  Robison Decl. ¶ 2. NARA regulations provide that FOIA requests for Presidential records of the Clinton Administration be sent to the Director of the Clinton Presidential Library for processing.[5]  See 36 C.F.R. § 1250.22(c).

NARA received legal custody of the Presidential records of former President William J. Clinton, including records from the Office of the First Lady, on January 20, 2001.  See Robison Decl. ¶ 13.  These records included approximately 78 million pages of textual records, over twenty million electronic email records, and over 60 other Clinton Presidential electronic systems.  Id.  Between January 20, 2001 and January 20, 2006 (the date that Clinton Presidential records became available to FOIA requests), the Clinton Library staff received training in anticipation of the opening of the Library's records to FOIA processing.  Id. ¶ 14.  This training included two archivists on the Clinton Library staff traveling to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Library's handling of FOIA requests under the Presidential Records Act.  Id.  The Library staff also participated in training

---

[5]     Consistent with the FOIA, NARA may expedite certain record requests "to the head of [its] FOIA queue."  36 C.F.R. § 1250.28(a); see also 5 U.S.C. § 552(a)(6)(E)(v) (regarding expedited FOIA requests).  However, NARA's regulations provide that the agency "cannot expedite requests for Presidential records." 36 C.F.R. § 1250.28(b).  NARA also has separate fee authority for its archival records.  See 44 U.S.C. § 2116.  Thus, the Clinton Presidential Library is not governed by the FOIA fee and fee waiver provisions in 5 U.S.C. § 522(a)(4)(A)(vi), and therefore, the Library does not provide fee waivers for copying.  On the other hand, the Library does not charge search fees for the time that the Library's staff searches for documents responsive to FOIA requests.  See Robison Decl.  ¶ 20.

exercises held in person and via phone conferencing with NARA headquarters staff familiar with FOIA processing issues in general, including being briefed by NARA's Presidential Materials Staff, as well as by various other NARA FOIA officials. Id.

Further, during this time, the Clinton Library staff was involved in establishing initial intellectual control over both the presidential records and artifacts. Robison Decl. ¶ 14. Archivists prepared a "master location register, combining numerous inventories and in-house databases in preparation for moving all materials to the Library site which opened November 18, 2004, and to assist Library staff in being able to respond to PRA and FOIA requests." Id. The Library staff also created more detailed "finding aids," which provide a rough index of the Library's various collections. Id. In addition, Library staff responded to numerous special access requests and subpoenas. Id. Finally, the Clinton Library systematically processed and released over one million pages of Clinton Presidential records. Id.

The Clinton Presidential Library began receiving and accepting FOIA requests on January 20, 2006. Robison Decl. ¶ 15. FOIA requests to the Clinton Presidential Library are placed in queues to ensure fair and efficient processing. Robison Decl. ¶ 17. The Clinton Presidential Library has 17 separate access queues, 16 for FOIA requests and one for mandatory review of classified documents. Id. The queues are divided by the type of records requested, as follows: (1) textual unclassified; (2) textual classified; (3) electronic classified; (4) electronic unclassified; and (5) audio-visual ("AV"). Id. While a request may include multiple types of records, each request is placed in the queue based on the record type that makes up the largest portion of the request, except in the case of audiovisual material, which is segregated into its own queues. Id. These five queues are then further divided by the volume of records initially estimated to be responsive: (1) large, i.e., over 5000 pages; (2) medium, i.e., 501-5000 pages; or (3) small, i.e., 500 or less pages. Id. Within each queue, the FOIA cases are organized by date received. Id. There is also a sixteenth queue for records subject to multiple requests. Robison Decl. ¶ 17. The Clinton Library rotates through its queues, and as the next-in-line FOIA request is selected from each queue, that queue will then go to the end of the queue line. Id.

The Clinton Presidential Library queue structure has been continually evolving in order to ensure as fair and efficient processing as possible given the limited archival resources at the Clinton Library.  Id.  In an attempt to better serve its requesters, the Library has added additional queues and adjusted queue requirements.  Id.  For example, in July of 2007, the Library added the sixteenth queue for records that are the subject of multiple FOIA requests.  Robison Decl. ¶ 17.  FOIA requests are moved into the multi-request queue when the Library received multiple requests for significant portions of the same series or sub-series of records.  Id. ¶ 25.  Once the requests are transferred to the multi-request queue, the library will begin systematically processing the entire file, series, or sub-series as opposed to individual folders.  Id.  This process allows the Library to respond more rapidly to FOIA requesters who wish to gain access to the same or similar files.  Id.  Also, by opening an entire series or sub-series, other researchers will have access to these records without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog.  Id.  Further, the Library recognizes that continued flexibility may be needed in the future processing of extremely large requests, and it may consider treating very large requests as multiple segments to minimize the impact that such requests have on staff resources and on other FOIA requesters in line.  See id. at ¶ 17.  The current queue structure is the result of experience gained by conducting many FOIA request searches as well as extensive discussions among staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C.  Id. ¶ 17.

Between January 20, 2006, and April 4, 2006 (the date of the present FOIA request), the Library received 210 FOIA requests, totaling an estimated 5,260,000 pages.  Robison Decl. ¶ 16.  As of January 24, 2008, a total of 430 FOIA requests have been received by the Library since the five-year moratorium expired.  Id.  As of January 24, 2008, the archivists at the Library have processed 72 FOIA requests, representing a total of approximately 225,094 pages of textual and electronic records and 44,363 audio-visual records.  Id.  The Library currently has 303 pending FOIA requests, which it estimates will involve the processing of approximately 10,500,000 pages of Presidential records.  Id. ¶ 16.

The Library has no more than six archivists available to process, as a portion of their overall job responsibilities, all of the Library's pending FOIA requests for textual and electronic records (excluding the AV queues).  Robison Decl. ¶ 18.  However, NARA's Office of Presidential Libraries expects that the President's budget submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist for funding 15 new archivists for processing Presidential records.  Robison Decl. ¶ 24.  Additionally, NARA's Office of Presidential Libraries and the Presidential Materials Staff decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records.  Id. ¶ 26.  As a result, a one year pilot project was initiated to implement the most promising proposals.  Id.  Such proposals include halting the time-consuming routine referral of classified records to originating and/or equity agencies.  Id.  NARA is also expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project, which, when operational, will give the Library the means to preserve, process, and provide sustained access to electronic records including Presidential electronic records.  Id. ¶ 22.

**B.      Plaintiff's FOIA Request**

By letter dated April 4, 2006, more than two months after the five-year moratorium on the public disclosure of Clinton Presidential Records had been lifted, Plaintiff submitted a FOIA request to the Clinton Presidential Library, seeking access to "Clinton Presidential records," specifically:  "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton (hereafter "Task Force"), to include but not limited to any and all sub-elements of the Task Force."[6]  Robison Decl. ¶ 4; see also id. at Exhibit 1, attached

---

[6]    The Task Force on National Health Care Reform was established by President Clinton on January 25, 1993.  The President named First Lady Hillary Rodham Clinton as the chairman of the Task Force, and appointed as its other members the Secretaries of the Health and Human Services, Treasury, Defense, Veterans Affairs, Commerce, and Labor Departments, as well as the Director of the Office of Management and Budget, and three White House advisers.  President Clinton charged this body with the task of listening to all parties and then preparing health care reform legislation to be submitted to Congress within 100 days of President Clinton taking office.  See 29 Weekly Comp. Pres. Doc. 96-97 (Feb. 1, 1993).

thereto.  Plaintiff also requested a waiver of search and duplication fees.  Id. ¶ 4; see also id. at Exhibit 1 at 2-6.

The Supervisory Archivist for the Clinton Presidential Library replied by letter dated April 10, 2006, noting that an initial search of the Library's textual, electronic, and audiovisual Presidential records revealed approximately 3,022,030 pages of textual records, 2,884 pages of electronic records, 1,021 photographs, 3 videotapes and 3 audiotapes that may be responsive to Plaintiff's request (which was assigned case number 2006-0885-F).  Robison Decl. ¶ 31; see also id. at Exhibit 3, attached thereto.  In addition, she explained that "[t]here are approximately 13,400 pages of the White House Health Care Interdepartmental Working Group papers concerning the Task Force open and available for research."[7]  Robison Decl. ¶ 31.  The 13,400 pages comes from a much larger collection of 550,000 pages of records from the White House Health Care Interdepartmental Working Group that were made publicly available in 1994. Robison Decl. ¶ 30.  Indeed, the Clinton Library has more records opened on the subject of health care than on any other single topic.  Id.

The Supervisory Archivist then explained the Library's review process, outlining how the Library processed FOIA requests for records covered by the PRA and placed the request in a FOIA queue:

> The staff of the Clinton Library is currently processing and reviewing FOIA requests that precede your request.  To treat everyone equitably, we have placed your request in our complex unclassified processing queue by the date it was received in our office.  FOIA requests received by the Clinton Library are processed and reviewed for access under provisions of the PRA and FOIA and are subject to Executive Order 13233, which requires that we notify the representatives of the former President and the incumbent President prior to the release of any Presidential records.

---

[7] President Clinton created the White House Health Care Interdepartmental Working Group at the same time that he created the Task Force on National Health Care Reform.  The Interdepartmental Working Group was created to gather information, generate ideas, and formulate alternative options for consideration by the Task Force.  See Clinton Presidential Library Finding Aid on the Interdepartmental Working Group, at http://www.clintonlibrary.gov/documents/Finding_Aid_HealthCare.pdf

Id. at Exhibit 3.  As was acknowledged by Plaintiff, sometime thereafter, staff at the Clinton Presidential Library assisted Plaintiff during its research visits to the Library.  Id. at Exhibit 4, attached thereto.

On July 25, 2006, Plaintiff sent a second letter to the Library, acknowledging the "processing and review procedures . . . under the provisions of the FOIA, the [PRA], and Executive Order 13233," and requesting a status update and estimated date of completion for six of its pending FOIA requests to the Library, including its request for records of the Task Force. Id. at Exhibit 4; see also id. ¶ 32.  The Supervisory Archivist responded on August 9, 2006, identifying 155 FOIA requests pending before Plaintiff's request and at least 2,000,000 pages of records to process before Plaintiff's request would reach the front of its queue.  Robison Decl. ¶ 32; see also id. at Exhibit 5, attached thereto.  She further explained that she could not provide an estimated date of completion, in part because the Clinton Presidential Library had only been processing FOIA requests for a period of less than seven months.  Id.

On January 16, 2007, Plaintiff again requested a status update and an estimated completion date.  Robison Decl. ¶ 32; see also id. at Exhibit 6, attached thereto.  The Supervisory Archivist responded on February 9, 2007, explaining that the FOIA request had moved up in its processing queue, but that it had not yet reached the front of the queue.  Id.; see id. at Exhibit 7.

Thereafter, Plaintiff's FOIA request was moved into the Library's newly-created multi-request queue because the Library has received other FOIA requests for records concerning the Task Force on National Health Care Reform.  Robison Decl. ¶ 33.  Prior to receiving Plaintiff's FOIA request, the Clinton Presidential Library received two FOIA requests (from third parties), that either directly related to, or were subsumed within, Judicial Watch's broad request for *all* of the Task Force's records.  The first of these requests was for "Ira Magaziner files on Health Care Task Force/Health Care Reform."[8]  Id.  This request is currently at the front of the multi-request queue, and there are a total of three requests pending in the other queues in rotation which must

---

[8] Ira Magaziner was President Clinton's senior policy advisor at the time that the Task Force was created; he was one of the three White House advisors who were also members of the Task Force.  See 29 Weekly Comp. Pres. Doc. 96-97 (Feb. 1, 1993).

be processed before the Library reaches this request.  Id.   There are an estimated 154,330 pages of records responsive to this request, 72,000 of which represent Ira Magaziner's Task Force records that will be processed first.  Id.  The second of these requests was for "Hillary Clinton files on Health Care Task Force/Health Care Reform."  Id.  There are an estimated 90,000 pages of records responsive to this request, 30,000 of which represent Hillary Clinton's Task Force records.  Id.  There are a total of 43 FOIA requests pending before this request.  Id.[9]

At present, the Library's best estimate is that it will *begin* processing the first of the two third-party requests within this calendar year.  Robison Decl. ¶ 38.  The second third party request will then be processed as it arises in the FOIA queue.  Once the Library completes processing each of these requests, or segments of these requests, the representatives of the former and incumbent Presidents must be given an opportunity to review the records.  Robison Decl. ¶ 35.  After that review process has been completed, the Library will be able to release these records and notify both the third party requester and Plaintiff that the records are open.  Id.

As for the remainder of Plaintiff's FOIA request (i.e., that portion of the FOIA request that is not processed in response to the prior third party requests), that request is currently sixth in line in the multi-request queue and there are a total of 82 FOIA requests pending before it in the queues in rotation.  Robison Decl.  ¶ 34.  If the Library is to process the full remainder of this request, the Library intends to allow for presidential review of the materials as the Library completes its review of portions of the responsive documents.  See id. ¶ 36.  Therefore, presidential review of the documents can occur incrementally, and as reasonably segregable subseries of documents have undergone that review, NARA can inform Judicial Watch of the Clinton Presidential records that are available and whether any records within that portion are being withheld.  Id.

---

[9] The records responsive to these two, third party requests would not, however, fully satisfy Plaintiff's all-encompassing request, as Plaintiff has not requested a simple subset of Task Force records, or a particular member's Task Force records, but instead have requested *all* of the Task Force's records.

## LEGAL STANDARDS

Defendant moves to dismiss this action under Federal Rules of Civil Procedure 12(b)(1), or in the alternative, under Rule 12(b)(6). The district court may consider matters outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction. Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Under the FOIA, "federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'" Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150 (1980). "Unless each of these criteria is met, a district court lacks jurisdiction to devise remedies to force an agency to comply with the FOIA's disclosure requirements." U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989); see also Kissinger, 445 U.S. at 150 ("Judicial authority to devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by § 552, if the agency has contravened all three components of this obligation."). Thus, where a request fails to comply with the FOIA's requirements, and the agency, therefore, has not improperly withheld anything pursuant to the FOIA, the court can dismiss the complaint for lack of jurisdiction. See, e.g., Dale v. IRS, 238 F. Supp. 2d 99, 107 (D.D.C. 2002) (concluding that because the plaintiff did not comply with the "requirement that the records sought be 'reasonably' described" and "did not make a 'firm commitment' to pay the fees associated with his FOIA search . . . the court is without jurisdiction over this action"); Kuffel v. U.S. Bureau of Prisons, 882 F. Supp. 1116, 1120 (D.D.C. 1995) (dismissing claims for lack of jurisdiction after finding that the agency conducted a good faith, reasonable search for records and that "the FOIA requirement that 'agency records' exist to be 'improperly withheld' cannot be met").

Other cases have found that a failure to comply with the FOIA's requirements is more properly the subject of a motion to dismiss for the failure to state a claim upon which relief can be granted. See Sweetland v. Walters, 60 F.3d 852, 855 (D.C. Cir. 1995) (dismissing FOIA claim under Rule 12(b)(6) where plaintiff could not show that the records in question were agency records under FOIA, and noting that the district court has subject matter jurisdiction over

substantive claims arising under the laws of the United States); <u>Nurse v. Sec'y of Air Force</u>, 231 F. Supp. 2d 323, 330 (D.D.C. 2002) (finding that the plaintiff failed to state a claim upon which relief can be granted, and granting summary judgment to defendant, because plaintiff failed to reasonably describe the records requested).[10]  In reviewing a motion to dismiss under Rule 12(b)(6), "the Court must accept all well-pleaded allegations as true, construing them in the light most favorable to the plaintiff."  <u>Jackson v. Bush</u>, 448 F. Supp. 2d 198, 200 (D.D.C. 2006). However, the court need not accept unsupported inferences or legal conclusions drawn by the non-moving party.  <u>Am. Hist. Ass'n v. Nat'l Archives and Records Admin.</u>, 516 F. Supp. 2d 90, 102 (D.D.C. 2007)

In the alternative to a dismissal, Defendant moves this Court to stay the proceedings pursuant to 5 U.S.C. § 552(a)(6)(C), and <u>Open America v. Watergate Special Prosecution Force</u>, 547 F.2d 605 (D.C. Cir. 1976).  Generally, the Court may "allow the agency additional time to complete its review of the records" upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request."  5 U.S.C. § 552(a)(6)(C)(i).  The legal standard for granting a stay will be explored in greater detail below.

## DISCUSSION

### I.      Plaintiff's Claims Should be Dismissed Because its Request is Inadequate Under the FOIA

A request is inadequate under the FOIA if it will inflict an undue or unreasonable burden on the agency that must respond to that request.  Plaintiff's FOIA request for "[a]ny and all records of the Task Force on National Health Care Reform" imposes such an undue burden on the Clinton Presidential Library, as it would require the Library to process well over three

---

[10]  If this Court finds that the issue presented by Defendant's Motion to Dismiss is not a jurisdictional one, it should consider the motion under Federal Rule of Civil Procedure 12(b)(6). Although Defendant submits that, as to its Motion to Dismiss, the Robison declaration is used predominantly for background information, if this Court's consideration of the declaration on this issue then converts the instant motion into one for summary judgment, the Court should nonetheless award summary judgment to Defendant.   Summary judgment is to be freely granted pursuant to Federal Rule of Civil Procedure 56 where there are no material facts genuinely at issue, and the agency is entitled to judgment as a matter of law.  <u>See, e.g.</u>, <u>Burka v. U.S. Dep't of Health & Human Servs.</u>, 87 F.3d 508, 514 (D.C. Cir. 1996).

million pages of documents under the PRA and FOIA's statutory scheme. Although the sheer magnitude of a FOIA request is not a traditional reason for granting relief from the strictures of the FOIA, a request of this scale is not a traditional request, and compliance with such a request appears to be unprecedented in this circuit's published case law.[11] Because the breadth of Plaintiff's request in this case would impose an exceedingly unreasonable burden on the Library, rendering the request inadequate under the FOIA, Plaintiff's Complaint should be dismissed for lack of jurisdiction or for failure to state a claim upon which relief can be granted.

### A.    A Request is Inadequate Under the FOIA if it Would Require the Agency to Expend an Unreasonable Amount of Effort to Satisfy the Request

A request under the FOIA must "reasonably describe" the records sought. See 5 U.S.C. § 552(a)(3).[12] This requirement has often been analyzed in the proverbial "needle in a haystack" scenario – that is, where the agency would have to conduct an unreasonably onerous search of a large volume of records in order to identify and locate the responsive documents. See, e.g., Dale, 238 F. Supp. 2d at 104-05 (finding that a FOIA request for any and all documents that refer or relate in any way to the requester was subject to dismissal because the "request amounted to an all-encompassing fishing expedition of files at IRS offices across the country," and did not permit an IRS employee to locate the records with a reasonable amount of effort); Marks v. United States, 578 F.2d 261, 263 (9th Cir. 1978) (finding that a FOIA request that required a search of every FBI field office would not reasonably describe the records sought).

What is evident from this jurisprudence is that the reasonable description requirement is measured by the effort that must be expended by the agency to satisfy the FOIA request. See

---

[11] In Armstrong v. Bush, 139 F.R.D. 547 (D.D.C. 1991), the plaintiff sued to prohibit the destruction of material stored on a particular computer system and simultaneously filed a FOIA request for that information. The government denied the FOIA request, contending that it would have to print out and then process over seven million pages of material to respond to the request. Id. at 553. Thereafter, the "plaintiffs [did] not appear to seriously dispute that the initial [FOIA] request was unduly broad." Id.

[12] Prior to a 1974 amendment of the FOIA, the statute required that a request made under the FOIA be for "identifiable records." See Pub. L. 93-502, § 1(b)(1). This provision was amended to its current form, which requires that a request "reasonably describes" the records sought.

<u>Dale</u>, 238 F. Supp. 2d at 104 ("A description 'would be sufficient if it enabled a professional employee of the agency who was familiar with the subject area of the request to locate the record with *a reasonable amount of effort*.'") (internal quotation marks omitted) (emphasis added); <u>Marks</u>, 578 F.2d at 263 (same). Thus, the courts have recognized that the question of whether or not a request "reasonably describes" records demands an underlying inquiry into the relative context of the agency's systems of records and the records themselves. For example, in <u>Goland v. CIA</u>, 607 F.2d 339 (D.C. Cir. 1978), the D.C. Circuit stated that "[i]t is well established that an agency is not required to reorganize its files in response to a plaintiff's request in the form in which it was made, and that if an agency has not previously segregated the requested class of records production may be required only where the agency can identify that material with reasonable effort." 607 F.2d at 353 (internal quotations and citations omitted). The court then dismissed the FOIA request because the agency's affidavit "plainly show[ed] that the *effort required* to locate the hypothesized 'back-up' documents would be unreasonable" in that case. <u>Id.</u> at 353-54 (emphasis added).

Even in situations where the FOIA request actually does describe documents with "sufficient precision to enable the agency to identify them" the agency still need not comply with a request that is "so broad as to impose an unreasonable burden upon the agency . . . ." <u>Am. Fed. of Gov't Employees, Local 2782,</u> 907 F.2d 203 at 209 (emphasis added); <u>see</u> <u>Judicial Watch, Inc. v. Export-Import Bank</u>, 108 F. Supp.2d 19, 26-28 (D.D.C. 2000) (noting that "[a] description of the requested documents is adequate if it enables a professional agency employee familiar with the subject area to locate the record with a reasonable amount of effort. *Further*, a request can be inadequate if it imposes an unreasonable burden") (internal citation omitted) (emphasis added); <u>Nation Magazine v. U.S. Customs Serv.</u>, 71 F.3d 885, 891-92 (D.C. Cir. 1995) (finding that a search through 23 years of unindexed files for records pertaining to H. Ross Perot imposed an unreasonable burden on the agency); <u>Irons v. Schuyler</u>, 465 F.2d 608, 613 (D.C. Cir. 1972) (holding that although the request for "all unpublished manuscript decisions of the Patent Office" did "describe in general a type of record. . . the contours of the records thus

described are so broad *in the context of the Patent Office files* as not to come within a reasonable interpretation of 'identifiable records' as this statutory language is used in paragraph (a)(3).") (emphasis added).  At bottom, the amount of effort that must be expended by the agency is evaluated because the "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters."  Assassination Archives and Research Center, Inc. v. CIA, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd in part, 1990 WL 123924 (D.C. Cir. 1990) (per curiam).

### B.    An Overbroad Request Can Require the Expenditure of an Unreasonable Amount of Effort by the Agency

Courts have not explicitly confined the reasonableness inquiry to the "needle in a haystack" context.  Indeed, several courts have suggested that there are other scenarios which challenge the reasonable limits of a FOIA request.

For example, courts have noted that broad requests or broad interpretations of requests would be improper under the FOIA.  See, e.g., Hunt v. Commodity Futures Trading Commission, 484 F. Supp. 47, 51 (D.D.C. 1979) (rejecting the requesters' broader interpretation of their FOIA request as including information concerning the requesters *and* any other large commodity trader, where the request was only for information that "concerned" the requester, because such a broad interpretation would "expand their original FOIA request to include virtually every piece of paper in Commission files nationwide"); Gaunce v. Burnett, 849 F.2d 1475 (9th Cir. 1988) (unpublished) (finding that a request for "every scrap of paper wherever located in the agency which related to [the requester's] activity in the world of aviation" was "unreasonably vague" and that such "broad, sweeping requests" were not permissible under the FOIA. Id. at *1 (internal quotation marks omitted).

So, too, in American Federation of Government Employees, the D.C. Circuit held that a "broad" request for "every chronological office file and correspondent file, internal and external, for every branch office, staff office [etc.]" imposed an "unreasonable burden upon the agency" because the request would require the agency not only to locate the records, but also to "*review,*

*redact, and arrange for inspection a vast quantity of material*." 907 F.2d at 209 (emphasis

added). Thus, in considering the burden that a FOIA request would impose upon an agency, the

court in American Federation of Government Employees considered more than the work

involved in merely searching for the records, but also considered the burden that the breadth of

the request would impose for the review and processing of the materials.[13] Later, in Nation

Magazine, the D.C. Circuit reasoned that, "[t]o be sure, there are some limits on what an agency

must do to satisfy its FOIA obligations. For example, a request to inspect 'every chronological

file, internal and external, for every branch office, staff office [etc.]' of the Census Bureau . . .

was held to be unreasonable." Id. at 891 (citing Am. Fed'n of Gov't Employees, Local 2782,

907 F.2d at 208-209). Consequently, the general principle that a FOIA request could impose an

unreasonable burden on an agency due to the sheer breadth of the request finds support in the

D.C. Circuit's FOIA jurisprudence. In addition, overbreadth in the context of a FOIA request

has also been analogized to the discovery context, where overbroad requests are objectionable.

See Com. of Mass. v. HHS, 727 F.Supp 35, 36 & n.2 (D. Mass 1989) (noting that "[a] request for

all documents 'relating to' a subject is usually subject to criticism as over-broad . . . . Such a

request thus unfairly places the onus of non-production on the recipient of the request and not

where it belongs– upon the person who drafted such a sloppy request. Just as such requests are

objectionable under [FRCP] 26(b)(1), so ought they be objectionable under the [Freedom of

Information] Act.").

     Moreover, a request for the entire "haystack," at some point, must be unreasonable under

the FOIA if the prevailing "needle in a haystack" case law is to be given any effect. Irons v.

---

[13] Several years prior, in Yeager v. Drug Enforcement Administration, 678 F.2d 315
(D.C. Cir. 1982), where the FOIA requester sought all the records within a particular computer
system of the agency, the court noted that "[a]lthough the number of records requested appears
to be irrelevant to the determination whether they have been 'reasonably described,' appellees'
overbreadth argument raises serious questions concerning the allowable scope of FOIA
requests." Id. at 326. In that case, there were approximately one million individual records (not
pages) at issue, id. at 321 & n 13, each record consisting of a single database entry of an
individual's information, id. at 317 & n.2. The court in Yeager ultimately found that the FOIA
request reasonably described the records, but the court limited its finding to the "circumstances
of [that] case." Id. at 326.

Schuyler provides an apt example.  There, the D.C. Circuit held that a request for "all unpublished manuscript decisions of the Patent Office" was so broad in the context of the Patent Office files as not to come within a reasonable interpretation of "identifiable records" because it would have required the agency to search through the "more than 3,500,000 files of patents, approximately 100,000 files of patent interferences . . . approximately 180,000 pending patent applications, and well over a million of abandoned patent applications" as any of these might have contained unpublished manuscript decisions.  465 F.2d at 611.  The court therefore dismissed the request because it would have imposed an unreasonable burden on the agency. Irons and subsequent jurisprudence cannot be read so narrowly as to apply only in situations where the *search* for documents – as opposed to the processing of documents – is unduly burdensome.  Otherwise, a FOIA requester can always circumvent a dismissal by simply asking for the entire haystack.  In Irons, rather than asking for only the "unpublished manuscript decisions" of the Patent Office, the requester could have asked for all files of the Patent Office. Such a request would not pose a specific problem of identification or search, but surely, such a request would be unreasonable under the FOIA.  Cf. Hunt, 484 F. Supp. at 51 (rejecting the requesters' broader interpretation of their FOIA request which would have included "virtually every piece of paper in Commission files nationwide"); Mason v. Callaway, 554 F.2d 129, 131 (4th Cir. 1977) ("[Requests for] all correspondence, documents, memoranda, tape recordings, notes, and any other material pertaining to the atrocities committed against plaintiffs, . . . including, but not limited to, the files of [various government offices] . . . typifies the lack of specificity that Congress sought to preclude in the requirement of 5 U.S.C. § 552(a)(3) that records sought be reasonably described.").

### C.    Plaintiff's FOIA Request for "Any and All Records of the Task Force" Imposes an Unreasonable Burden on NARA and Therefore Plaintiff has Failed to Make a Proper Request Under the FOIA

In the present case, Plaintiff's request for "[a]ny and all records of the Task Force on National Health Care Reform" imposes an exceedingly unreasonable burden on the Library due to its scope and sheer volume of responsive documents.  First, the Task Force itself was a

complex entity created by President Clinton, with First Lady Hillary Rodham Clinton as the chairman and several agency heads as its members, including the Secretaries of the Health and Human Services, Treasury, Defense, Veterans Affairs, Commerce, and Labor Departments, as well as the Director of the Office of Management and Budget, and three White House advisers. Therefore, "any and all" records of this complete entity would include records from each and every one of its members and records that the members may have obtained from any other sources.  As noted in its correspondence with Plaintiff, the Clinton Library estimated that over three million documents are responsive to Plaintiff's request for any and all records "of the Task Force." <u>See</u> Robison Decl. at Exhibit 3.  The Library remains confident to this day that this request would involve in the range of three million pages of responsive records.  <u>Id.</u> at ¶ 37. That makes this request the largest FOIA request that the Clinton Presidential Library has received to date, and indeed it is larger than any FOIA request ever received to date by any of the other PRA Libraries.  Robison Decl.  ¶ 37.

Second, at least 13,400 pages of the White House Health Care Interdepartmental Working Group papers specifically concerning the Task Force have already been opened and are available for research.  <u>See</u> Answer at  ¶ 8.  Moreover, requests for the Task Force records of both Ira Magaziner and Hillary Clinton, were made prior to Judicial Watch's request.  Records responsive to those requests will begin to arise in the queue within this calendar year for processing by the Library.  Robison Decl.  ¶ 38.  Consequently, requests that are more specific and manageable in scope concerning the Task Force have been, or are, in the process of being released.  By comparison, however, Plaintiff's FOIA request is unreasonably broad.  Plaintiff's request would require the Library to process millions of pages under the PRA and FOIA's statutory schemes and time table and conduct a manual page-by-page, line-by-line review in order to redact materials protected by the PRA and the FOIA.[14]   Although NARA cannot

---

[14]   In addition to the approximately three million pages of textual records, 1,021 photographs, and six video and audio tapes, the Library would have to review an estimated 2,884 pages of electronic records, including the time-consuming process of converting any unreadable attachments to emails into a readable form for processing.

provide an exact estimate of how long it would take to complete the processing of such a massive set of records, based on the amount of records that the Library has processed within its first two years of receiving FOIA requests, and the number of personnel processing such requests, it is reasonable to expect that the processing of three million pages would take at least several years for the agency to complete, once the processing began.  See generally Robison Decl.  ¶ 38-40.

Such a review of documents is unreasonable under the FOIA's statutory scheme, which allows the agency an initial 20 days to respond to FOIA requests.  While the FOIA and Open America jurisprudence provide the agency a mechanism to seek a stay under exceptional circumstances, the onus should not be on the agency to seek this type of extraordinary relief any time a requester makes an overbroad request.[15]  Further, without limits to the reasonable breadth of a FOIA request, agencies and the courts faced with voluminous requests will always be forced into an extended court-monitored administrative process.  Other FOIA requesters who seek records from these agencies will suffer undue delay or have their requests pushed further down the queue by those with the resources to file a FOIA suit and obtain a court ordered resolution of their request.  A request that presents such an unreasonable burden on an agency is not proper under the FOIA and therefore Plaintiff's claims should be dismissed.[16]  Cf. Judicial Watch, Inc., 108 F. Supp.2d at 26-28 (finding that a request seeking "all records pertaining to contacts" between two individuals and any entities related to China was "unreasonably broad" and

---

[15]  The showing that an agency must make under Open America v.Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976) and its progeny generally centers on the agency's FOIA system and backlog as a whole.  In the present case, the current backlog of FOIA requests at NARA that precedes Judicial Watch's request is a separate and distinct issue from the burden presented by Judicial Watch's overbroad request.

[16]  Defendant notes that due to the unique mission of NARA and the independent obligation on the Archivist under the 44 U.S.C. § 2203(f)(1) to make Presidential records available to the public as rapidly and completely as possible, the records requested by Plaintiff will ultimately be reviewed and processed for public release regardless of whether Plaintiff's claims are dismissed.  By this motion, Defendant only seeks relief from any obligations under the FOIA's statutory framework and timetable.

"burdensome," and therefore the request itself was deemed "inadequate" and no FOIA search was necessary).

## II.     Alternatively, this Court Should Grant a Stay of Proceedings to Permit the Clinton Presidential Library to Process its FOIA Requests in a Fair and Orderly Manner

In the alternative, this Court should take one of two approaches:  (1) hold Defendant's Motion to Dismiss in abeyance and grant Defendant's Motion for a Stay of Proceedings until Plaintiff's FOIA request reaches the front of its queue, at which point the Court could consider the Motion to Dismiss, or the Motion may be mooted by subsequent narrowing of the request;[17] or (2) grant Defendant's Motion for a Stay of Proceedings in order for Plaintiff's request to reach the front of its queue and to provide the Library with sufficient time to then process that request.

### A.     The Clinton Presidential Library Can Demonstrate Exceptional Circumstances Warranting a Stay of Proceedings

An agency receiving a FOIA request generally must determine whether to comply with the request within 20 working days.  See 5 U.S.C. § 552(a)(6)(A)(i).  Once the initial twenty days has passed without an agency determination on the request, the FOIA requester "shall be deemed to have exhausted his administrative remedies," id. at § 552(a)(6)(C)(i), and the requester can file suit in federal court.  The Court may, however, "allow the agency additional time to complete its review of the records" upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." Id. § 552(a)(6)(C)(i).  The leading case construing section 552(a)(6)(C)(i) was the D.C. Circuit's decision in Open America v.Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir.

---

[17]   The parties are discussing possible narrowing of the present FOIA request.  Most recently, Plaintiff has indicated that it might, for example, consider excluding certain litigation records and media reports relating to the Task Force from its request.  It is not clear how many, if any, of these records fall within the scope of records that the Library has identified as potentially responsive to Plaintiff's request for "all records" of the Task Force.  However, the Library intends to continue these discussions with Plaintiff and to assist the Plaintiff in any way it can in determining how the request could be narrowed.  Defendant will promptly notify the Court if the parties are able to achieve any significant narrowing of the request at issue.

1976), which held that an agency is entitled to additional time to process a FOIA request under §
552(a)(6)(C) when it:

> is deluged with a volume of requests for information vastly in excess of that
> anticipated by Congress, when the existing resources are inadequate to deal with
> the volume of such requests within the time limits of subsection (6)(A), and when
> the agency can show that it "is exercising due diligence" in processing the
> requests.

Id. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)); see also Oglesby v. U.S. Dep't of the Army, 920
F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional
circumstances have prevented it from responding on time, the court will refrain from ruling on
the request itself and allow the agency to complete its determination.").  The court noted that
section 552(a)(6)(C) "was designed and inserted specifically as a safety valve for [FOIA]."
Open Am., 547 F.2d at 610.  The Open America decision also recognized that the "real parties at
interest" may not be the ones before the Court but the "other persons or organizations who made
requests prior" to the plaintiff.  Id. at 614.  "If everyone could go to court when his request had
not been processed within thirty days, and by filing a court action automatically go to the head of
the line at the agency, we would soon have a listing based on priority in filing lawsuits, i.e., first
in court, first out of the agency."  Id. at 615.  Thus, a plaintiff is not entitled to jump ahead of the
line solely because it filed a lawsuit.

    As part of the Electronic Freedom of Information Act Amendments of 1996, Congress
amended 5 U.S.C. § 552(a)(6)(C), affirming the proposition in Open America, and clarifying that
even a "predictable agency workload of requests" could constitute "exceptional circumstances"
when an agency could demonstrate "reasonable progress in reducing its backlog of pending
requests."  See 5 U.S.C. § 552(a)(6)(C)(ii) & (iii); H.R. Rep. No. 104-795, at 24, reprinted in
1996 U.S.C.C.A.N. 3448, 3467 (noting that the FOIA Amendments were "consistent" with the
holding in Open America).

    In the D.C. Circuit, the current articulation of the standard for granting a stay pursuant to
the FOIA and the Open America doctrine is as follows:

> [A]n Open America stay may be granted (1) when an agency is burdened with an
> unanticipated number of FOIA requests; and (2) when agency resources are

> inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency shows 'reasonable progress' in reducing its backlog of requests.

Elec. Frontier Found. v. U.S. Dep't of Justice, 517 F. Supp.2d 111, 120 (D.D.C. 2007) (internal quotation marks omitted); Appleton v. FDA, 254 F. Supp. 2d 6, 8 (D.D.C. 2003) (noting first three factors); Ctr. for Pub. Integrity v. U.S. Dep't of State, 2006 WL 1073066, *2 (D.D.C. 2006) ("the amendments link the requirement to demonstrate 'reasonable progress' to those cases where an agency claims exceptional circumstances based on 'predictable agency workload' . . . . The legislative history contemplates that where an agency faces an 'unforeseen' increase in FOIA requests and the request for a stay is not based on a 'routine backlog,' a stay may be justified notwithstanding the lack of a reduction in the backlog.") (citing H.R. Rep. No. 104-795, at 24).

"When considering a request for an Open America stay, [a]gency affidavits are accorded a presumption of good faith" by the court. Elec. Frontier Found., 517 F. Supp.2d at 117 (internal quotation marks omitted). As will be shown below and through the attached declaration, the Clinton Presidential Library can demonstrate that exceptional circumstances exist, warranting a stay in this case.

### 1.   The Clinton Presidential Library Has Received an Unprecedented Number of FOIA Requests

Notwithstanding the various preparations for FOIA processing that were taken by the Clinton Presidential Library, including reviewing the procedures of other Presidential libraries, undergoing training sessions, categorizing and preparing the Library's voluminous collection for FOIA processing, and systematically processing over a million pages of records, several factors have culminated in an unanticipated volume of FOIA requests and unanticipated delays in the Library's ability to process such requests.

First, the five-year moratorium on disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests on that date. The Library is therefore still in its infancy in receiving and processing requests, and is continuing to

develop and refine its queue structure for efficient processing.  In the first three months after January 20, 2006 alone, the Clinton Presidential Library received approximately 210 FOIA requests, totaling around 5,260,000 pages of records.  Robison Decl. ¶ 16. By the end of its first year of processing FOIA requests, the Library had received over 336 FOIA requests.  Id. ¶ 23. As of January 24, 2008, the Library has received a total of 430 FOIA requests.  Id. ¶ 16.

To place these FOIA requests for Clinton Presidential records in their proper context, it is useful to compare and contrast the experiences of the other PRA libraries.  While the Clinton Library received over 336 FOIA requests in its first year of processing, the George H.W. Bush Presidential Library and the Ronald Reagan Presidential Library both received approximately 100 FOIA requests in their respective first years of processing FOIA requests. Id. ¶ 23.  Thus, the Clinton Presidential Library received an unexpected number of FOIA requests in its first year of processing, representing a three-fold increase in the requests made to the two most recent Presidential Libraries.  Id. ¶ 23.  This increase in number of requests is compounded by the fact that despite the best efforts of the Clinton Presidential Library staff, and unlike the experience of NARA staff at the other Presidential libraries, the FOIA requesters to the Clinton Library have been less willing to substantially narrow broad and far-ranging requests.  Id.  It is clear, therefore, that within the Open America context, the Library has experienced an unanticipated number of FOIA requests.  See Elect. Frontier Found., 517 F. Supp.2d at 119 (finding that an additional one-third as many requests per month, coupled with staff shortages demonstrated that the agency had been deluged with a number of unanticipated requests);  Open America, 547 F.3d at 617 (Leventhal, J., concurring) (noting that the government's showing that the number of FOIA requests had increasing at an unforeseen rate was supported by its affidavit which compared the requests received by the agency in years past).

In addition, the sheer total volume of records held at the Clinton Library has itself contributed to unanticipated delays in the Library's ability to process FOIA requests after January 2006.  As stated earlier, the Clinton Library holds an estimated 78 million pages of Presidential textual records.  By comparison, the Reagan Library holds approximately 43.8

million pages of textual records, and the Bush Library holds about 33.7 million pages of textual records.  Robison Decl. ¶ 21.  Beyond that, the Clinton Library also holds an estimated 20 million presidential electronic mail records, 2 million electronic cables and 60 other electronic systems, which is orders of magnitude greater than similar electronic record holdings elsewhere in these other Libraries, and, if printed in a textual format, would rival in size the entire volume of Presidential records generated during the eight years of President Reagan's administration. Id.  This increase in the volume of holdings and variety of formats of media necessarily requires more complex and time consuming searching and pulling of records, and demands greater efforts to maintain intellectual control over this vast collection of records through traditional hard copy finding aids and electronic indices of various kinds.  Id.

As the first Presidential Library to have a significant volume of born-electronic records, the Clinton Presidential Library has received FOIA requests for more than one million emails in the twenty months since Clinton Presidential records became subject to FOIA.  Id. ¶ 22.  While NARA is expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project, and while upgrades in functionality have been made to the system that currently holds Clinton Presidential electronic records, the Clinton Library must print electronic records to paper prior to arranging, reviewing, and describing them.  Id.  Additionally, the Clinton Library archival staff has spent large amounts of staff time on an unanticipated process known as a "de-hexification," a process converting attachments to individual email records that cannot be read due to an unknown or unreadable file into something approaching readable form.  Id.

### 2.    The Clinton Presidential Library Has Limited Resources, Inadequate to Process the Flood of FOIA Requests Within 20 Days

The Clinton Presidential Library can allocate no more than six archivists for processing all of its pending FOIA requests for textual and electronic records, (as represented in the thirteen non-AV queues) as a portion of their overall job duties and responsibilities.  Robison Decl. ¶ 18. Counting each archivist as a "Full Time Equivalent" or "FTE" position in government,

approximately 51.5% of total FTE time has been devoted to processing FOIA requests.  Id.  This processing requires not only page-by-page, line-by-line review to ensure that all exempt information is properly identified and redacted, but also includes the time-consuming tasks of searching for, arranging, describing, and performing basic preservation on the responsive records.  Id.  Also included in this process is the time required to conduct reviews of records as needed in response to ongoing discussions with representatives of the former President.  Id.

Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent on reference services, including answering all incoming general reference requests from the public, as well as requests received from places such as the White House, the Clinton Foundation, the former President, government agencies, and others.  Robison Decl. ¶ 19. Archivists also staff the Library's textual and audio-visual research rooms when researchers are present.  Id.  During this time, archivists have responded to 3,600 separate reference inquiries. Id.  Archivists staff the Library's textual and audio-visual research rooms when researchers are present, and the Clinton Library has had 432 visits to its research room in this period.  Id. Archivists also spend time responding to what are called "special access" requests under 44 U.S.C. § 2205, including since January 20, 2006, four significant special access requests from the incumbent President, and one from a federal court.  Id.  These requests are often time sensitive and require the review of classified information, thereby adding additional complexity to the work done by the archivists.  Id.  Additionally, archivists spend time improving the functionality of access to electronic records, including working with contractors on upgrades to the Presidential Electronic Record Library known as "PERL."  Robison Decl. ¶ 19.   Finally, archivists spend time working on museum exhibit issues, assisting the Curator with writing text, and dealing with a variety of administrative issues as they arise.  Id.

All of these other responsibilities of the archivists are not insignificant, and they weigh in favor of a finding that the Library has limited resources to process the large volume of FOIA requests within twenty days.  See Ctr. for Pub. Integrity, 2006 WL 1073066, at *3 (recognizing, inter alia, the other responsibilities of the office that handled FOIA requests, including time-

consuming requests from Congress and other federal agencies); <u>Edmonds v. FBI</u>, 2002 WL

32539613, at *2 (D.D.C. Dec. 3, 2002) (noting that the "FOIA personnel also spend time on

administrative appeals, litigation, and large projects," contributing to the exceptional

circumstances warranting an <u>Open America</u> stay).

     Beyond having limited resources available to process the FOIA requests ahead of

Plaintiff's request within the Library's queue, the Library also has limited resources to process

Plaintiff's actual request (of more than three million pages) within the general timetable of the

FOIA.  <u>See</u> Robison Decl. ¶ 39.  Limited resources and staffing shortages contribute to an

exceptional circumstance finding under <u>Open America</u>, as they inherently affect the progress that

can be made by the agency in processing FOIA requests.  <u>See</u> <u>Elect. Frontier Found.</u>, 517 F.

Supp.2d at 119; <u>Ctr. For Biological Diversity v. Gutierrez</u>, 451 F. Supp. 2d 57, 70 (D.D.C. 2006)

(noting that "'[r]easonable progress' is affected, of course, by the number of requests for

information . . . and the budget allocated by Congress.").

     **3.**     **The Clinton Presidential Library Is Exercising Due Diligence in**
                  **Processing FOIA Requests and Has Shown Reasonable Progress in**
                  **Reducing its Backlog**

     NARA is aware of the unprecedented number and volume of FOIA requests received by

the Clinton Presidential Library to date and has been working to address the issue.  Most

significantly, NARA's Office of Presidential Libraries expects that the President's budget

submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist

for funding 15 new archivists for processing Presidential records.  Robison Decl. ¶ 24.   If

funded, the Clinton Presidential Library would receive the largest number of these archival

resources, and this staff would be dedicated to reducing the FOIA backlog at the library.  <u>Id.</u>

     Apart from seeking additional funding for positions, NARA has also taken concrete steps

to address the Clinton Presidential Library's FOIA backlog. For example, as part of a

government-wide effort undertaken in response to Executive Order 13392 to improve the

disclosure of government information, NARA's PRA libraries created multi-request FOIA

queues.  Robison Decl. ¶ 25.  As referenced above, FOIA requests are moved to this queue when

a library receives multiple requests for significant portions of the same series or sub-series of records.  Id.  Once the requests are transferred to the multi-request queue, the library has been systematically processing the entire series or subseries as opposed to individual folders.  Robison Decl. ¶ 25.  Systematic processing is faster than traditional FOIA processing, because it entails processing records in their archival and historical context, rather than simply finding, pulling, and tracking records from many different file series.  Id.  Therefore, systematic processing assists in responding more rapidly to FOIA requesters who wish to gain access to the same or similar files.  Id.  The multi-request queue is part of a larger, complex first-in first-out queue system at the Library, which also supports a due diligence finding.  See generally Ctr. for Pub. Integrity, 2006 WL 1073066, at *4;  Appleton, 254 F. Supp. 2d at 9; Ohaegbu v. FBI, 936 F. Supp. 7, 8 (D.D.C. 1996); Cohen v. FBI, 831 F. Supp 850, 854 (S.D. Fla. 1993).

        In addition, NARA's Office of Presidential Libraries, after discussions with the Supervisory Archivists of the three PRA libraries, undertook an in-house study in the Spring of 2007 to review ways to achieve faster processing of Presidential records, and has initiated a one-year pilot project of the most promising proposals.  Robison Decl. ¶ 26.  NARA is also expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project.  Id. ¶ 22.  Such undertakings serve as further evidence of due diligence.  See Elect. Frontier Found., 517 F. Supp.2d at 118-19 (noting that the agency "continues to make efforts to reduce the backlog and processing time for FOIA requests, by developing the Sentinal Project and establishing the Central Records Complex," which are "expected to reduce the FBI's FOIA request processing time in the long-run"); Appleton, 254 F. Supp. 2d at 9 (noting, inter alia, that the agency implemented new electronic filing and redaction systems).

        Finally, with regard to Plaintiff's request in this case, the Clinton Presidential Library has demonstrated its good faith efforts and due diligence, by quickly assigning the request a FOIA request number, placing it in the multi-request queue once that queue was created, and by always promptly responding to all inquiries by Plaintiff.  The Library also readily informed Plaintiff of

responsive documents that had already been made publicly available, assisted Plaintiff in its research visits to the Library, and has committed to producing documents on a rolling basis or in batches, in an effort to produce records to Plaintiff as quickly as possible while still complying with its obligations under the PRA and FOIA.  Such cooperation by the agency is yet another factor that demonstrates the agency's due diligence.  See Appleton, 254 F. Supp. 2d at 9.

NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints, to address the important issue of expedient FOIA processing.  In addition, while the Library is facing well beyond a "predictable agency workload of requests," it nonetheless has shown reasonable progress in reducing its backlog, processing 72 FOIA requests (representing 225,094 pages of textual and electronic records and 44,363 audio-visual records) since the opening of the Library.  Robison Decl. ¶ 16.  Specifically for Plaintiff's request, the Library's multi-request queue system ensures a fair, but efficient processing of records, demonstrated by the Library's commitment to begin processing a portion of Plaintiff's request within this calendar year.  Moreover, twelve FOIA requests totaling approximately 93,720 pages are currently being processed by Clinton Presidential Library archival staff.  Id. ¶ 33 & n. 3.  As each of these FOIA requests is completed, archival staff will pull the next FOIA request to be processed from its respective queue.  Id.

**B.      Additional Time is Routinely Granted When An Agency Demonstrates, As Here, Exceptional Circumstances**

Courts have frequently issued orders extending the time to respond to FOIA requests, including orders granting stays of several years in length or otherwise permitting agencies several years to process documents under exceptional circumstances.  See, e.g., Elect. Frontier Found., 517 F. Supp.2d at 120 (granting agency's request for a one year stay, with the possibility of further extension at the end of that year if warranted); Piper v. U.S. Dep't of Justice, 339 F. Supp. 2d 13, 16 (D.D.C. 2004) (discussing a stay of two years given to the FBI); Appleton, 254 F. Supp. 2d at 7, 11 (granting FDA's motion to stay proceedings for over a year pending

completion of search and production of documents); <u>Williams v. FBI</u>, 2000 WL 1763680, at *3 (giving the FBI until May 2, 2001, to review records requested prior to August 21, 1998); <u>Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice</u>, 102 F. Supp. 2d 6, 9 & n.1 (D.D.C. 2000) (discussing an order giving the FBI until June 8, 2000, to respond to a request dated July 15, 1997); <u>Edmond v. U.S. Attorney</u>, 959 F. Supp. 1, 4 (D.D.C. 1997) (giving the U.S. Attorney's Office until April 1, 1998, to respond to a request filed August 14, 1992, with the opportunity to seek a further extension if necessary at that time); <u>Jimenez v. FBI</u>, 938 F. Supp. 21, 31 (D.D.C. 1996) (granting FBI's request for a four year stay to respond to the FOIA request); <u>Ohaegbu v. FBI</u>, 936 F. Supp. 7, 8-9 (D.D.C. 1996) (granting request for a one year stay).

Stays and extended periods for processing are particularly important in cases like this, where the agency has shown that it has taken its responsibilities under the FOIA very seriously, by taking reasonable preparations in training its staff and preparing its records, by processing requests in an orderly and fair basis, and, once a problem such as an unanticipated rise in FOIA requests and backlog occurs, by taking significant steps towards alleviating that problem.  While it is regrettable that the Library is currently without greater resources to be able to process all of its FOIA requests within twenty days, it would be even more unfortunate, under these circumstances, to disrupt the Library's queue system and judicially assign Plaintiff's FOIA request for processing before other requests that are ahead of it.  Robison Decl. ¶ 40.  It has been recognized in <u>Open America</u> and its progeny, that such a solution is fraught with inequity.  <u>See</u> <u>Open America</u>, 547 F.2d at 615 ("[B]y fixing a time limitation on agency action and according a right to bring suit when the applicant has not been satisfied within the time limits," Congress could not have intended that "an automatic preference" be given to the FOIA plaintiff where the result is that other "requests will be displaced"); <u>Caifano v. Wampler</u>, 588 F. Supp. 1392, 1394 (N.D. Ill. 1984) (finding that an order that an agency "take action on a plaintiff's [FOIA] request within a specified time period," "would be to 'vault' plaintiff's request over the requests of other individuals who were ahead of him in the FOIA line but who did not seek judicial relief.  This would unfairly prejudice those other individuals, and we will not do that").  The inequity of line

jumping in a situation where the agency has taken reasonable steps to combat delay is even seen outside of the FOIA context.  See, e.g., Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (noting, in a mandamus action concerning delays in the Department of Interior's consideration of a tribal council's petition for federal recognition, that where there was no evidence that the agency was not working on the petition or was treating the petitioner unfairly, "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain") (internal quotation marks and brackets omitted); In re Barr Labs. Inc., 930 F.2d 72, 75 (D.C. Cir. 1991) (finding same, in a mandamus action concerning delays in the FDA's consideration of an application for approval of generic drugs, and noting that where the problem stemmed from a lack of resources, it was for the "political branches to work out").

In this case, the inequitable consequences of vaulting the entirety of Plaintiff's request to the front of the FOIA queue are particularly troubling, given the massive volume of records that this particular request seeks.  Robison Decl. ¶ 40.  Not only would such a solution disrupt the fair and orderly processing of requests, it would do so with a mammoth request that is orders of magnitude beyond what the Clinton Presidential Library staff has experienced to date.  Id. ¶ 38. The resulting disruption and delay in the processing of other FOIA requests would be felt for many years to come.  Id. ¶ 40.  Because NARA can demonstrate both exceptional circumstances and due diligence in handling Plaintiff's request, the Court should stay the proceedings to allow the Library time to process Plaintiff's request in accordance with the Presidential Records Act.

If this Court grants a stay of the proceedings, Defendant respectfully requests that an Order be issued staying the pending proceeding for one year (with an opportunity at that point to seek additional time as needed to complete the processing), in order for the Library to begin processing the first portion of Plaintiff's request (concerning Ira Magaziner's Task Force files). As for the remaining portions of Plaintiff's request, if deemed necessary by this Court, NARA is prepared to submit a status report within 120 days of the entry of any stay, to advise the Court

and Plaintiff of the status of those remaining portions of the request in the Library's FOIA queue.

## CONCLUSION

For all of the reasons noted above, this Court should dismiss this action for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), or for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In the alternative, Defendant respectfully requests that an Order be issued staying the pending proceeding in the manner described above.

Respectfully submitted this 29th day of January, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

OF COUNSEL                     /s/ Varu Chilakamarri
JASON R. BARON                 VARU CHILAKAMARRI (NY Bar)
(DC Bar No. 366663)            Trial Attorney, Federal Programs Branch
Director of Litigation         U.S. Department of Justice, Civil Division
Office of the General Counsel  Tel: (202) 616-8489
NARA                           Fax: (202) 616-8470
8601 Adelphi Road, Suite 3110  varudhini.chilakamarri@usdoj.gov
College Park, MD 20740
Telephone: (301) 837-1499      Mailing Address:
Fax: (301) 837-0293            Post Office Box 883
jason.baron@nara.gov           Washington, D.C. 20044

                               Courier Address:
                               20 Massachusetts Ave., NW, Rm. 7226
                               Washington, D.C. 20001

                               *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that on January 29, 2008, a true and correct copy of the foregoing Defendant's

Motion to Dismiss or, in the Alternative, for a Stay of the Proceedings, and Memorandum of

Points and Authorities was served electronically by the U.S. District Court for the District of

Columbia Electronic Document Filing System (ECF) and that the documents are available on the

ECF system.


                                          /s/ Varu Chilakamarri
                                         VARU CHILAKAMARRI

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,        )
                         )
           Plaintiff,    )
                         )
          v.          )     Civil Action No: 07-1987 (PLF)
                         )
U.S. NATIONAL ARCHIVES AND    )
RECORDS ADMINISTRATION,      )
                         )
                         )
          Defendant.    )
_____)

## DECLARATION OF EMILY ROBISON

    I, Emily Robison, declare as follows:

1.     I am the Deputy Director of the William J. Clinton Presidential Library.  My background, training, and experience is as an archivist, having been continuously employed at the Clinton Presidential Library in the capacity of Supervisory Archivist from February 2002 to August 2004, Deputy Director from September 2004 to May 2007, Acting Director from May 2007 to November 2007, and currently as Deputy Director.   In my current capacity, I assist the Director in supervising the staff of the Clinton Presidential Library, which currently include:  one supervisory archivist who supervises eight archivists, one archives specialist, one archives technician, and a part-time student; one curator who supervises 4.6 full-time equivalent ("FTE") museum staff, one education specialist, 2.3 FTE audiovisual museum staff, and 3.5 FTE admissions clerks; one IT contractor; and five administrative staff members of the Library.

2.        Pursuant to Title 44 of the U.S. Code, Chapter 21, the Clinton Presidential Library is a component of the National Archives and Records Administration ("NARA"), and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.

3.        Due to the nature of my official duties, I am familiar with the procedures followed by the Clinton Presidential Library in responding to requests for Presidential records from its files pursuant to the provisions of the Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and Executive Order 13233.  NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing. See 36 C.F.R. § 1250.22.

4.        Specifically, I am familiar with the treatment which has been afforded the April 4, 2006 FOIA request submitted by Judicial Watch, Inc., seeking "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton (hereafter "Task Force"), to include but not limited to any and all sub-elements of the Task Force." (See Exhibit 1).  That April 4, 2006 FOIA request was assigned FOIA case number 2006-0885-F.  That request also sought a waiver of search and duplication fees.

5.        This Declaration is based on my personal knowledge, as well as facts supplied to me by NARA staff as known to them in the course of their duties.

## PRESIDENTIAL RECORDS ACT OF 1978

6.        The PRA sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records.  See 44 U.S.C. §§ 2201, 2207.  "Presidential records" covered by the PRA include "documentary materials, or any reasonably segregable portion thereof, created or

2

received by the President, his immediate staff, or a unit or individual of the Executive Office of

the President whose function is to advise and assist the President, in the course of conducting

activities which relate to or have an effect upon the carrying out of the constitutional, statutory,

or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). Included among

"Presidential records" are documentary materials created or received by the Office of the First

Lady, when those materials meet the above definition.

7.      Documentary materials deemed Presidential records are the property of the United States,

44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA. Id.

§ 2204. The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative

duty to make [Presidential] records available to the public as rapidly and completely as possible

consistent" with limitations under the PRA. Id. § 2203(f)(1). However, there is no public access

to Presidential records under FOIA until the earlier of (a) five years after the date on which the

Archivist obtains custody of the records, or (b) NARA's completion of processing and

organization of integral file segments of records. Id. § 2204(b)(2). In addition, the President

may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be

restricted with respect to information" within one of six enumerated categories: (1) classified

information designated by Executive order; (2) documents relating to appointments to Federal

office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade

secrets and commercial or financial information obtained from a person and privileged or

confidential; (5) confidential communications requesting or submitting advice, between the

President and his advisers, or between such advisers; or (6) personnel and medical files and

similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal

3

privacy. See 44 U.S.C. §§ 2204(a)(1) – (a)(6). Thus, Presidential records falling into one of the six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA request. The PRA provides that the Archivist's decision to withhold a record within the 12 year period under one of the six enumerated restrictions of the PRA "shall not be subject to judicial review." Id. § 2204(b)(3).

8.      During his time in office, President William J. Clinton asserted the six enumerated restrictions in 44 U.S.C. § 2204(a)(1) – (a)(6) for the full 12 year period. In a letter dated November 6, 2002, President Clinton provided additional guidance to the Archivist, explaining that he intended to ease, for NARA's review and processing purposes, the application of two of the enumerated restrictions of the PRA, namely: § 2204(a)(2), which concerns documents relating to appointments to Federal office; and § 2204(a)(5), which concerns confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers. (See Exhibit 2). President Clinton did not, however, waive these restrictions in their entirety, nor did he eliminate the need for NARA to review and process records under all six of the PRA's enumerated categories. Accordingly, NARA must withhold documents covered by the six restrictions as currently defined in consultation with the former President. Any documents covered by one of the six Presidential restrictions on disclosure are not releasable until January 22, 2013, at which time those processed and restricted records that are not also subject to a FOIA exemption will be proposed for release.

9.      In addition, subject to the limitations on access imposed by § 2204(a) & (b), the PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b), subject to the exception that the (b)(5) exemption, 5

U.S.C. § 552(b)(5), is unavailable. See 44 U.S.C. § 2204(c)(1). Applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. §§ 552(b)(2) & (b)(7), respectively, may apply to records not otherwise covered by one of the PRA restrictions. Such FOIA exemptions, which are applicable in the twelve year period, may also be applied to Presidential records beyond the 12 year PRA restriction period. See 44 U.S.C. § 2204(c)(1). The Archivist may therefore withhold documents from disclosure under FOIA exemptions even when they are not subject to restriction under the PRA.

10.     Once a Presidential Library intends to disclose Presidential records, NARA must notify the incumbent and the former President, through their designated representatives, in order to provide them an opportunity to review the records for any constitutionally-based privileges that may apply. 36 C.F.R. § 1270.46; see also Executive Order 13233, § 3; 44 U.S.C. §§ 2204(c)(2), 2206.

11.     In light of the constitutionally-based provisions of the PRA and Presidential Executive Order 13233, including the requirement of a Presidential notification period, NARA's regulations provide that the agency "cannot expedite requests for Presidential records." 36 C.F.R. § 1250.28(b).[1] Additionally, Judicial Watch did not request that NARA expedite its FOIA request.

---

[1] NARA's regulations at § 1250.28(b) reflect the provisions of prior Executive Order 12667.

12.    NARA has been following the requirements of Executive Order 13233[2] by notifying the representatives of the former and incumbent Presidents of its intent to release non-exempt records, and by providing the representatives an opportunity to review such records.

### FOIA PROCESSING AT THE CLINTON PRESIDENTIAL LIBRARY

13.    NARA received legal custody of the Presidential records of former President Clinton, including records from the Office of the First Lady, on January 20, 2001. These records included approximately 78 million pages of textual records and over twenty million electronic email records and over 60 other Clinton Presidential electronic systems.

14.    Between January 20, 2001 and January 20, 2006, the Clinton Library staff was involved in establishing initial intellectual control over both presidential records and artifacts. Archivists prepared a master location register, combining numerous inventories and in-house databases in preparation for moving all materials to the Library site which opened November 18, 2004, and to assist Library staff in being able to respond to PRA and FOIA requests. Library staff also began to create more detailed "finding aids," which collectively provide a rough index to the holdings of the Clinton Administration at the Clinton Presidential Library, and they responded to numerous special access requests and subpoenas. Library staff also proceeded in this period to process and release over a million pages of Clinton Presidential records systematically. In anticipation of the opening of Clinton Presidential Library records to FOIA processing on January 20, 2006, two archivists on my staff traveled in 2005 to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Presidential Library's handling

---

[2] The Clinton Presidential Library is aware of the recent decision in *American Historical Association v. NARA*, Civ. No. 01-2447, -- F. Supp. 2d --, 2007 WL 2822027 (D.D.C. Oct. 1, 2007) (CKK), which enjoined NARA from relying on section 3(b) of Executive Order 13233, but left intact all other provisions of the Executive Order. The Library will not take any action that is

6

of FOIA requests under the Presidential Records Act. Clinton Presidential Library staff also participated in one or more training exercises held in person and via phone conferencing with NARA headquarters staff familiar with FOIA processing issues in general, including being briefed by NARA's Presidential Materials Staff, as well as by various other NARA FOIA officials.

15.    On January 20, 2006, the five-year moratorium on disclosure mandated by the PRA expired, thus triggering the period for public access requests to Presidential records through FOIA requests. See 44 § 2204(b)(2). Hence, on that date the Clinton Presidential Library began receiving and accepting FOIA requests.

16.    Between January 20, 2006, and April 4, 2006 (the date of the present FOIA request), the Library received 210 FOIA requests for Clinton Presidential records totaling a rough estimation of 5,260,000 pages. As of January 24, 2008, a total of 430 FOIA requests have been received by the Library since the five-year moratorium expired. As of January 24, 2008, archivists at the Library have processed 72 FOIA requests, representing a total of approximately 225,094 pages of textual and electronic records, and 44,363 audio-visual records. We currently have 303 pending FOIA requests, which we roughly estimate will involve the processing of at least 10,500,000 pages of Presidential records.

17.    To be as fair as possible to the public seeking access to Clinton Presidential records, the Clinton Presidential Library has established 17 separate access queues, 16 for FOIA requests and one for mandatory review requests of classified documents in accordance with Executive order 12958, as amended. The queues are divided by the type of records requested, as follows: (1) textual unclassified; (2) textual classified; (3) electronic classified; (4) electronic unclassified;

---

inconsistent with the court's order.                    7

and (5) audio-visual (AV). Requests normally include multiple types of records. Requests such as these are placed in the queue based on the majority of the record type being requested, except in the case of audiovisual material which is segregated into its own separate queues. Requests in categories (1) through (5) identified above are then further divided by the volume of records initially estimated to be responsive: (1) large, i.e., over 5000 pages; (2) medium, i.e., 501-5000 pages; or (3) small, i.e., 500 or less pages. (In the case of the AV queues, the three queues are similarly organized by small, medium, or large request, by number of records rather than pages.) Within each of these fifteen queues, the FOIA cases are organized by date received. The Clinton Library rotates through each of the queues, as well as through a sixteenth queue for records subject to multiple requests, as described in more detail, *infra,* ¶ 25. As the next-in-line FOIA request is selected from each queue, that queue will then go to the end of the queue line. The Clinton Presidential Library queue structure has been continually evolving in order to ensure both fair and efficient processing, given the limited archival resources at the Clinton Library. In an attempt to better serve our requestors, we have added additional queues and adjusted queue requirements, and intend to continue to make further refinements as circumstances warrant. We further believe that continued flexibility is needed to handle future processing of certain extremely large requests (generally in the range of 50,000 pages and up) if such requests are not otherwise narrowed by the requestor. Accordingly, the Library reserves the right to consider treating these types of large requests as consisting of multiple segments, so as to limit initial processing to a subset of the request. Processing such large requests in this manner minimizes the impact on Library staff resources and does not otherwise unduly interfere with the rights of other FOIA requestors. Our current queue structure is the result of experience gained by

8

conducting many FOIA request searches as well as discussions between staff at the Clinton

Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in

Washington, D.C.  In response to Executive order 13392 on Improving Agency Disclosure of

Information, NARA prepared a FOIA improvement plan in 2006.  One of the proposals for the

PRA Presidential Libraries was to establish the additional queue for records that are the subject

of multiple FOIA requests.  This new multi-request queue was added in July 2007.  See

*infra,* ¶ 25.

18.     The Clinton Presidential Library can allocate no more than six archivists for processing

all of its pending FOIA requests for textual and electronic records, which comprise thirteen

queues and exclude the three AV queues.  Counting each archivist as a "full time equivalent" or

"FTE" position in government, we estimate that from January 20, 2006 until January 4, 2008,

approximately 51.5% of total archival FTE time was available to process FOIA requests.  (See

¶ 19 for an explanation of the remainder of FTE time.)  This processing requires not only a page-

by-page, line-by-line review to ensure that all exempt information is properly identified and

redacted, but also the time-consuming tasks of searching for, arranging, describing, and

performing basic preservation on the responsive records.  Also included is time required to

conduct re-reviews of records as needed in response to ongoing negotiations with representatives

of the former President.

19.     Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent

on reference services, including answering all incoming general reference requests from the

public, as well as requests received from places such as the White House, the Clinton

Foundation, the former President, government agencies, and others.  In that time, archivists have

responded to 3,600 separate reference inquiries. Archivists staff the Library's textual and audio-visual research rooms when researchers are present, and the Clinton Library has had 432 visits to its research room in this period (including from representatives of Judicial Watch). Archivists also spend time responding to what are called "special access" requests under 44 U.S.C. § 2205, including since January 20, 2006, four significant special access requests from the incumbent President, one from Congress, and one from a federal court. These requests are often time-sensitive in nature and require intensive, detailed searching and review on the part of the archival staff. Also, these are often requests for the more sensitive and/or classified records in the library, adding additional complexity to the work done by the archivists. Additionally, archivists spend time improving the functionality of access to electronic records, including working with contractors on upgrades to the Presidential Electronic Record Library, known as "PERL." Finally, archivists spend time working on museum exhibit issues, assisting the curator with writing text, and dealing with a variety of administrative issues as they arise.

20.    NARA has separate fee authority for its archival records. See 44 U.S.C. § 2116. Thus, the Clinton Presidential Library is not governed by the FOIA fee and fee waiver provisions per 5 U.S.C. § 522(a)(4)(A)(vi). We do not provide any fee waivers for copying, although researchers can view documents in a research room for free. However, we do not charge any search fees for the time that the Library's staff searches for records responsive to FOIA requests.

### UNANTICPATED DELAYS IN FOIA PROCESSING AND DUE DILIGENCE

21.    Notwithstanding all of our attempts at due diligence, the sheer total volume of records held at the Clinton Presidential Library has contributed to unanticipated delays in the Library's ability to process FOIA requests after January 2006. For example, the Clinton Presidential

Library holds an estimated 78 million pages of textual Presidential records, whereas in contrast

the Reagan and Bush Presidential Libraries hold 43.8 million and 33.7 million pages of textual

records governed by the PRA, respectively.  The Clinton Presidential Library also holds an

estimated 20 million presidential electronic mail records, two million electronic cables, and 60

other electronic systems, which is orders of magnitude greater than similar electronic records

holdings in these other Libraries and, if printed in a textual format, would rival in size the entire

volume of Presidential records generated during the eight years of the Reagan Administration.

This increase both in the volume of holdings and variety of formats necessarily requires more

complex and time-consuming searching and pulling of records, and also demands greater efforts

to maintain intellectual control over this vast collection of records through traditional hard copy

finding aids and electronic indices of various kinds.

22.    As the first Presidential Library to have a significant volume of born-electronic records,

the Clinton Presidential Library has received FOIA requests for more than one million emails in

the two years since Clinton Presidential records became subject to FOIA.  NARA is currently

expending significant resources to address the explosion in volume of electronic records through

its Electronic Records Archives program, which, when operational, will give us the means to

preserve, process, and provide sustained access to electronic records including Presidential

electronic records. See www.archives.gov/era.  Additionally, upgrades in functionality have been

made to PERL, which is the current system that the Library uses for holding and accessing

Clinton Presidential electronic records.  However, given the limitations of the PERL system (e.g.,

it has no on-screen redaction capabilities), the Clinton Presidential Library must print electronic

records to paper prior to arranging, describing and reviewing them.  Additionally, the Clinton

11

Presidential Library staff has spent large amounts of time on an unanticipated process known as "de-hexification," which involves converting attachments to individual email records that cannot be read due to an unknown or unreadable file into something approaching readable form.

23.    In the first year of FOIA processing alone, the Library experienced an unexpected jump in the volume and complexity of the incoming FOIA requests themselves compared to the first year at other Libraries. In contrast to what transpired at the Reagan and Bush Presidential Libraries, we received 336 FOIA requests in the first calendar year of FOIA processing, between January 20, 2006 and December 31, 2006 – a three-fold increase over the approximately 100 FOIA requests received during the first year of FOIA processing at the Reagan and Bush Presidential Libraries. Also, in contrast to the experience of NARA staff at those libraries, and despite the best efforts of Clinton Presidential Library staff, we have not been particularly successful in convincing FOIA requestors at our Library to work with us in substantially narrowing, either by date, content, or by some other reasonable means, what often have been extremely far-ranging requests for "all" records on a number of topics.

24.    NARA is aware of the unprecedented number and volume of FOIA requests received by the Clinton Presidential Library to date and has been working to address this issue. Most significantly, NARA's Office of Presidential Libraries expects that the President's budget submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist of the United States for funding 15 new archivists for processing Presidential records. If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this staff would be dedicated to reducing the FOIA backlog at the library.

25.    Apart from seeking additional funding for positions, we also have taken concrete steps to

address our FOIA backlog. For example, as noted in ¶ 17, as part of a government-wide effort undertaken in response to Executive Order 13392 to improve the disclosure of government information, NARA's PRA libraries created "multi-request FOIA queues." As referenced above, FOIA requests are moved to this queue when a library receives multiple requests for significant portions of the same series or sub-series of records. Once the requests are transferred to the multi-request queue, the library will begin systematically processing an entire segment of records, as opposed to individual folders. Because systematic processing is faster than individual FOIA processing, this assists in responding more rapidly to FOIA requestors who wish to gain access to the same or similar files. Systematic processing is faster because it entails processing records in their archival and historical context; in contrast, FOIA processing requires archivists to find, pull and track records from many different file series. Systematic processing also has had the effect of opening up more materials to access, because in lieu of making individual folders available, researchers can gain access to larger groups of records. By opening an entire series or sub-series, we will enable access to these records to future researchers without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog. We have not yet had occasion to process extremely large requests in this queue; however, the Library will face at some point (including, perhaps, in this case) the issue of how to reasonably limit these requests so as to be fair to all other FOIA requestors.

26.     Additionally, NARA's Office of Presidential Libraries, after discussions with the Supervisory Archivists of the three PRA libraries, decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records. As a result of this study, a one-year pilot project was initiated to implement the most promising proposals.

13

Such proposals include halting what has been a time-consuming process of routinely referring to the originating and/or equity agencies those classified items processed in response to FOIA requests.

27.     In sum, NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints and the ever-increasing demand for Presidential records, to address the important issue of improving FOIA request processing.

## FOIA CASE LOG NUMBER 2006-0885-F

28.     On April 4, 2006, Judicial Watch submitted its FOIA request ("Request") for "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton . . . to include but not limited to any and all sub-elements of the Task Force." The Task Force on National Health Care Reform was established by President Clinton on January 25, 1993.  The President named First Lady Hillary Rodham Clinton as the chairman of the Task Force, and appointed as its other members the Secretaries of the Departments of Health and Human Services, Treasury, Defense, Veterans Affairs, Commerce, and Labor, as well as the Director of the Office of Management and Budget, and three White House advisers.  President Clinton charged this body with the task of listening to all parties and then preparing health care reform legislation to be submitted to Congress within 100 days of President Clinton taking office.  See 29 Weekly Comp. Pres. Doc. 96-97 (Feb. 1, 1993).

29.     After receiving Judicial Watch's Request, archivists at the Clinton Presidential Library conducted what we term a "preliminary search" to determine the approximate volume of records that could be responsive, in order to place the request in the appropriate FOIA queue.  The

preliminary search for records responsive to Judicial Watch's Request consisted of searching a series of databases in the nature of finding aids, as supplemented by the institutional knowledge of our Clinton Presidential Library staff archivists. Most of the databases are consolidated in the aforementioned PERL system. One of the applications searched is a database known as CDSS (the Clinton Document Search System), which allows Clinton Presidential Library archivists to search the description of Clinton Presidential records retired and filed in the White House Office of Records Management (WHORM) Subject Files, or folder titles of Staff Member Office Files entered into the WHORM system. This database serves as a finding aid to millions of pages of textual Clinton Presidential records. Other applications searched include databases originally created by the Clinton White House Photo Office and the White House Communications Office, which allow searches of Clinton Presidential photographs, videotapes, and audiotapes. Additionally, a search was conducted of an MS Access database created by the Clinton Presidential Library staff, consisting of Clinton Presidential folder title lists. Finally, the preliminary search also included a search of e-mails captured by the Clinton Automated Records Management System (known as "ARMS"), for potentially responsive e-mail records.

30.    Part of the preliminary search for FOIA requests entails examining finding aids and the MS Access database to determine if potentially responsive records have been previously released and, therefore, are already available. It is known to the Clinton Presidential Library staff that approximately 550,000 pages of records from the White House Health Care Interdepartmental Working Group ("Working Group") had previously been made publicly available in 1994. In fact, the Clinton Library has more records opened on the subject of health care than on any other single topic. The Working Group was created by President Clinton at the same time as the Task

Force. Both were a part of his Health Care Reform initiative. The Working Group was created to gather information, generate ideas, and formulate alternative options for consideration by the Task Force. Therefore, library archivists conducted a basic search of the folder titles of the Working Group finding aids, as well as the MS Access database, for previously released potentially responsive records related to the Health Care Task Force. It was determined that 134 folders totalling an estimated 13,400 pages of these previously released public papers of the Working Group specifically contained the terms "Health Care Task Force," or were specifically the files of Ira Magaziner, and as such were potentially more specifically responsive to the plaintiff's Request than the entire 550,000 pages of available material of the Working Group.

31.    By letter dated April 10, 2006, the Clinton Presidential Library's Supervisory Archivist notified Judicial Watch that its Request had been received and assigned case number 2006-0885-F. The preliminary search of the Library's electronic finding aids and databases revealed that there were an estimated 3,022,030 pages of unprocessed textual records, 2,884 pages of unprocessed electronic records, 1,021 unprocessed photographs, three unprocessed videotapes, and three unprocessed audiotapes that were potentially responsive to the Request. However, our letter also indicated that the "page total is an estimate and that all pages processed might not be relevant to [the] specific topic." (See Exhibit 3). We also explained that "[t]here are approximately 13,400 pages of the White House Health Care Interdepartmental Working Group papers concerning the Task Force open and available for research." We then provided an overview of our review process, outlining how the Library processed FOIA requests for records covered by the PRA and placed the request in the queue.

32.    On July 25, 2006, Judicial Watch corresponded with the Library, requesting an estimated

completion date for the Request. (See Exhibit 4). On August 9, 2006, the Supervisory Archivist responded that the Request had been placed into a processing queue and that approximately 155 requests preceded the Request, requiring processing and review of over 2,000,000 pages of records pursuant to the PRA, FOIA, and Executive Order 13233. (See Exhibit 5). She also noted that, "[b]ecause the Clinton Library has only been processing records in response to FOIA requests for less than seven months, we do not yet have a sense of how long it will take us to process the [pending requests] . . . nor how long it will take us to process [the Request] once [it] reach[es] the front of our queue." Upon receipt of further inquiry by Judicial Watch on January 16, 2007 (see Exhibit 6), the Supervisory Archivist responded on February 9, 2007 that the Request had moved up in its processing queue, but that it had not yet reached the front of its queue. (See Exhibit 7). The Supervisory Archivist explained that the archivists "must complete a page-by-page review of all records to determine if this material can be released or if it requires withholding under one of the six [PRA] restrictive categories and/or the eight applicable FOIA exemptions that apply to Clinton Presidential records," and that "[w]e are working diligently to make these records available as soon as possible."

33.     Because we received other requests involving records relating to the Health Care Task Force prior to receipt of the request from Judicial Watch, Judicial Watch's request has been placed in the Library's multi-request queue, which as explained in ¶ 25 was implemented to more efficiently process requests or portions of requests for significant portions of the same series or sub-series of records. Prior to receiving Judicial Watch's request, the Clinton Presidential Library received two other FOIA requests that are relevant to, if not subsumed within, Judicial Watch's request. Because we believe that all the records that are responsive to these third party

17

requests are relevant to Judicial Watch's request, in actuality, a portion of Judicial Watch's

request will be processed with each of the following requests. The first health care request that

met the test for the multi-request queue is for records for "Ira Magaziner files on Health Care

Task Force/Health Care Reform." This request will have records that fall within or relate to

Judicial Watch's request, as Mr. Magaziner was a senior advisor to the Health Care Task Force

and one of only three White House advisors that were also members of the Task Force. That

request is currently at the front of the multi-request queue. There are currently three other queues

which have cases that must be processed before we next reach the multi-request queue. We

estimate that out of the approximately 154,330 pages of records responsive to this request,

approximately 72,000 represent Ira Magaziner Health Care Task Force records that are also

responsive to the present Judicial Watch request and that will, therefore, be processed first. This

request is the fourth case in line to be processed.[3] The second health care request that met the

test for placement in the multi-request queue was made for "Hillary Clinton files on Health Care

Task Force/Health Care Reform." We estimate that of the approximately 90,000 pages of

records responsive to this second request, 30,000 pages deal with Ms. Clinton's Health Care

Task Force Records, and thus form the universe of pages to be processed as part of the second

request in the multi-request queue dealing with the subject of health care -- which also happen to

be responsive to the Judicial Watch request. There are a total of 43 FOIA requests pending

before this second health care request (not including requests in the separate AV queues).

34.     The remainder of the Judicial Watch request not processed in response to the two

previous health care-related FOIA requests is currently the sixth FOIA case pending in the multi-

---

[3] Currently, the twelve FOIA requests totaling approximately 93,720 pages are being processed
by Clinton Presidential Library archival staff. As each of these FOIA requests is completed,

request queue and, under the queue structure process described in ¶¶ 17 and 18, in which we rotate through each of the 13 non-AV FOIA queues, there are a total of 82 FOIA requests pending ahead of the remainder of Plaintiff's request. Given that the remainder of the Judicial Watch request (approximately 2,900,000 pages, representing the original estimate of 3,000,000 pages, minus a combined 100,000 or so pages processed as part of the two earlier requests in the multi-request queue, per ¶ 33, *supra),* it is clear that this represents just the type of extremely large request that will likely best be handled by the Library in segments, so as to allow us to allocate our scarce staff resources in a manner that is fair to other FOIA requestors.

35.    Once processing of each third-party request, or segments of each request, is completed, pursuant to the terms of the PRA, NARA's regulations, and Executive Order 13233, NARA will notify the representatives of the former and incumbent President of the Clinton Presidential Library's proposed release of the records. Once that review process has been completed, NARA will inform both the third party requestor and Judicial Watch of the Clinton Presidential records that are available and whether any records are being withheld.

36.    Once the remainder of Judicial Watch's request reaches the top of its queue and the Library begins processing it, the Library intends to allow for presidential review of the materials as the Library completes its review of portions of the responsive documents. Therefore, presidential review of the documents can occur incrementally and, as reasonably segregable sub-collections of documents have undergone that review, NARA will inform Judicial Watch of the Clinton Presidential records that are available and whether any records within that portion are being withheld.

---

archival staff will pull the next FOIA request to be processed from its respective queue.

**ADDITIONAL OBSERVATIONS ON PROCESSING AND ON THE OVERBREADTH**

**OF THE PRESENT REQUEST**

37.   We continue to be confident that the present, unnarrowed Judicial Watch request involves in

the range of three million pages.  At an estimated three million pages, the size and scope of

Judicial Watch's present FOIA request makes it the largest FOIA request that the Clinton

Presidential Library has received to date.  Further, the request is greater than any FOIA request

ever received to date at any of the Presidential Record Act libraries (i.e., the Reagan and George

H.W. Bush Presidential Libraries).   The largest FOIA request that the Clinton Presidential staff

has processed, in its entirety, to date, was a segment of a FOIA for material relating to Native

Americans, totaling 56,639 pages.

38.   As stated above, ¶ 16, in the two years since we began receiving FOIA requests, Clinton

Presidential Library staff have processed approximately 225,094 pages of records.  The historical

experience of Presidential Library staffs has been that the rate of FOIA processing increases over

time, as archivists work with materials and become more familiar with the overall presidential

record collections, as well as with the nature of FOIA exemptions and processing.  However,

given the continuing uncertainty as to how much faster we can accomplish the processing of our

current backlog of FOIA requests because of resource and budget constraints, we are not in a

position to provide a reasonable estimate at this time as to how long it may take to process a

FOIA request of three million pages in scope – a request orders of magnitude beyond what the

staff at the Clinton Presidential Library has experienced to date.   As stated above, ¶ 33 & n.3,

with 93,720 pages ahead of the first of the health care related requests in our multi-request queue,

we believe that Clinton Presidential Staff will be in a position to begin working on a significant

portion of Judicial Watch's request during this calendar year.

39.   Prior to the onset of the present litigation, the Clinton Presidential Library did not, during the administrative process, elect to pursue active negotiations with the requestor aimed at attempting to narrow the scope of what is clearly an immensely large FOIA request.  Nor, however, did Judicial Watch approach the Library with a proposal for narrowing its request prior to initiating the present litigation.  Although plaintiff's past correspondence with the Clinton Presidential Library indicates some level of familiarity with the Library's holdings, it is not clear whether representatives of plaintiff have availed themselves of the Health Care Task Force materials that are currently open and available to the public at the Library, or other of the Library's resources, for the purpose of narrowing their request.  For the reasons stated in this Declaration, even a substantially narrowed request must await its time in the queue.  However, it is also clear that if plaintiff is willing to substantially narrow its request, the ultimate processing time may be significantly reduced.

40.   The Clinton Presidential Library and NARA take their responsibilities with regard to the administration of the Presidential Records Act and the FOIA very seriously, and all reasonable efforts are being made to comply with statutory deadlines.  It is regrettable that the Library is without greater resources at its disposal, and that the processing of presidential records for opening to the public is necessarily delayed.  Nevertheless, as a matter of equity, and to ensure that each requestor receives the attention he or she deserves, the Library must be able to process its pending FOIA requests based on the sound administrative policies and practices developed to date.  It would simply be unfair to judicially assign plaintiff's request for processing ahead of other requests in the various queues.  Each court order that requires that one request be given

priority ahead of others invariably works to the detriment of other, more patient requestors, and thereby encourages other requestors to seek relief in the courts, thereby undermining the Library's (and NARA's) attempts at managing the many FOIA requests received annually in a fair and consistent fashion. This is even more true in the present case, given the mammoth size and scope of the plaintiff's request, where a court order requiring the immediate halt of all other FOIA processing in favor of processing the present request will effectively deny FOIA access to all requestors of Clinton Library presidential records for many years to come.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2̲3̲ day of January, 2008.

_Emily Robison_
EMILY ROBISON
Deputy Director
Clinton Presidential Library

# EXHIBIT  1



**Judicial Watch™**

*Because no one
is above the law*

<u>**VIA FACSIMILE AND CERTIFIED U.S. MAIL**</u>

April 4, 2006

FOIA Coordinator
CLINTON PRESIDENTIAL LIBRARY
1200 President Clinton Avenue
Little Rock, AR 72201
(Fax. No.: 501-244-2881)
(Art. No.: 7005 0390 0004 0892 3042)

Re: <u>**Freedom of Information Act Request**</u>

Dear Mr. Sir/Madam:

Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests request access to the following Clinton Presidential records from the Clinton Presidential Library (hereafter "Clinton Library"):

> Any and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton (hereafter "Task Force"), to include but not limited to any and all sub-elements of the Task Force.

For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes,

501 School Street, SW   Suite 500   Washington, DC 20024   Tel: (202) 646-5172   (888) JW-ETHIC
Fax: (202) 646-5199   email: info@judicialwatch.org   Web Site: www.JudicialWatch.org

Judicial Watch, Inc. FOIA Request
April 4, 2006
Page 2

compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)     Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

(2)     Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA. Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each

Judicial Watch, Inc. FOIA Request
April 4, 2006
Page 3

month. The organization also utilizes an e-mail Infonet service that sends out updates of
Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)     Judicial Watch also periodically publishes and disseminates its own distinct
works in the form of books and reports. For example, in September 1998 Judicial
Watch, Inc. published the *Interim Report on Crimes and Other Offenses Committed by
President Bill Clinton Warranting His Impeachment and Removal from Elected Office*.
This 145-page report was accompanied by nearly 4,000 pages of supporting
documentation and was crafted, in part, from the raw materials obtained by Judicial
Watch through FOIA requests, among other regular means. In August 1999, Judicial
Watch published *Filegate Status Report*, which is 136 pages long and is supported by
nearly 1000 pages of documentation. In March 2001, Judicial Watch, Inc. published *The
Judicial Watch Florida Recount*, an independent, non-partisan analysis of the results of
Florida's hotly contested 2000 Presidential election based upon an sampling of ballots
reviewed by Judicial Watch pursuant to Florida's version of FOIA. In February 2002,
Judicial Watch published *The Judicial Watch 2002 "State of the Union" Report, Bush
Administration Ethics Enforcement: "A Failure of Leadership."* In September 2002,
Judicial Watch, Inc. published *Fatal Neglect: The U.S. Government's Continuing
Failure to Protect American Citizens from Terrorists*. Most recently on November 21,
2003, Judicial Watch produced *Analysis of GAO Testimony: US Postal Service – Clear
Communication With Employees Needed Before Reopening of Brentwood Facility*.
(GAO-04-2057T/October 23, 2003). Comptroller General of the United States David M.
Walker, in a reply to Judicial Watch's *Analysis of GAO Testimony*, wrote on December
17, 2003, "We view Judicial Watch as an important accountability organization in
Washington, D.C." On February 16, 2005 Judicial Watch was rated by the highly
respected capitol newspaper *The Hill* as being one of the nation's top ten "watchdogs."
Most recently, on June 29, 2005, Judicial Watch produced a special report "US Border
Patrol Survey Analysis," a report of an analysis of documents produced under FOIA.

Judicial Watch also publishes and disseminates its distinctive work by participating in
public conferences and seminars, including its own "Ethics in Government" conferences held in
Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch
hold quarterly education panels at the National Press Club in Washington DC that have been
televised by C-SPAN. Past panel discussions have been: "A Discussion of Ethics in
Washington," "The Case for Open Government," "Conservative Perspectives on the Alito
Nomination," and "The Role of Grassroots Groups in the Supreme Court Nominating Process."
Judicial Watch also works with other media organizations to publish and disseminate distinctive
work to the public, and representatives of Judicial Watch appear frequently on nationally
broadcast television and radio programs. Judicial Watch has been granted press credentials at a
number of national conventions and other events.

Judicial Watch, Inc. FOIA Request
April 4, 2006
Page 4

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts document the operations and activities of the federal government and to educate the public about these operations and activities. Judicial Watch is studying the Task Force on Health Care Reform chaired by former First Lady Hillary Rodham Clinton as a project of its Transparency Program.

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. *See D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, namely the creation of and conduct of the Task Force on Health Care Reform and the formulation of health care policy during the Clinton administration.

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience, as a

Judicial Watch, Inc. FOIA Request
April 4, 2006
Page 5

reasonably broad audience is obviously interested in the continuing national debate over health care reform in the wake of recent changes in Medicare.

Indeed, the taxpaying American public deserves full disclosure of the facts and circumstances surrounding the creation and operation of the Task Force. During the Clinton administration (1993-2001) controversy erupted over the existence of and operations of the Task Force on Health Care Reform, chaired by First Lady Hillary Rodham Clinton, and the White House Health Care Interdepartmental Working Group, organized by White House Senior Domestic Policy Advisor Ira Magaziner (hereafter "Working Group").[1] In resulting litigation[2] the records of the White House Health Care Interdepartmental Working Group were released.[3] However the records of the cabinet-level Task Force have not been released in full to this date.

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including radio and television programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the records of the cabinet-level Task Force. The Clinton Presidential Library website describes the relationship between The Working Group and the Task Force:

> The concept of membership in working groups was loosely defined and extremely fluid; individuals moved from one group to another or new participants were added when their knowledge on an issue was needed. Overall responsibility for the organic design of the Interdepartmental Working Group rested with Ira Magaziner, White House Senior Domestic Policy Advisor. Later, Magaziner took a role as an advisor to the working

---

[1]    Peter Flaherty, Timothy Flaherty. *The First Lady: A Comprehensive View of Hillary Rodham Clinton*. Vital Issues Press, September 1996. pp. 185-206

[2]    *Association of American Physicians and Surgeons, Inc et al., v. Hillary Rodham Clinton, et al.*, Civil Action No. 93-0399 (RCL).

[3]    "History White House Health Care Interdepartmental Working Group"
[ http://www.clintonlibrary.gov/documents/Finding_Aid_HealthCare.pdf ]

Judicial Watch, Inc. FOIA Request
April 4, 2006
Page 6

> groups, a 'sounding board' for new ideas from various
> participants, and a representative who forwarded the
> working groups final proposals to the Task Force.[4]

The records requested by Judicial Watch undoubtedly will shed additional light on this important matter.

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

CJF/mac

---

[4] *Ibid*

# EXHIBIT 2



*N*
NOV 13 2002

**OFFICE OF**
**WILLIAM JEFFERSON CLINTON**

November 6, 2002

The Honorable John W. Carlin
Archivist of the United States
National Archives
    at College Park
7601 Adelphi Road
College Park, Maryland  20740

Dear Mr. Carlin:

On August 19, 1994, I wrote to the then Acting Archivist of the
United States, Dr. Trudy Huskamp Peterson, in accordance with the
Presidential Records Act (PRA), 44 U.S.C. 2201-2207, specifying
that access should be restricted to all six categories of records
set forth in section 2204(a) of the PRA for twelve years after
the termination of my service as President of the United States.

In order to provide guidance to the NARA staff in the processing
of the records of my Administration, I would like to ease for
review and processing purposes the application of two of the
restrictions -- section 2204(a)(2), "relating to appointments or
submitting advice between the President and his advisers, or
between such advisers" -- subject to the limitations described
below.

With respect to easing section 2204(a)(2), information should
generally be considered for withholding only if it:

> 1.  contains clearly confidential personal information,
> including social security numbers, private salary, medical
> history, negative, derogatory, or other information that
> would otherwise require it to be restricted under section
> 2204(a)(6) of the PTA; or

> 2.  would still be subject to restriction under section
> 2204(a)(5), in accordance with the easing instructions
> described below.

With respect to easing section 2204(a)(5), information should
generally be considered for withholding only if it contains:

> 1.  negative or derogatory information about individuals
> involved in the appointment process, including their non-
> selection.

> 2.  confidential communications regarding a sensitive
> policy, personal, or political matter that is contained
> within a Presidential record, as defined in section 2201 of
> the PRA;

Carlin, Page Two.

    3.  confidential communications on a foreign policy topic;

    4.  confidential communications involving legal issues and advice, including, but not limited to, matters in litigation and matters subject to investigation by Congress, the Department of Justice, or an Independent Counsel;

    5.  communications directly from the President, unless routine in nature;

    6.  communications directly between the President and the Vice President, unless routine in nature;

    7.  communications directly between the President and the First Lady, and their families, unless routine in nature;

    8.  communications directly to or from a former President, Vice President, or their families, unless routine in nature.

My intent it to make available to the public as full a record as possible documenting the decision-making, policy-making, and appointment process of my Presidency by applying both the appointment and confidential advice restrictions as narrowly as possible.  I anticipate, at the appropriate time and after further discussions with the NARA staff, waiving these two restriction categories except as noted above.  I encourage NARA staff to consult with my designated representative on any questions or concerns that they may have, including with respect to individual records and particular record categories.

I am hopeful that this letter clarifies my intent and provides the guidance NARA staff will need to process the records of my Administration.

Sincerely,

# EXHIBIT 3



# *Clinton Presidential Library*

*1200 President Clinton Avenue*
*Little Rock, AR 72201*

April 10, 2006

Christopher J. Farrell
Judicial Watch, Inc.
501 School Street, SW Suite 500            **FOIA Case: 2006-0885-F**
Washington, D.C. 20024

Dear Mr. Farrell:

This letter is in response to your request dated April 4, 2006 for Clinton Presidential records under the Freedom of Information Act (FOIA) (5 U.S.C. § 552) and Presidential Records Act (PRA) (44 U.S.C. §§ 2201-2207). Your request was received by the Clinton Library on April 4, 2006.

We have performed an initial search of our "textual, electronic, and audiovisual" Presidential records for documents involving records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton to include but not limited to any and all sub-elements of the Task Force. Approximately 3,022,030 pages of textual records, 2,884 pages of electronic records, 1,021 photographs, 3 videotapes and 3 audiotapes must be processed in order to respond to your request. Please note that the audiotapes are recordings of remarks at official White House events. Please keep in mind that the page total is an estimate and that all pages processed might not be relevant to your specific topic. There are approximately 13,400 pages of the White House Health Care Interdepartmental Working Group papers concerning the Task Force open and available for research.

The staff of the Clinton Library is currently processing and reviewing FOIA requests that precede your request. To treat everyone equitably, we have placed your request in our complex unclassified processing queue by the date it was received in our office. FOIA requests received by the Clinton Library are processed and reviewed for access under provisions of the PRA and FOIA and are subject to Executive Order 13233, which requires that we notify the representatives of the former President and the incumbent President prior to the release of any Presidential records. Also, it should be noted that many of the documents processed in response to your request may be closed in whole or part in compliance with PRA restrictions and FOIA exemptions.

When processing is completed and the notification period has passed, we will inform you of the availability of the requested records. The Clinton Library does not charge search fees. However, reproduction fees apply if you request material copied. You can request that we copy these records at the current reproduction fee of $.50 per page, or you can choose to view these documents in the research room of the Clinton Library where a self-service copier is available for the current price of $.15 a page. You may also bring certain scanners into our research room at no charge. I have included a copy of our scanning policy.

If you have any questions regarding your FOIA request, please contact our staff at (501) 244-2877. Your case log number is **2006-0885-F**. Please have this number accessible for reference during any future contact concerning this FOIA request.

Sincerely,

*Melissa Walker*

Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library

MW: dms

# EXHIBIT 4



# Judicial Watch

*Because no one is above the law!*

July 25, 2006

**BY FAX (501-244-2881)**
Ms. Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library
1200 President Clinton Boulevard
Little Rock, AR  72201

### Re:  Status Updates for Freedom of Information Act Requests

Dear Ms. Walker:

First, on behalf of Judicial Watch and my research colleagues, please accept our sincere thanks and appreciation to you and your staff for the courtesy and professionalism extended to us during our research visits to the Clinton Library.

As you know, Judicial Watch has several Freedom of Information Act (FOIA) requests pending with your office.  This letter serves as our formal request for a FOIA case status update for each of our requests.  The following requests are pending:

| FOIA Case No. | Date Received | Subject |
|---|---|---|
| 2006-0885-F | April 4, 2006 | Task Force on National Health Care Reform |
| 2006-0886-F | April 5, 2006 | First Lady's Calendar |
| 2006-0946-F | April 7, 2006 | White House Travel Office |
| 2006-1066-F | April 19, 2006 | White House Security Office & Vetting |
| 2006-1067-F | April 19, 2006 | Judicial Nominees |
| 2006-1080-F | April 21, 2006 | Death of Vincent W. Foster, Jr., Esq. |

We understand the processing and review procedures you follow under the provisions of FOIA, the Presidential Records Act (PRA) and Executive Order 13233; and we appreciate the enormous volume of textual and electronic records, as well as other archival materials, in your custody.  Your FOIA receipt acknowledgement letters are clear and straightforward.

Kindly provide us with an estimated date of completion or some other quantifiable benchmark to objectively judge when we can reasonably expect to receive records responsive to our requests.  Undoubtedly, your office maintains some means of

---

Ms. Melissa Walker
William J. Clinton Presidential Library
Re: Status Updates for FOIA Requests
July 25, 2006
Page 2

tracking work progress, and a business process that allows managers such as yourself to assess the productivity and performance of your archivist team. Arriving at a "good faith estimate" for completion of each request is consistent with both the FOIA law and the guidance in Executive Order 13392. The National Archives and Records Administration (NARA) is an extremely sophisticated FOIA processor with unparalleled experience in reviewing and clearing records for release to the American public.

I look forward to receiving your status update for each of our pending FOIA requests. Thanks for your cooperation.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell
Director of Investigations & Research

# EXHIBIT 5



# *Clinton Presidential Library*

*1200 President Clinton Avenue*
*Little Rock, AR 72201*

August 9, 2006

Christopher J. Farrell
Judicial Watch, Inc.
501 School Street, SW Suite 500
Washington, D.C. 20024

**FOIA Cases: 2006-0885-F; 2006-0886-F; 2006-0946-F; 2006-1066-F; 2006-1067-F; 2006-1080-F**

Dear Mr. Farrell:

This letter is in response to your correspondence dated July 25, 2006 requesting additional information regarding the Freedom of Information Act (FOIA) requests filed by Judicial Watch. Your letter was received by the Clinton Library on July 25, 2006. I hope the following response addresses any concerns you have regarding these FOIA cases.

As we explained in our initial search letters, the Clinton Library has placed each FOIA request in our processing queues. None of the six (6) FOIA requests made by Judicial Watch have reached the front of the queue; therefore, processing has not yet begun. There are currently 155 FOIA requests pending before FOIA case 2006-0885-F; 156 pending before 2006-0886-F; 157 pending before 2006-0946-F; 190 pending before 2006-1066-F; 191 pending before 2006-1067-F; and 192 pending before 2006-1080-F.

Many of the FOIA requests that precede those filed by Judicial Watch require that we review a large volume of records and will take a significant amount of time to process. Because the Clinton Library has only been processing records in response to FOIA requests for less than seven months, we do not yet have a sense of how long it will take us to process the 155 cases pending prior to the first FOIA request about which you inquire nor how long it will take us to process each of the FOIA requests listed in your letter once they reach the front of our queue. However, to respond to the 155 FOIA cases preceding yours will require that we process more than 2,000,000 pages of records before your first FOIA request reaches the front of the queue.

Please be aware that we fully understand the desire of Judicial Watch to gain access to records responsive to these requests at the earliest possible convenience. The primary mission of the National Archives and Records Administration, which operates the Clinton Library, is to ensure that the American public has access to the records in our legal custody. We welcome requests from all those interested in gaining access to our holdings and work to make those records available as soon as possible.

I hope this information addresses any concerns you have regarding the abovementioned FOIA cases. If you have any additional questions regarding your FOIA request, please contact our staff at (501) 244-2877. If you cannot resolve your concerns with the staff at the Clinton Library you may refer your inquiries to our FOIA Public Liaison, John Laster at (202) 357-5144.

Sincerely,

Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library

MW: dms

# EXHIBIT 6



# Judicial Watch

*Because no one is above the law!*

January 16, 2007

**BY FAX (501-244-2881)**
Ms. Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library
1200 President Clinton Boulevard
Little Rock, AR 72201

**Re: Status Updates for Freedom of Information Act Requests**

Dear Ms. Walker:

  As you know, Judicial Watch has several Freedom of Information (FOIA) requests pending with your office. This letter serves as our formal request for a FOIA case status update for each of our requests. The following requests are pending:

| FOIA Case No. | Date Received | Subject |
|---|---|---|
| 2006-0885-F | April 4, 2006 | Task Force on National Health Care Reform |
| 2006-0886-F | April 5, 2006 | First Lady's Calendar |
| 2006-0946-F | April 7, 2006 | White House Travel Office |
| 2006-1066-F | April 19, 2006 | White House Security Office & Vetting |
| 2006-1067-F | April 19, 2006 | Judicial Nominees |
| 2006-1080-F | April 21, 2006 | Death of Vincent W. Foster, Jr., Esq. |

  We understand you process and review records under the provisions of the FOIA, the Presidential Records Act and Executive Orders 13233 and 13392.

  Kindly provide us with an estimated date of completion or some other quantifiable benchmark to objectively judge when we can reasonably expect to receive records responsive to our requests. Arriving at a "good faith estimate" for completion of each request is consistent with both the FOIA law and the guidance in Executive Order 13392. Thanks for your cooperation.

Sincerely,

Christopher J. Farrell
Director of Investigations & Research

---

# EXHIBIT 7



# *Clinton Presidential Library*

*1200 President Clinton Avenue*
*Little Rock, AR 72201*

February 9, 2007

Christopher J. Farrell
Judicial Watch, Inc.
501 School Street, SW Suite 500
Washington, D.C. 20024

**FOIA Cases: 2006-0885-F; 2006-0886-F; 2006-0946-F; 2006-1066-F; 2006-1067-F; 2006-1080-F**

Dear Mr. Farrell:

This letter is in response to your correspondence dated January 16, 2007 requesting the status of the Freedom of Information Act (FOIA) requests filed by Judicial Watch. Your letter was received by the Clinton Library on January 16, 2007. I hope the following response addresses any concerns you have regarding these FOIA cases.

Since our previous correspondence in August 2006, each of the six (6) FOIA requests noted above has moved up within their respective processing queues. However, none of these requests has reached the front of their queue. Unfortunately, while we can not provide an estimated date that processing of your FOIA requests will begin, as we explained in our previous correspondence, the archival staff must process approximately 2,000,000 pages of records before processing can begin on any of the abovementioned FOIA cases.

As you may be aware, processing Presidential records is time-consuming. Archivists must complete a page-by-page review of all records to determine if this material can be released or if it requires withholding under one of the six Presidential Records Act (PRA) Presidential restrictive categories and/or the eight applicable FOIA exemptions that apply to Clinton Presidential records.

We fully understand the desire of each FOIA requestor to gain access to records at the earliest possible convenience. The primary mission of the National Archives and Records Administration, which operates the Clinton Library, is to ensure that the American public has access to the records in our legal custody. We are working diligently to make these records available as soon as possible.

I hope this information addresses any concerns you have regarding the abovementioned FOIA cases. If you have any additional questions regarding your FOIA request, please contact our staff at (501) 244-2877. If you cannot resolve your concerns with the staff at the Clinton Library you may refer your inquiries to our FOIA Public Liaison, John Laster at (202) 357-5144.

Sincerely,

*Melissa Walker*

Melissa Walker
Supervisory Archivist
William J. Clinton Presidential Library

MW: dms

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
JUDICIAL WATCH, INC.,                       )
                                                          )
                              Plaintiff,            )
                                                          )        Civil Action No. 07-1987 (PLF)
                    v.                                )
                                                          )
U.S. NATIONAL ARCHIVES AND         )
RECORDS ADMINISTRATION,            )
                                                          )
                              Defendant.          )
_____)

**[PROPOSED] ORDER**

      The Court, having fully considered Defendant's Motion to Dismiss or, in the Alternative,

for a Stay of Proceedings, finds that Motion to be well-taken, and it is hereby GRANTED.  This

action is DISMISSED for lack of jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(1).

      IT IS SO ORDERED, this _____ day of _____, 200__.


                                   _____
                                   JUDGE PAUL L. FRIEDMAN
                                   United States District Judge