**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————————
)
JUDICIAL WATCH, INC.,                               )
                                                    )
                            Plaintiff,              )
                                                    )          Civil Action No. 07-1987 (PLF)
                    v.                              )
                                                    )
U.S. NATIONAL ARCHIVES AND                          )
RECORDS ADMINISTRATION,                             )
                                                    )
                            Defendant.              )
—————————————————————————)


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE,
<u>FOR A STAY OF THE PROCEEDINGS</u>**

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    Statutory and Regulatory Framework of the Presidential Records Act . . . . . . . . . . . . . . 3

      A.    Statutory Restrictions on the Release of Presidential Records . . . . . . . . . . . . . . 3

      B.    FOIA Exemptions Applicable to Presidential Records . . . . . . . . . . . . . . . . . . . . . 5

      C.    Requirement for Presidential Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    The Clinton Presidential Library, FOIA Requests, and Queue Structure . . . . . . 7

      B.    Plaintiff's FOIA Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    Plaintiff's Claims Should be Dismissed Because its Request is Inadequate Under the
      FOIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      A.    A Request is Inadequate Under the FOIA if it Would Require the Agency to
            Expend an Unreasonable Amount of Effort to Satisfy the Request . . . . . . . . . . 16

      B.    An Overbroad Request Can Require the Expenditure of an Unreasonable Amount
            of Effort by the Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      C.    Plaintiff's FOIA Request for "Any and All Records of the Task Force" Imposes
            an Unreasonable Burden on NARA and Therefore Plaintiff has Failed to Make a
            Proper Request Under the FOIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.   Alternatively, this Court Should Grant a Stay of Proceedings to Permit the Clinton
      Presidential Library to Process its FOIA Requests in a Fair and Orderly Manner . . . . . 23

      A.    The Clinton Presidential Library Can Demonstrate Exceptional Circumstances
            Warranting a Stay of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            1.    The Clinton Presidential Library Has Received an Unprecedented Number
                  of FOIA Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            2.    The Clinton Presidential Library Has Limited Resources, Inadequate to
                  Process the Flood of FOIA Requests Within 20 Days . . . . . . . . . . . . . . . 27

            3.    The Clinton Presidential Library Is Exercising Due Diligence in
                  Processing FOIA Requests and Has Shown Reasonable Progress in
                  Reducing its Backlog . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.      Additional Time is Routinely Granted When An Agency Demonstrates, As Here, Exceptional Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**INTRODUCTION**

This case concerns a Freedom of Information Act ("FOIA") request for the entire set of records of a Task Force, namely, the Task Force on National Health Care Reform ("Task Force"), which was chaired by First Lady Hillary Rodham Clinton.  This FOIA request is for Clinton Presidential records governed by the provisions of the Presidential Records Act, 44 U.S.C. § 2201, et seq., and it encompasses more than three million pages of potentially responsive documents.  Defendant, the National Archives and Records Administration ("NARA"), which includes the Clinton Presidential Library ("Library"), moves this Court to dismiss the claims brought by Plaintiff, or in the alternative, for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C), and <u>Open America v. Watergate Special Prosecution Force</u>, 547 F.2d 605 (D.C. Cir. 1976).

The Court should dismiss Plaintiff's claims, because they constitute an improper request for records under the FOIA.  Plaintiff's request fails because it is excessively broad in scope and presents an undue burden on the Clinton Presidential Library.  Courts have long recognized that a FOIA request is improper if it imposes so onerous a burden that the agency with reasonable effort cannot comply with the request.  Because the Plaintiff's request is defective, no records have been improperly withheld, and this Court therefore lacks jurisdiction over Plaintiff's claim. For the same reason, Plaintiff's claim would also be subject to dismissal for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

In the alternative, because exceptional circumstances exist in the present case, this Court should grant a stay of the proceedings, as additional time would be necessary to allow the Library to process Plaintiff's large FOIA request.  Although the Library is exercising due diligence in responding to Plaintiff's request, the large number of pending requests that pre-date Plaintiff's request, the enormous volume of potentially responsive records in this case, and the limited resources currently available to the Library for the processing of FOIA requests, constitute exceptional circumstances necessitating a stay so that the Library may continue to process records in a fair and orderly manner.  In support of this motion, Defendant has provided

a declaration from Emily Robison, the Deputy Director of the Clinton Presidential Library, which explains that the Library intends to process the records in at least three groups.[1]  The Library would require a stay of approximately one year during which it will *begin* processing the first group of records.[2]  The Library would then process the remaining groups of records as they arise under the Library's current FOIA queue system.  Several factors prevent NARA from providing a date certain by which it can compete processing these latter portions of the request, including:  the volume of records that are ahead of Plaintiff's request in the FOIA queue; the massive volume of records that Plaintiff's request itself encompasses; that the Library has only been processing FOIA requests for two years and may experience increases in its rate of processing as its staff gains greater familiarity with the collection and FOIA processing; and that there currently exists uncertainty about funding for additional requested resources that may be appropriated for the Library's FOIA processing.  Given this uncertainty, if this Court grants a stay of proceedings, NARA is prepared to submit a status report within 120 days of the entry of the stay (if deemed necessary by the Court), to provide the Court and Plaintiff with an updated status of where the requested documents fall within the Library's FOIA queue system.

---

[1]  As will be explained in greater detail below, Plaintiff's FOIA request overlaps with two smaller, and more manageable FOIA requests that were submitted by third parties prior to Plaintiff's request:  a request for Ira Magaziner's Task Force files (i.e., the first group), and for Hillary Clinton's Task Force files (i.e., the second group).  These two prior Task Force requests have been moved into the Library's multi-request queue system, for the more efficient and practical processing of records.  The Library intends to process these FOIA requests in the order in which they were received.  The third group of records would then consist of the remainder of documents responsive to Plaintiff's request, which may need to be further divided into multiple segments.

[2]  This is the Library's estimate of how long it will take for the first of the third party requests related to the Task Force to reach the front of the FOIA queue, and for processing to begin on that request.  This estimate does not include the time that it will take the Library to *complete* its processing of that request, nor the time that the representatives of the incumbent and former Presidents are legally entitled to under the Presidential Records Act, 44 U.S.C. § 2204(c)(2) & § 2206, accompanying regulations, and Executive Order 13233, for the review and assertion of any constitutional privileges.

# BACKGROUND

## I.    Statutory and Regulatory Framework of the Presidential Records Act

The Presidential Records Act of 1978 ("PRA"), sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records.  The PRA defines "Presidential records" as:

> [D]ocumentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2).  Included among "Presidential records" are documentary materials created or received by the Office of the First Lady – an office within the Executive Office of the President – when those materials meet the definition of "Presidential records" set forth in the PRA. See, e.g., Executive Office of the President, available at http://www.whitehouse.gov/government/eop.html (last visited January 28, 2008); H.R. Rep. No. 95-1487, at 12 (1978), reprinted at 1978 U.S.C.C.A.N. 5732, 5743 ("When the President's spouse or other family member or associate serves as a de facto member of the President's staff, the documents which reflect such service are included in the ambit of presidential records[.]"); cf. Ass'n of Am. Phys. & Surgeons, Inc. v. Clinton, 997 F.2d 898, 904, 911 (D.C. Cir. 1993) (noting that "*Congress* itself *has* recognized that the President's spouse acts as the functional equivalent of an assistant to the President," and finding that the Federal Advisory Committee Act's "full-time officer or employee of the government" phrase applied to Mrs. Clinton's membership in the Task Force) (emphasis in original).  Thus, Plaintiff's FOIA request encompasses Presidential records.

### A.    Statutory Restrictions on the Release of Presidential Records

Presidential records are the property of the United States, 44 U.S.C. § 2202, and upon conclusion of a President's term in office, the Archivist of the United States ("Archivist") assumes responsibility for the custody, control, and preservation of the Presidential records.  Id. § 2203(f)(1). The Archivist has an affirmative duty to make Presidential records available to the

public as rapidly and completely as possible consistent with limitations under the PRA.  Id. Subject to several exceptions discussed below, Presidential records are to be generally administered in accordance with the provisions of the FOIA.  Id. § 2204(c)(1).

As an initial matter, there is no public access to Presidential records under the FOIA until the earlier of (a) five years after the date on which the Archivist obtains custody of the records, or (b) the Archivist's completion of processing and organization of the records or an integral file segment thereof.  Id. § 2204(b)(2).  In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories:  (1) classified information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.  See 44 U.S.C. §§ 2204(a)(1) - (6).  Thus, Presidential records falling into one of these six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA request during that time.  The PRA provides that the Archivist's decision to categorize a record as falling under one of the six enumerated, restricted categories, and then to withhold the record within the 12 year period, "shall not be subject to judicial review."  44 U.S.C. § 2204(b)(3); see also H.R. Rep. No. 95-1487, at 4, 16 ("The subsection also provides that when a presidential restriction is in effect, a determination by the archivist regarding access is not subject to judicial review . . .."); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1294 (D.C. Cir. 1993).

Pursuant to 44 U.S.C. § 2204(a), during his time in Office, President Clinton asserted his right to apply the six enumerated restrictions in the PRA for the full 12 year period to all

Presidential records.[3]  See Declaration of Emily Robison ("Robison Decl.") ¶ 8, attached hereto as Exhibit A.  Any documents covered by one of the six categories as currently defined in consultation with the former President are therefore not releasable until January 22, 2013, at which time those records not also subject to a FOIA exemption may be proposed for release. See id.  The five-year moratorium on public disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests for documents on that date.  Id. ¶ 15.

      **B.**      **FOIA Exemptions Applicable to Presidential Records**

      In addition to the aforementioned restrictions of the PRA, the PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b), except the (b)(5) exemption covering "privileged" records. See 44 U.S.C. § 2204(c)(1).  Thus, the documents responsive to Plaintiff's request must also be examined under the applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. § 552(b)(2) & (b)(7), respectively.  The Archivist may therefore withhold Presidential records under the FOIA exemptions, even if those records are not otherwise covered by one of the six enumerated restrictions of the PRA, or if those PRA restrictions have expired under the 12-year PRA restriction period.  See 44 U.S.C. § 2204(c)(1). Given the requirements of the PRA, as well as those of the FOIA which have been adopted by the PRA, the Clinton Library archivists must engage in a page-by-page, line-by-line review of all records responsive to Plaintiff's request before any disclosure of those records can be made.  See Robison Decl.  ¶ 18.

---

[3]  In 2002, President Clinton provided additional guidance to the Archivist, explaining that he intended to ease, for NARA's review and processing purposes, the application of two of the enumerated restrictions of the PRA, namely:  § 2204(a)(2), which concerns documents relating to appointments to Federal office; and § 2204(a)(5), which concerns confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers.  President Clinton did not, however, waive these two restrictions in their entirety.  See Declaration of Emily Robison ¶ 8.

**C.      Requirement for Presidential Review**

The PRA further provides that none of its provisions "shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." 44 U.S.C. § 2204(c)(2).  Consistent with those constitutionally-based privileges, the incumbent President and the former President (whose records are at issue) are both afforded an opportunity to review all Presidential records prior to their public disclosure.  See 36 C.F.R. § 1270.46; see also Exec. Order No. 13233, 66 FR 56025 (2001).  Specifically, once the Archivist has made an initial determination to disclose Presidential records, he must provide notice of the Presidential records to be disclosed to the former and incumbent Presidents, as well as an opportunity for them to review the records so that they may assert any constitutionally-based privileges.  See 44 U.S.C. §§ 2204(c)(2), 2206(3); C.F.R. § 1270.46; Exec. Order No. 13233.[4]

The legislative history of the PRA explains the rationale behind the delayed disclosure of restricted Presidential records and the mechanisms for ensuring Presidential review.  In passing the bill that became the PRA, Congress recognized that "premature disclosure" of Presidential records could have a "'chilling effect' on presidents and the frankness of advice they could expect from their staffs." H.R. Rep. No. 95-1487, at 8.  It was felt, in fact, that the failure to recognize that potential "might eventually diminish the completeness of the written record created and left by chief executives." Id.  Congress acknowledged, in passing the PRA, the need to consider the "expectation of confidentiality of executive communications to avoid the

---

[4] In American Historical Association v. National Archives and Records Administration, 516 F. Supp. 2d 90 (D.D.C. 2007), the court enjoined NARA from relying on section 3(b) of Executive Order 13233, but left intact all other provisions of the Executive Order.  The court held that after providing the former President with the minimum 30 days of notice that is provided for under NARA's regulations implementing the PRA, "the Archivist may make a discretionary decision with respect to the release of such documents though they are pending the former president's review." Id. at 110.  NARA will not take any action that is inconsistent with the court's Order.  As will be made clear below, however, the role that Executive Order 13233 may play with respect to the records responsive to Plaintiff's FOIA request is an issue that is neither ripe, nor relevant at this time, given the current status of Plaintiff's FOIA request in NARA's FOIA queue structure.

prospect of a constitutional infirmity." Id. Thus, the PRA sought to balance these considerations against the desire for "ready availability" of Presidential records. Id.; see also id. at 15 (Congress sought to balance "the objectives of assuring early availability with the concern that the premature disclosure of sensitive presidential records will eventually result in less candid advice being placed on paper and a depleted historical record").

## II.   Factual Background

### A.   The Clinton Presidential Library, FOIA Requests, and Queue Structure

The Clinton Presidential Library is a component of NARA and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members. Robison Decl. ¶ 2. NARA regulations provide that FOIA requests for Presidential records of the Clinton Administration be sent to the Director of the Clinton Presidential Library for processing.[5] See 36 C.F.R. § 1250.22(c).

NARA received legal custody of the Presidential records of former President William J. Clinton, including records from the Office of the First Lady, on January 20, 2001. See Robison Decl. ¶ 13. These records included approximately 78 million pages of textual records, over twenty million electronic email records, and over 60 other Clinton Presidential electronic systems. Id. Between January 20, 2001 and January 20, 2006 (the date that Clinton Presidential records became available to FOIA requests), the Clinton Library staff received training in anticipation of the opening of the Library's records to FOIA processing. Id. ¶ 14. This training included two archivists on the Clinton Library staff traveling to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Library's handling of FOIA requests under the Presidential Records Act. Id. The Library staff also participated in training

---

[5]   Consistent with the FOIA, NARA may expedite certain record requests "to the head of [its] FOIA queue." 36 C.F.R. § 1250.28(a); see also 5 U.S.C. § 552(a)(6)(E)(v) (regarding expedited FOIA requests). However, NARA's regulations provide that the agency "cannot expedite requests for Presidential records." 36 C.F.R. § 1250.28(b). NARA also has separate fee authority for its archival records. See 44 U.S.C. § 2116. Thus, the Clinton Presidential Library is not governed by the FOIA fee and fee waiver provisions in 5 U.S.C. § 522(a)(4)(A)(vi), and therefore, the Library does not provide fee waivers for copying. On the other hand, the Library does not charge search fees for the time that the Library's staff searches for documents responsive to FOIA requests. See Robison Decl. ¶ 20.

exercises held in person and via phone conferencing with NARA headquarters staff familiar with

FOIA processing issues in general, including being briefed by NARA's Presidential Materials

Staff, as well as by various other NARA FOIA officials.  Id.

Further, during this time, the Clinton Library staff was involved in establishing initial

intellectual control over both the presidential records and artifacts.  Robison Decl. ¶ 14.

Archivists prepared a "master location register, combining numerous inventories and in-house

databases in preparation for moving all materials to the Library site which opened November 18,

2004, and to assist Library staff in being able to respond to PRA and FOIA requests."  Id.  The

Library staff also created more detailed "finding aids," which provide a rough index of the

Library's various collections.  Id.  In addition, Library staff responded to numerous special

access requests and subpoenas.  Id.  Finally, the Clinton Library systematically processed and

released over one million pages of Clinton Presidential records.  Id.

The Clinton Presidential Library began receiving and accepting FOIA requests on

January 20, 2006.  Robison Decl. ¶ 15.  FOIA requests to the Clinton Presidential Library are

placed in queues to ensure fair and efficient processing.  Robison Decl. ¶ 17.  The Clinton

Presidential Library has 17 separate access queues, 16 for FOIA requests and one for mandatory

review of classified documents.  Id.   The queues are divided by the type of records requested, as

follows:  (1) textual unclassified; (2) textual classified; (3) electronic classified; (4) electronic

unclassified; and (5) audio-visual ("AV").  Id.   While a request may include multiple types of

records, each request is placed in the queue based on the record type that makes up the largest

portion of the request, except in the case of audiovisual material, which is segregated into its

own queues.  Id.  These five queues are then further divided by the volume of records initially

estimated to be responsive:  (1) large, i.e., over 5000 pages; (2) medium, i.e., 501-5000 pages; or

(3) small, i.e., 500 or less pages.  Id.   Within each queue, the FOIA cases are organized by date

received.  Id.   There is also a sixteenth queue for records subject to multiple requests.  Robison

Decl. ¶ 17.  The Clinton Library rotates through its queues, and as the next-in-line FOIA request

is selected from each queue, that queue will then go to the end of the queue line.  Id.

The Clinton Presidential Library queue structure has been continually evolving in order to ensure as fair and efficient processing as possible given the limited archival resources at the Clinton Library.  Id.  In an attempt to better serve its requesters, the Library has added additional queues and adjusted queue requirements.  Id.  For example, in July of 2007, the Library added the sixteenth queue for records that are the subject of multiple FOIA requests.  Robison Decl. ¶ 17.  FOIA requests are moved into the multi-request queue when the Library received multiple requests for significant portions of the same series or sub-series of records.  Id. ¶ 25.  Once the requests are transferred to the multi-request queue, the library will begin systematically processing the entire file, series, or sub-series as opposed to individual folders.  Id.  This process allows the Library to respond more rapidly to FOIA requesters who wish to gain access to the same or similar files.  Id.  Also, by opening an entire series or sub-series, other researchers will have access to these records without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog.  Id.  Further, the Library recognizes that continued flexibility may be needed in the future processing of extremely large requests, and it may consider treating very large requests as multiple segments to minimize the impact that such requests have on staff resources and on other FOIA requesters in line.  See id. at ¶ 17.  The current queue structure is the result of experience gained by conducting many FOIA request searches as well as extensive discussions among staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C.  Id. ¶ 17.

Between January 20, 2006, and April 4, 2006 (the date of the present FOIA request), the Library received 210 FOIA requests, totaling an estimated 5,260,000 pages.  Robison Decl. ¶ 16.  As of January 24, 2008, a total of 430 FOIA requests have been received by the Library since the five-year moratorium expired.  Id.  As of January 24, 2008, the archivists at the Library have processed 72 FOIA requests, representing a total of approximately 225,094 pages of textual and electronic records and 44,363 audio-visual records.  Id.  The Library currently has 303 pending FOIA requests, which it estimates will involve the processing of approximately 10,500,000 pages of Presidential records.  Id. ¶ 16.

The Library has no more than six archivists available to process, as a portion of their overall job responsibilities, all of the Library's pending FOIA requests for textual and electronic records (excluding the AV queues).  Robison Decl. ¶ 18.  However, NARA's Office of Presidential Libraries expects that the President's budget submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist for funding 15 new archivists for processing Presidential records.  Robison Decl. ¶ 24.  Additionally, NARA's Office of Presidential Libraries and the Presidential Materials Staff decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records.  Id. ¶ 26.  As a result, a one year pilot project was initiated to implement the most promising proposals. Id.  Such proposals include halting the time-consuming routine referral of classified records to originating and/or equity agencies.  Id.  NARA is also expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project, which, when operational, will give the Library the means to preserve, process, and provide sustained access to electronic records including Presidential electronic records.  Id. ¶ 22.

**B.     Plaintiff's FOIA Request**

By letter dated April 4, 2006, more than two months after the five-year moratorium on the public disclosure of Clinton Presidential Records had been lifted, Plaintiff submitted a FOIA request to the Clinton Presidential Library, seeking access to "Clinton Presidential records," specifically:  "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton (hereafter "Task Force"), to include but not limited to any and all sub-elements of the Task Force."[6]  Robison Decl. ¶ 4; see also id. at Exhibit 1, attached

---

[6]     The Task Force on National Health Care Reform was established by President Clinton on January 25, 1993.  The President named First Lady Hillary Rodham Clinton as the chairman of the Task Force, and appointed as its other members the Secretaries of the Health and Human Services, Treasury, Defense, Veterans Affairs, Commerce, and Labor Departments, as well as the Director of the Office of Management and Budget, and three White House advisers. President Clinton charged this body with the task of listening to all parties and then preparing health care reform legislation to be submitted to Congress within 100 days of President Clinton taking office.  See 29 Weekly Comp. Pres. Doc. 96-97 (Feb. 1, 1993).

thereto.  Plaintiff also requested a waiver of search and duplication fees.  Id. ¶ 4; see also id. at Exhibit 1 at 2-6.

The Supervisory Archivist for the Clinton Presidential Library replied by letter dated April 10, 2006, noting that an initial search of the Library's textual, electronic, and audiovisual Presidential records revealed approximately 3,022,030 pages of textual records, 2,884 pages of electronic records, 1,021 photographs, 3 videotapes and 3 audiotapes that may be responsive to Plaintiff's request (which was assigned case number 2006-0885-F).  Robison Decl. ¶ 31; see also id. at Exhibit 3, attached thereto.  In addition, she explained that "[t]here are approximately 13,400 pages of the White House Health Care Interdepartmental Working Group papers concerning the Task Force open and available for research."[7]  Robison Decl. ¶ 31.  The 13,400 pages comes from a much larger collection of 550,000 pages of records from the White House Health Care Interdepartmental Working Group that were made publicly available in 1994.  Robison Decl. ¶ 30.  Indeed, the Clinton Library has more records opened on the subject of health care than on any other single topic.  Id.

The Supervisory Archivist then explained the Library's review process, outlining how the Library processed FOIA requests for records covered by the PRA and placed the request in a FOIA queue:

> The staff of the Clinton Library is currently processing and reviewing FOIA requests that precede your request.  To treat everyone equitably, we have placed your request in our complex unclassified processing queue by the date it was received in our office.  FOIA requests received by the Clinton Library are processed and reviewed for access under provisions of the PRA and FOIA and are subject to Executive Order 13233, which requires that we notify the representatives of the former President and the incumbent President prior to the release of any Presidential records.

---

[7] President Clinton created the White House Health Care Interdepartmental Working Group at the same time that he created the Task Force on National Health Care Reform.  The Interdepartmental Working Group was created to gather information, generate ideas, and formulate alternative options for consideration by the Task Force.  See Clinton Presidential Library Finding Aid on the Interdepartmental Working Group, at http://www.clintonlibrary.gov/documents/Finding_Aid_HealthCare.pdf

Id. at Exhibit 3.  As was acknowledged by Plaintiff, sometime thereafter, staff at the Clinton Presidential Library assisted Plaintiff during its research visits to the Library.  Id. at Exhibit 4, attached thereto.

On July 25, 2006, Plaintiff sent a second letter to the Library, acknowledging the "processing and review procedures . . . under the provisions of the FOIA, the [PRA], and Executive Order 13233," and requesting a status update and estimated date of completion for six of its pending FOIA requests to the Library, including its request for records of the Task Force. Id. at Exhibit 4; see also id. ¶ 32.  The Supervisory Archivist responded on August 9, 2006, identifying 155 FOIA requests pending before Plaintiff's request and at least 2,000,000 pages of records to process before Plaintiff's request would reach the front of its queue.  Robison Decl. ¶ 32; see also id. at Exhibit 5, attached thereto.  She further explained that she could not provide an estimated date of completion, in part because the Clinton Presidential Library had only been processing FOIA requests for a period of less than seven months.  Id.

On January 16, 2007, Plaintiff again requested a status update and an estimated completion date.  Robison Decl. ¶ 32; see also id. at Exhibit 6, attached thereto.  The Supervisory Archivist responded on February 9, 2007, explaining that the FOIA request had moved up in its processing queue, but that it had not yet reached the front of the queue.  Id.; see id. at Exhibit 7.

Thereafter, Plaintiff's FOIA request was moved into the Library's newly-created multi-request queue because the Library has received other FOIA requests for records concerning the Task Force on National Health Care Reform.  Robison Decl. ¶ 33.  Prior to receiving Plaintiff's FOIA request, the Clinton Presidential Library received two FOIA requests (from third parties), that either directly related to, or were subsumed within, Judicial Watch's broad request for *all* of the Task Force's records.  The first of these requests was for "Ira Magaziner files on Health Care Task Force/Health Care Reform."[8]  Id.  This request is currently at the front of the multi-request queue, and there are a total of three requests pending in the other queues in rotation which must

---

[8] Ira Magaziner was President Clinton's senior policy advisor at the time that the Task Force was created; he was one of the three White House advisors who were also members of the Task Force.  See 29 Weekly Comp. Pres. Doc. 96-97 (Feb. 1, 1993).

be processed before the Library reaches this request.  Id.   There are an estimated 154,330 pages of records responsive to this request, 72,000 of which represent Ira Magaziner's Task Force records that will be processed first.  Id.  The second of these requests was for "Hillary Clinton files on Health Care Task Force/Health Care Reform."  Id.  There are an estimated 90,000 pages of records responsive to this request, 30,000 of which represent Hillary Clinton's Task Force records.  Id.  There are a total of 43 FOIA requests pending before this request.  Id.[9]

At present, the Library's best estimate is that it will *begin* processing the first of the two third-party requests within this calendar year.  Robison Decl. ¶ 38.  The second third party request will then be processed as it arises in the FOIA queue.  Once the Library completes processing each of these requests, or segments of these requests, the representatives of the former and incumbent Presidents must be given an opportunity to review the records.  Robison Decl. ¶ 35.  After that review process has been completed, the Library will be able to release these records and notify both the third party requester and Plaintiff that the records are open.  Id.

As for the remainder of Plaintiff's FOIA request (i.e., that portion of the FOIA request that is not processed in response to the prior third party requests), that request is currently sixth in line in the multi-request queue and there are a total of 82 FOIA requests pending before it in the queues in rotation.  Robison Decl.  ¶ 34.  If the Library is to process the full remainder of this request, the Library intends to allow for presidential review of the materials as the Library completes its review of portions of the responsive documents.  See id. ¶ 36.  Therefore, presidential review of the documents can occur incrementally, and as reasonably segregable subseries of documents have undergone that review, NARA can inform Judicial Watch of the Clinton Presidential records that are available and whether any records within that portion are being withheld.  Id.

---

[9] The records responsive to these two, third party requests would not, however, fully satisfy Plaintiff's all-encompassing request, as Plaintiff has not requested a simple subset of Task Force records, or a particular member's Task Force records, but instead have requested *all* of the Task Force's records.

## LEGAL STANDARDS

Defendant moves to dismiss this action under Federal Rules of Civil Procedure 12(b)(1), or in the alternative, under Rule 12(b)(6). The district court may consider matters outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction. Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Under the FOIA, "federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'" Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150 (1980). "Unless each of these criteria is met, a district court lacks jurisdiction to devise remedies to force an agency to comply with the FOIA's disclosure requirements." U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989); see also Kissinger, 445 U.S. at 150 ("Judicial authority to devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by § 552, if the agency has contravened all three components of this obligation."). Thus, where a request fails to comply with the FOIA's requirements, and the agency, therefore, has not improperly withheld anything pursuant to the FOIA, the court can dismiss the complaint for lack of jurisdiction. See, e.g., Dale v. IRS, 238 F. Supp. 2d 99, 107 (D.D.C. 2002) (concluding that because the plaintiff did not comply with the "requirement that the records sought be 'reasonably' described" and "did not make a 'firm commitment' to pay the fees associated with his FOIA search . . . the court is without jurisdiction over this action"); Kuffel v. U.S. Bureau of Prisons, 882 F. Supp. 1116, 1120 (D.D.C. 1995) (dismissing claims for lack of jurisdiction after finding that the agency conducted a good faith, reasonable search for records and that "the FOIA requirement that 'agency records' exist to be 'improperly withheld' cannot be met").

Other cases have found that a failure to comply with the FOIA's requirements is more properly the subject of a motion to dismiss for the failure to state a claim upon which relief can be granted. See Sweetland v. Walters, 60 F.3d 852, 855 (D.C. Cir. 1995) (dismissing FOIA claim under Rule 12(b)(6) where plaintiff could not show that the records in question were agency records under FOIA, and noting that the district court has subject matter jurisdiction over

substantive claims arising under the laws of the United States); <u>Nurse v. Sec'y of Air Force</u>, 231 F. Supp. 2d 323, 330 (D.D.C. 2002) (finding that the plaintiff failed to state a claim upon which relief can be granted, and granting summary judgment to defendant, because plaintiff failed to reasonably describe the records requested).[10]  In reviewing a motion to dismiss under Rule 12(b)(6), "the Court must accept all well-pleaded allegations as true, construing them in the light most favorable to the plaintiff."  <u>Jackson v. Bush</u>, 448 F. Supp. 2d 198, 200 (D.D.C. 2006).  However, the court need not accept unsupported inferences or legal conclusions drawn by the non-moving party.  <u>Am. Hist. Ass'n v. Nat'l Archives and Records Admin.</u>, 516 F. Supp. 2d 90, 102 (D.D.C. 2007)

In the alternative to a dismissal, Defendant moves this Court to stay the proceedings pursuant to 5 U.S.C. § 552(a)(6)(C), and <u>Open America v. Watergate Special Prosecution Force</u>, 547 F.2d 605 (D.C. Cir. 1976).  Generally, the Court may "allow the agency additional time to complete its review of the records" upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request."  5 U.S.C. § 552(a)(6)(C)(i).  The legal standard for granting a stay will be explored in greater detail below.

## DISCUSSION

## I.   Plaintiff's Claims Should be Dismissed Because its Request is Inadequate Under the FOIA

A request is inadequate under the FOIA if it will inflict an undue or unreasonable burden on the agency that must respond to that request.  Plaintiff's FOIA request for "[a]ny and all records of the Task Force on National Health Care Reform" imposes such an undue burden on the Clinton Presidential Library, as it would require the Library to process well over three

---

[10]   If this Court finds that the issue presented by Defendant's Motion to Dismiss is not a jurisdictional one, it should consider the motion under Federal Rule of Civil Procedure 12(b)(6). Although Defendant submits that, as to its Motion to Dismiss, the Robison declaration is used predominately for background information, if this Court's consideration of the declaration on this issue then converts the instant motion into one for summary judgment, the Court should nonetheless award summary judgment to Defendant.   Summary judgment is to be freely granted pursuant to Federal Rule of Civil Procedure 56 where there are no material facts genuinely at issue, and the agency is entitled to judgment as a matter of law.  <u>See, e.g.</u>, <u>Burka v. U.S. Dep't of Health & Human Servs.</u>, 87 F.3d 508, 514 (D.C. Cir. 1996).

million pages of documents under the PRA and FOIA's statutory scheme.  Although the sheer magnitude of a FOIA request is not a traditional reason for granting relief from the strictures of the FOIA, a request of this scale is not a traditional request, and compliance with such a request appears to be unprecedented in this circuit's published case law.[11]  Because the breadth of Plaintiff's request in this case would impose an exceedingly unreasonable burden on the Library, rendering the request inadequate under the FOIA, Plaintiff's Complaint should be dismissed for lack of jurisdiction or for failure to state a claim upon which relief can be granted.

> **A.      A Request is Inadequate Under the FOIA if it Would Require the Agency to Expend an Unreasonable Amount of Effort to Satisfy the Request**

A request under the FOIA must "reasonably describe" the records sought.  See 5 U.S.C. § 552(a)(3).[12]  This requirement has often been analyzed in the proverbial "needle in a haystack" scenario – that is, where the agency would have to conduct an unreasonably onerous search of a large volume of records in order to identify and locate the responsive documents.  See, e.g., Dale, 238 F. Supp. 2d at 104-05 (finding that a FOIA request for any and all documents that refer or relate in any way to the requester was subject to dismissal because the "request amounted to an all-encompassing fishing expedition of files at IRS offices across the country," and did not permit an IRS employee to locate the records with a reasonable amount of effort); Marks v. United States, 578 F.2d 261, 263 (9th Cir. 1978) (finding that a FOIA request that required a search of every FBI field office would not reasonably describe the records sought).

What is evident from this jurisprudence is that the reasonable description requirement is measured by the effort that must be expended by the agency to satisfy the FOIA request.  See

---

[11] In Armstrong v. Bush, 139 F.R.D. 547 (D.D.C. 1991), the plaintiff sued to prohibit the destruction of material stored on a particular computer system and simultaneously filed a FOIA request for that information.  The government denied the FOIA request, contending that it would have to print out and then process over seven million pages of material to respond to the request. Id. at 553.  Thereafter, the "plaintiffs [did] not appear to seriously dispute that the initial [FOIA] request was unduly broad." Id.

[12] Prior to a 1974 amendment of the FOIA, the statute required that a request made under the FOIA be for "identifiable records."  See Pub. L. 93-502, § 1(b)(1). This provision was amended to its current form, which requires that a request "reasonably describes" the records sought.

Dale, 238 F. Supp. 2d at 104 ("A description 'would be sufficient if it enabled a professional employee of the agency who was familiar with the subject area of the request to locate the record with *a reasonable amount of effort*.'") (internal quotation marks omitted) (emphasis added); Marks, 578 F.2d at 263 (same).  Thus, the courts have recognized that the question of whether or not a request "reasonably describes" records demands an underlying inquiry into the relative context of the agency's systems of records and the records themselves.  For example, in Goland v. CIA, 607 F.2d 339 (D.C. Cir. 1978), the D.C. Circuit stated that "[i]t is well established that an agency is not required to reorganize its files in response to a plaintiff's request in the form in which it was made, and that if an agency has not previously segregated the requested class of records production may be required only where the agency can identify that material with reasonable effort."  607 F.2d at 353 (internal quotations and citations omitted).  The court then dismissed the FOIA request because the agency's affidavit "plainly show[ed] that the *effort required* to locate the hypothesized 'back-up' documents would be unreasonable" in that case. Id. at 353-54 (emphasis added).

Even in situations where the FOIA request actually does describe documents with "sufficient precision to enable the agency to identify them" the agency still need not comply with a request that is "so broad as to impose an unreasonable burden upon the agency . . . ."  Am. Fed. of Gov't Employees, Local 2782, 907 F.2d 203 at 209 (emphasis added); see Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp.2d 19, 26-28 (D.D.C. 2000) (noting that "[a] description of the requested documents is adequate if it enables a professional agency employee familiar with the subject area to locate the record with a reasonable amount of effort.  *Further*, a request can be inadequate if it imposes an unreasonable burden") (internal citation omitted) (emphasis added); Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 891-92 (D.C. Cir. 1995) (finding that a search through 23 years of unindexed files for records pertaining to H. Ross Perot imposed an unreasonable burden on the agency); Irons v. Schuyler, 465 F.2d 608, 613 (D.C. Cir. 1972) (holding that although the request for "all unpublished manuscript decisions of the Patent Office" did "describe in general a type of record. . . the contours of the records thus

described are so broad *in the context of the Patent Office files* as not to come within a reasonable interpretation of 'identifiable records' as this statutory language is used in paragraph (a)(3).") (emphasis added).  At bottom, the amount of effort that must be expended by the agency is evaluated because the "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters."  Assassination Archives and Research Center, Inc. v. CIA, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd in part, 1990 WL 123924 (D.C. Cir. 1990) (per curiam).

> **B.    An Overbroad Request Can Require the Expenditure of an Unreasonable Amount of Effort by the Agency**

Courts have not explicitly confined the reasonableness inquiry to the "needle in a haystack" context.  Indeed, several courts have suggested that there are other scenarios which challenge the reasonable limits of a FOIA request.

For example, courts have noted that broad requests or broad interpretations of requests would be improper under the FOIA.  See, e.g., Hunt v. Commodity Futures Trading Commission, 484 F. Supp. 47, 51 (D.D.C. 1979) (rejecting the requesters' broader interpretation of their FOIA request as including information concerning the requesters *and* any other large commodity trader, where the request was only for information that "concerned" the requester, because such a broad interpretation would "expand their original FOIA request to include virtually every piece of paper in Commission files nationwide"); Gaunce v. Burnett, 849 F.2d 1475 (9th Cir. 1988) (unpublished) (finding that a request for "every scrap of paper wherever located in the agency which related to [the requester's] activity in the world of aviation" was "unreasonably vague" and that such "broad, sweeping requests" were not permissible under the FOIA. Id. at *1 (internal quotation marks omitted).

So, too, in American Federation of Government Employees, the D.C. Circuit held that a "broad" request for "every chronological office file and correspondent file, internal and external, for every branch office, staff office [etc.]" imposed an "unreasonable burden upon the agency" because the request would require the agency not only to locate the records, but also to "*review,*

*redact, and arrange for inspection a vast quantity of material*."  907 F.2d at 209 (emphasis

added).  Thus, in considering the burden that a FOIA request would impose upon an agency, the

court in American Federation of Government Employees considered more than the work

involved in merely searching for the records, but also considered the burden that the breadth of

the request would impose for the review and processing of the materials.[13]  Later, in Nation

Magazine, the D.C. Circuit reasoned that, "[t]o be sure, there are some limits on what an agency

must do to satisfy its FOIA obligations.  For example, a request to inspect 'every chronological

file, internal and external, for every branch office, staff office [etc.]' of the Census Bureau . . .

was held to be unreasonable."  Id. at 891 (citing Am. Fed'n of Gov't Employees, Local 2782,

907 F.2d at 208-209).  Consequently, the general principle that a FOIA request could impose an

unreasonable burden on an agency due to the sheer breadth of the request finds support in the

D.C. Circuit's FOIA jurisprudence.  In addition, overbreadth in the context of a FOIA request

has also been analogized to the discovery context, where overbroad requests are objectionable.

See Com. of Mass. v. HHS, 727 F.Supp 35, 36 & n.2 (D. Mass 1989) (noting that "[a] request for

all documents 'relating to' a subject is usually subject to criticism as over-broad . . . . Such a

request thus unfairly places the onus of non-production on the recipient of the request and not

where it belongs– upon the person who drafted such a sloppy request.  Just as such requests are

objectionable under [FRCP] 26(b)(1), so ought they be objectionable under the [Freedom of

Information] Act.").

    Moreover, a request for the entire "haystack," at some point, must be unreasonable under

the FOIA if the prevailing "needle in a haystack" case law is to be given any effect.  Irons v.

_____

[13] Several years prior, in Yeager v. Drug Enforcement Administration, 678 F.2d 315
(D.C. Cir. 1982), where the FOIA requester sought all the records within a particular computer
system of the agency, the court noted that "[a]lthough the number of records requested appears
to be irrelevant to the determination whether they have been 'reasonably described,' appellees'
overbreadth argument raises serious questions concerning the allowable scope of FOIA
requests."  Id. at 326.  In that case, there were approximately one million individual records (not
pages) at issue, id. at 321 & n 13, each record consisting of a single database entry of an
individual's information, id. at 317 & n.2.  The court in Yeager ultimately found that the FOIA
request reasonably described the records, but the court limited its finding to the "circumstances
of [that] case."  Id. at 326.

Schuyler provides an apt example.  There, the D.C. Circuit held that a request for "all unpublished manuscript decisions of the Patent Office" was so broad in the context of the Patent Office files as not to come within a reasonable interpretation of "identifiable records" because it would have required the agency to search through the "more than 3,500,000 files of patents, approximately 100,000 files of patent interferences . . . approximately 180,000 pending patent applications, and well over a million of abandoned patent applications" as any of these might have contained unpublished manuscript decisions.  465 F.2d at 611.  The court therefore dismissed the request because it would have imposed an unreasonable burden on the agency.  Irons and subsequent jurisprudence cannot be read so narrowly as to apply only in situations where the *search* for documents – as opposed to the processing of documents – is unduly burdensome.  Otherwise, a FOIA requester can always circumvent a dismissal by simply asking for the entire haystack.  In Irons, rather than asking for only the "unpublished manuscript decisions" of the Patent Office, the requester could have asked for all files of the Patent Office.  Such a request would not pose a specific problem of identification or search, but surely, such a request would be unreasonable under the FOIA.  Cf. Hunt, 484 F. Supp. at 51 (rejecting the requesters' broader interpretation of their FOIA request which would have included "virtually every piece of paper in Commission files nationwide"); Mason v. Callaway, 554 F.2d 129, 131 (4th Cir. 1977) ("[Requests for] all correspondence, documents, memoranda, tape recordings, notes, and any other material pertaining to the atrocities committed against plaintiffs, . . . including, but not limited to, the files of [various government offices] . . . typifies the lack of specificity that Congress sought to preclude in the requirement of 5 U.S.C. § 552(a)(3) that records sought be reasonably described.").

### C.    Plaintiff's FOIA Request for "Any and All Records of the Task Force" Imposes an Unreasonable Burden on NARA and Therefore Plaintiff has Failed to Make a Proper Request Under the FOIA

In the present case, Plaintiff's request for "[a]ny and all records of the Task Force on National Health Care Reform" imposes an exceedingly unreasonable burden on the Library due to its scope and sheer volume of responsive documents.  First, the Task Force itself was a

complex entity created by President Clinton, with First Lady Hillary Rodham Clinton as the chairman and several agency heads as its members, including the Secretaries of the Health and Human Services, Treasury, Defense, Veterans Affairs, Commerce, and Labor Departments, as well as the Director of the Office of Management and Budget, and three White House advisers. Therefore, "any and all" records of this complete entity would include records from each and every one of its members and records that the members may have obtained from any other sources.  As noted in its correspondence with Plaintiff, the Clinton Library estimated that over three million documents are responsive to Plaintiff's request for any and all records "of the Task Force."  <u>See</u> Robison Decl. at Exhibit 3.  The Library remains confident to this day that this request would involve in the range of three million pages of responsive records.  <u>Id.</u> at ¶ 37. That makes this request the largest FOIA request that the Clinton Presidential Library has received to date, and indeed it is larger than any FOIA request ever received to date by any of the other PRA Libraries.  Robison Decl.  ¶ 37.

Second, at least 13,400 pages of the White House Health Care Interdepartmental Working Group papers specifically concerning the Task Force have already been opened and are available for research.  <u>See</u> Answer at  ¶ 8.  Moreover, requests for the Task Force records of both Ira Magaziner and Hillary Clinton, were made prior to Judicial Watch's request.  Records responsive to those requests will begin to arise in the queue within this calendar year for processing by the Library.  Robison Decl.  ¶ 38.  Consequently, requests that are more specific and manageable in scope concerning the Task Force have been, or are, in the process of being released.  By comparison, however, Plaintiff's FOIA request is unreasonably broad.  Plaintiff's request would require the Library to process millions of pages under the PRA and FOIA's statutory schemes and time table and conduct a manual page-by-page, line-by-line review in order to redact materials protected by the PRA and the FOIA.[14]   Although NARA cannot

---

[14]   In addition to the approximately three million pages of textual records, 1,021 photographs, and six video and audio tapes, the Library would have to review an estimated 2,884 pages of electronic records, including the time-consuming process of converting any unreadable attachments to emails into a readable form for processing.

provide an exact estimate of how long it would take to complete the processing of such a massive set of records, based on the amount of records that the Library has processed within its first two years of receiving FOIA requests, and the number of personnel processing such requests, it is reasonable to expect that the processing of three million pages would take at least several years for the agency to complete, once the processing began.  See generally Robison Decl.  ¶ 38-40.

Such a review of documents is unreasonable under the FOIA's statutory scheme, which allows the agency an initial 20 days to respond to FOIA requests.  While the FOIA and Open America jurisprudence provide the agency a mechanism to seek a stay under exceptional circumstances, the onus should not be on the agency to seek this type of extraordinary relief any time a requester makes an overbroad request.[15]  Further, without limits to the reasonable breadth of a FOIA request, agencies and the courts faced with voluminous requests will always be forced into an extended court-monitored administrative process.  Other FOIA requesters who seek records from these agencies will suffer undue delay or have their requests pushed further down the queue by those with the resources to file a FOIA suit and obtain a court ordered resolution of their request.  A request that presents such an unreasonable burden on an agency is not proper under the FOIA and therefore Plaintiff's claims should be dismissed.[16]  Cf. Judicial Watch, Inc., 108 F. Supp.2d at 26-28 (finding that a request seeking "all records pertaining to contacts" between two individuals and any entities related to China was "unreasonably broad" and

---

[15]  The showing that an agency must make under Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976) and its progeny generally centers on the agency's FOIA system and backlog as a whole.  In the present case, the current backlog of FOIA requests at NARA that precedes Judicial Watch's request is a separate and distinct issue from the burden presented by Judicial Watch's overbroad request.

[16]  Defendant notes that due to the unique mission of NARA and the independent obligation on the Archivist under the 44 U.S.C. § 2203(f)(1) to make Presidential records available to the public as rapidly and completely as possible, the records requested by Plaintiff will ultimately be reviewed and processed for public release regardless of whether Plaintiff's claims are dismissed.  By this motion, Defendant only seeks relief from any obligations under the FOIA's statutory framework and timetable.

"burdensome," and therefore the request itself was deemed "inadequate" and no FOIA search was necessary).

## II.    Alternatively, this Court Should Grant a Stay of Proceedings to Permit the Clinton Presidential Library to Process its FOIA Requests in a Fair and Orderly Manner

In the alternative, this Court should take one of two approaches:  (1) hold Defendant's Motion to Dismiss in abeyance and grant Defendant's Motion for a Stay of Proceedings until Plaintiff's FOIA request reaches the front of its queue, at which point the Court could consider the Motion to Dismiss, or the Motion may be mooted by subsequent narrowing of the request;[17] or (2) grant Defendant's Motion for a Stay of Proceedings in order for Plaintiff's request to reach the front of its queue and to provide the Library with sufficient time to then process that request.

### A.    The Clinton Presidential Library Can Demonstrate Exceptional Circumstances Warranting a Stay of Proceedings

An agency receiving a FOIA request generally must determine whether to comply with the request within 20 working days.  See 5 U.S.C. § 552(a)(6)(A)(i).  Once the initial twenty days has passed without an agency determination on the request, the FOIA requester "shall be deemed to have exhausted his administrative remedies," id. at § 552(a)(6)(C)(i), and the requester can file suit in federal court.  The Court may, however, "allow the agency additional time to complete its review of the records" upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request."  Id. § 552(a)(6)(C)(i).  The leading case construing section 552(a)(6)(C)(i) was the D.C. Circuit's decision in Open America v.Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir.

---

[17]   The parties are discussing possible narrowing of the present FOIA request.  Most recently, Plaintiff has indicated that it might, for example, consider excluding certain litigation records and media reports relating to the Task Force from its request.  It is not clear how many, if any, of these records fall within the scope of records that the Library has identified as potentially responsive to Plaintiff's request for "all records" of the Task Force.  However, the Library intends to continue these discussions with Plaintiff and to assist the Plaintiff in any way it can in determining how the request could be narrowed.  Defendant will promptly notify the Court if the parties are able to achieve any significant narrowing of the request at issue.

1976), which held that an agency is entitled to additional time to process a FOIA request under §

552(a)(6)(C) when it:

> is deluged with a volume of requests for information vastly in excess of that
> anticipated by Congress, when the existing resources are inadequate to deal with
> the volume of such requests within the time limits of subsection (6)(A), and when
> the agency can show that it "is exercising due diligence" in processing the
> requests.

Id. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)); see also Oglesby v. U.S. Dep't of the Army, 920

F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional

circumstances have prevented it from responding on time, the court will refrain from ruling on

the request itself and allow the agency to complete its determination.").  The court noted that

section 552(a)(6)(C) "was designed and inserted specifically as a safety valve for [FOIA]."

Open Am., 547 F.2d at 610.  The Open America decision also recognized that the "real parties at

interest" may not be the ones before the Court but the "other persons or organizations who made

requests prior" to the plaintiff.  Id. at 614.  "If everyone could go to court when his request had

not been processed within thirty days, and by filing a court action automatically go to the head of

the line at the agency, we would soon have a listing based on priority in filing lawsuits, i.e., first

in court, first out of the agency."  Id. at 615.  Thus, a plaintiff is not entitled to jump ahead of the

line solely because it filed a lawsuit.

As part of the Electronic Freedom of Information Act Amendments of 1996, Congress

amended 5 U.S.C. § 552(a)(6)(C), affirming the proposition in Open America, and clarifying that

even a "predictable agency workload of requests" could constitute "exceptional circumstances"

when an agency could demonstrate "reasonable progress in reducing its backlog of pending

requests."  See 5 U.S.C. § 552(a)(6)(C)(ii) & (iii); H.R. Rep. No. 104-795, at 24, reprinted in

1996 U.S.C.C.A.N. 3448, 3467 (noting that the FOIA Amendments were "consistent" with the

holding in Open America).

In the D.C. Circuit, the current articulation of the standard for granting a stay pursuant to

the FOIA and the Open America doctrine is as follows:

> [A]n Open America stay may be granted (1) when an agency is burdened with an
> unanticipated number of FOIA requests; *and* (2) when agency resources are

> inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency shows 'reasonable progress' in reducing its backlog of requests.

Elec. Frontier Found. v. U.S. Dep't of Justice, 517 F. Supp.2d 111, 120 (D.D.C. 2007) (internal quotation marks omitted); Appleton v. FDA, 254 F. Supp. 2d 6, 8 (D.D.C. 2003) (noting first three factors); Ctr. for Pub. Integrity v. U.S. Dep't of State, 2006 WL 1073066, *2 (D.D.C. 2006) ("the amendments link the requirement to demonstrate 'reasonable progress' to those cases where an agency claims exceptional circumstances based on 'predictable agency workload' . . . . The legislative history contemplates that where an agency faces an 'unforeseen' increase in FOIA requests and the request for a stay is not based on a 'routine backlog,' a stay may be justified notwithstanding the lack of a reduction in the backlog.") (citing H.R. Rep. No. 104-795, at 24).

"When considering a request for an Open America stay, [a]gency affidavits are accorded a presumption of good faith" by the court.  Elec. Frontier Found., 517 F. Supp.2d at 117 (internal quotation marks omitted).  As will be shown below and through the attached declaration, the Clinton Presidential Library can demonstrate that exceptional circumstances exist, warranting a stay in this case.

1.     **The Clinton Presidential Library Has Received an Unprecedented Number of FOIA Requests**

Notwithstanding the various preparations for FOIA processing that were taken by the Clinton Presidential Library, including reviewing the procedures of other Presidential libraries, undergoing training sessions, categorizing and preparing the Library's voluminous collection for FOIA processing, and systematically processing over a million pages of records, several factors have culminated in an unanticipated volume of FOIA requests and unanticipated delays in the Library's ability to process such requests.

First, the five-year moratorium on disclosure mandated by the PRA expired on January 20, 2006, and the Clinton Presidential Library began to receive FOIA requests on that date.  The Library is therefore still in its infancy in receiving and processing requests, and is continuing to

develop and refine its queue structure for efficient processing.  In the first three months after January 20, 2006 alone, the Clinton Presidential Library received approximately 210 FOIA requests, totaling around 5,260,000 pages of records.  Robison Decl. ¶ 16. By the end of its first year of processing FOIA requests, the Library had received over 336 FOIA requests.  Id. ¶ 23. As of January 24, 2008, the Library has received a total of 430 FOIA requests.  Id. ¶ 16.

To place these FOIA requests for Clinton Presidential records in their proper context, it is useful to compare and contrast the experiences of the other PRA libraries.  While the Clinton Library received over 336 FOIA requests in its first year of processing, the George H.W. Bush Presidential Library and the Ronald Reagan Presidential Library both received approximately 100 FOIA requests in their respective first years of processing FOIA requests. Id. ¶ 23.  Thus, the Clinton Presidential Library received an unexpected number of FOIA requests in its first year of processing, representing a three-fold increase in the requests made to the two most recent Presidential Libraries.  Id. ¶ 23.  This increase in number of requests is compounded by the fact that despite the best efforts of the Clinton Presidential Library staff, and unlike the experience of NARA staff at the other Presidential libraries, the FOIA requesters to the Clinton Library have been less willing to substantially narrow broad and far-ranging requests.  Id.  It is clear, therefore, that within the Open America context, the Library has experienced an unanticipated number of FOIA requests.  See Elect. Frontier Found., 517 F. Supp.2d at 119 (finding that an additional one-third as many requests per month, coupled with staff shortages demonstrated that the agency had been deluged with a number of unanticipated requests); Open America, 547 F.3d at 617 (Leventhal, J., concurring) (noting that the government's showing that the number of FOIA requests had increasing at an unforeseen rate was supported by its affidavit which compared the requests received by the agency in years past).

In addition, the sheer total volume of records held at the Clinton Library has itself contributed to unanticipated delays in the Library's ability to process FOIA requests after January 2006.  As stated earlier, the Clinton Library holds an estimated 78 million pages of Presidential textual records.  By comparison, the Reagan Library holds approximately 43.8

million pages of textual records, and the Bush Library holds about 33.7 million pages of textual records.  Robison Decl. ¶ 21.  Beyond that, the Clinton Library also holds an estimated 20 million presidential electronic mail records, 2 million electronic cables and 60 other electronic systems, which is orders of magnitude greater than similar electronic record holdings elsewhere in these other Libraries, and, if printed in a textual format, would rival in size the entire volume of Presidential records generated during the eight years of President Reagan's administration. Id.  This increase in the volume of holdings and variety of formats of media necessarily requires more complex and time consuming searching and pulling of records, and demands greater efforts to maintain intellectual control over this vast collection of records through traditional hard copy finding aids and electronic indices of various kinds.  Id.

As the first Presidential Library to have a significant volume of born-electronic records, the Clinton Presidential Library has received FOIA requests for more than one million emails in the twenty months since Clinton Presidential records became subject to FOIA.  Id. ¶ 22.  While NARA is expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project, and while upgrades in functionality have been made to the system that currently holds Clinton Presidential electronic records, the Clinton Library must print electronic records to paper prior to arranging, reviewing, and describing them.  Id.  Additionally, the Clinton Library archival staff has spent large amounts of staff time on an unanticipated process known as a "de-hexification," a process converting attachments to individual email records that cannot be read due to an unknown or unreadable file into something approaching readable form.  Id.

### 2.  The Clinton Presidential Library Has Limited Resources, Inadequate to Process the Flood of FOIA Requests Within 20 Days

The Clinton Presidential Library can allocate no more than six archivists for processing all of its pending FOIA requests for textual and electronic records, (as represented in the thirteen non-AV queues) as a portion of their overall job duties and responsibilities.  Robison Decl. ¶ 18. Counting each archivist as a "Full Time Equivalent" or "FTE" position in government,

approximately 51.5% of total FTE time has been devoted to processing FOIA requests.  Id.  This

processing requires not only page-by-page, line-by-line review to ensure that all exempt

information is properly identified and redacted, but also includes the time-consuming tasks of

searching for, arranging, describing, and performing basic preservation on the responsive

records.  Id.  Also included in this process is the time required to conduct reviews of records as

needed in response to ongoing discussions with representatives of the former President.  Id.

 Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent

on reference services, including answering all incoming general reference requests from the

public, as well as requests received from places such as the White House, the Clinton

Foundation, the former President, government agencies, and others.  Robison Decl. ¶ 19.

Archivists also staff the Library's textual and audio-visual research rooms when researchers are

present.  Id.  During this time, archivists have responded to 3,600 separate reference inquiries.

Id.  Archivists staff the Library's textual and audio-visual research rooms when researchers are

present, and the Clinton Library has had 432 visits to its research room in this period.  Id.

Archivists also spend time responding to what are called "special access" requests under 44

U.S.C. § 2205, including since January 20, 2006, four significant special access requests from

the incumbent President, and one from a federal court.  Id.  These requests are often time

sensitive and require the review of classified information, thereby adding additional complexity

to the work done by the archivists.  Id.  Additionally, archivists spend time improving the

functionality of access to electronic records, including working with contractors on upgrades to

the Presidential Electronic Record Library known as "PERL."  Robison Decl. ¶ 19.   Finally,

archivists spend time working on museum exhibit issues, assisting the Curator with writing text,

and dealing with a variety of administrative issues as they arise.  Id.

 All of these other responsibilities of the archivists are not insignificant, and they weigh in

favor of a finding that the Library has limited resources to process the large volume of FOIA

requests within twenty days.  See Ctr. for Pub. Integrity, 2006 WL 1073066, at *3 (recognizing,

inter alia, the other responsibilities of the office that handled FOIA requests, including time-

consuming requests from Congress and other federal agencies); <u>Edmonds v. FBI</u>, 2002 WL
32539613, at *2 (D.D.C. Dec. 3, 2002) (noting that the "FOIA personnel also spend time on
administrative appeals, litigation, and large projects," contributing to the exceptional
circumstances warranting an <u>Open America</u> stay).

Beyond having limited resources available to process the FOIA requests ahead of
Plaintiff's request within the Library's queue, the Library also has limited resources to process
Plaintiff's actual request (of more than three million pages) within the general timetable of the
FOIA. <u>See</u> Robison Decl. ¶ 39. Limited resources and staffing shortages contribute to an
exceptional circumstance finding under <u>Open America</u>, as they inherently affect the progress that
can be made by the agency in processing FOIA requests. <u>See</u> <u>Elect. Frontier Found.</u>, 517 F.
Supp.2d at 119; <u>Ctr. For Biological Diversity v. Gutierrez</u>, 451 F. Supp. 2d 57, 70 (D.D.C. 2006)
(noting that "'[r]easonable progress' is affected, of course, by the number of requests for
information . . . and the budget allocated by Congress.").

### 3. The Clinton Presidential Library Is Exercising Due Diligence in Processing FOIA Requests and Has Shown Reasonable Progress in Reducing its Backlog

NARA is aware of the unprecedented number and volume of FOIA requests received by
the Clinton Presidential Library to date and has been working to address the issue. Most
significantly, NARA's Office of Presidential Libraries expects that the President's budget
submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist
for funding 15 new archivists for processing Presidential records. Robison Decl. ¶ 24. If
funded, the Clinton Presidential Library would receive the largest number of these archival
resources, and this staff would be dedicated to reducing the FOIA backlog at the library. <u>Id.</u>

Apart from seeking additional funding for positions, NARA has also taken concrete steps
to address the Clinton Presidential Library's FOIA backlog. For example, as part of a
government-wide effort undertaken in response to Executive Order 13392 to improve the
disclosure of government information, NARA's PRA libraries created multi-request FOIA
queues. Robison Decl. ¶ 25. As referenced above, FOIA requests are moved to this queue when

a library receives multiple requests for significant portions of the same series or sub-series of records.  <u>Id.</u>  Once the requests are transferred to the multi-request queue, the library has been systematically processing the entire series or subseries as opposed to individual folders.  Robison Decl. ¶ 25.  Systematic processing is faster than traditional FOIA processing, because it entails processing records in their archival and historical context, rather than simply finding, pulling, and tracking records from many different file series.  <u>Id.</u>  Therefore, systematic processing assists in responding more rapidly to FOIA requesters who wish to gain access to the same or similar files.  <u>Id.</u>  The multi-request queue is part of a larger, complex first-in first-out queue system at the Library, which also supports a due diligence finding.  <u>See</u> generally <u>Ctr. for Pub. Integrity</u>, 2006 WL 1073066, at *4;  <u>Appleton</u>, 254 F. Supp. 2d at 9; <u>Ohaegbu v. FBI</u>, 936 F. Supp. 7, 8 (D.D.C. 1996); <u>Cohen v. FBI</u>, 831 F. Supp 850, 854 (S.D. Fla. 1993).

In addition, NARA's Office of Presidential Libraries, after discussions with the Supervisory Archivists of the three PRA libraries, undertook an in-house study in the Spring of 2007 to review ways to achieve faster processing of Presidential records, and has initiated a one-year pilot project of the most promising proposals.  Robison Decl. ¶ 26.  NARA is also expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives project.  <u>Id.</u> ¶ 22.  Such undertakings serve as further evidence of due diligence.  <u>See</u> <u>Elect. Frontier Found.</u>, 517 F. Supp.2d at 118-19 (noting that the agency "continues to make efforts to reduce the backlog and processing time for FOIA requests, by developing the Sentinal Project and establishing the Central Records Complex," which are "expected to reduce the FBI's FOIA request processing time in the long-run"); <u>Appleton</u>, 254 F. Supp. 2d at 9 (noting, *inter alia*, that the agency implemented new electronic filing and redaction systems).

Finally, with regard to Plaintiff's request in this case, the Clinton Presidential Library has demonstrated its good faith efforts and due diligence, by quickly assigning the request a FOIA request number, placing it in the multi-request queue once that queue was created, and by always promptly responding to all inquiries by Plaintiff.  The Library also readily informed Plaintiff of

responsive documents that had already been made publicly available, assisted Plaintiff in its research visits to the Library, and has committed to producing documents on a rolling basis or in batches, in an effort to produce records to Plaintiff as quickly as possible while still complying with its obligations under the PRA and FOIA.  Such cooperation by the agency is yet another factor that demonstrates the agency's due diligence.  See Appleton, 254 F. Supp. 2d at 9.

NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints, to address the important issue of expedient FOIA processing.  In addition, while the Library is facing well beyond a "predictable agency workload of requests," it nonetheless has shown reasonable progress in reducing its backlog, processing 72 FOIA requests (representing 225,094 pages of textual and electronic records and 44,363 audio-visual records) since the opening of the Library.  Robison Decl. ¶ 16.  Specifically for Plaintiff's request, the Library's multi-request queue system ensures a fair, but efficient processing of records, demonstrated by the Library's commitment to begin processing a portion of Plaintiff's request within this calendar year.  Moreover, twelve FOIA requests totaling approximately 93,720 pages are currently being processed by Clinton Presidential Library archival staff.  Id. ¶ 33 & n. 3.  As each of these FOIA requests is completed, archival staff will pull the next FOIA request to be processed from its respective queue.  Id.

**B.      Additional Time is Routinely Granted When An Agency Demonstrates, As Here, Exceptional Circumstances**

Courts have frequently issued orders extending the time to respond to FOIA requests, including orders granting stays of several years in length or otherwise permitting agencies several years to process documents under exceptional circumstances. See, e.g., Elect. Frontier Found., 517 F. Supp.2d at 120 (granting agency's request for a one year stay, with the possibility of further extension at the end of that year if warranted); Piper v. U.S. Dep't of Justice, 339 F. Supp. 2d 13, 16 (D.D.C. 2004) (discussing a stay of two years given to the FBI); Appleton, 254 F. Supp. 2d at 7, 11 (granting FDA's motion to stay proceedings for over a year pending

completion of search and production of documents); <u>Williams v. FBI</u>, 2000 WL 1763680, at *3 (giving the FBI until May 2, 2001, to review records requested prior to August 21, 1998); <u>Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice</u>, 102 F. Supp. 2d 6, 9 & n.1 (D.D.C. 2000) (discussing an order giving the FBI until June 8, 2000, to respond to a request dated July 15, 1997); <u>Edmond v. U.S. Attorney</u>, 959 F. Supp. 1, 4 (D.D.C. 1997) (giving the U.S. Attorney's Office until April 1, 1998, to respond to a request filed August 14, 1992, with the opportunity to seek a further extension if necessary at that time); <u>Jimenez v. FBI</u>, 938 F. Supp. 21, 31 (D.D.C. 1996) (granting FBI's request for a four year stay to respond to the FOIA request); <u>Ohaegbu v. FBI</u>, 936 F. Supp. 7, 8-9 (D.D.C. 1996) (granting request for a one year stay).

Stays and extended periods for processing are particularly important in cases like this, where the agency has shown that it has taken its responsibilities under the FOIA very seriously, by taking reasonable preparations in training its staff and preparing its records, by processing requests in an orderly and fair basis, and, once a problem such as an unanticipated rise in FOIA requests and backlog occurs, by taking significant steps towards alleviating that problem. While it is regrettable that the Library is currently without greater resources to be able to process all of its FOIA requests within twenty days, it would be even more unfortunate, under these circumstances, to disrupt the Library's queue system and judicially assign Plaintiff's FOIA request for processing before other requests that are ahead of it. Robison Decl. ¶ 40. It has been recognized in <u>Open America</u> and its progeny, that such a solution is fraught with inequity. <u>See</u> <u>Open America</u>, 547 F.2d at 615 ("[B]y fixing a time limitation on agency action and according a right to bring suit when the applicant has not been satisfied within the time limits," Congress could not have intended that "an automatic preference" be given to the FOIA plaintiff where the result is that other "requests will be displaced"); <u>Caifano v. Wampler</u>, 588 F. Supp. 1392, 1394 (N.D. Ill. 1984) (finding that an order that an agency "take action on a plaintiff's [FOIA] request within a specified time period," "would be to 'vault' plaintiff's request over the requests of other individuals who were ahead of him in the FOIA line but who did not seek judicial relief. This would unfairly prejudice those other individuals, and we will not do that"). The inequity of line

jumping in a situation where the agency has taken reasonable steps to combat delay is even seen outside of the FOIA context.  See, e.g., Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (noting, in a mandamus action concerning delays in the Department of Interior's consideration of a tribal council's petition for federal recognition, that where there was no evidence that the agency was not working on the petition or was treating the petitioner unfairly, "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain") (internal quotation marks and brackets omitted); In re Barr Labs. Inc., 930 F.2d 72, 75 (D.C. Cir. 1991) (finding same, in a mandamus action concerning delays in the FDA's consideration of an application for approval of generic drugs, and noting that where the problem stemmed from a lack of resources, it was for the "political branches to work out").

    In this case, the inequitable consequences of vaulting the entirety of Plaintiff's request to the front of the FOIA queue are particularly troubling, given the massive volume of records that this particular request seeks.  Robison Decl. ¶ 40.  Not only would such a solution disrupt the fair and orderly processing of requests, it would do so with a mammoth request that is orders of magnitude beyond what the Clinton Presidential Library staff has experienced to date.  Id. ¶ 38. The resulting disruption and delay in the processing of other FOIA requests would be felt for many years to come.  Id. ¶ 40.  Because NARA can demonstrate both exceptional circumstances and due diligence in handling Plaintiff's request, the Court should stay the proceedings to allow the Library time to process Plaintiff's request in accordance with the Presidential Records Act.

    If this Court grants a stay of the proceedings, Defendant respectfully requests that an Order be issued staying the pending proceeding for one year (with an opportunity at that point to seek additional time as needed to complete the processing), in order for the Library to begin processing the first portion of Plaintiff's request (concerning Ira Magaziner's Task Force files). As for the remaining portions of Plaintiff's request, if deemed necessary by this Court, NARA is prepared to submit a status report within 120 days of the entry of any stay, to advise the Court

and Plaintiff of the status of those remaining portions of the request in the Library's FOIA queue.

## CONCLUSION

For all of the reasons noted above, this Court should dismiss this action for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), or for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In the alternative, Defendant respectfully requests that an Order be issued staying the pending proceeding in the manner described above.

Respectfully submitted this 29th day of January, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

OF COUNSEL                                     /s/ Varu Chilakamarri
JASON R. BARON                          VARU CHILAKAMARRI (NY Bar)
(DC Bar No. 366663)                     Trial Attorney, Federal Programs Branch
Director of Litigation                       U.S. Department of Justice, Civil Division
Office of the General Counsel          Tel: (202) 616-8489
NARA                                              Fax: (202) 616-8470
8601 Adelphi Road, Suite 3110       varudhini.chilakamarri@usdoj.gov
College Park, MD 20740
Telephone: (301) 837-1499             Mailing Address:
Fax: (301) 837-0293                        Post Office Box 883
jason.baron@nara.gov                      Washington, D.C. 20044

                                                        Courier Address:
                                                        20 Massachusetts Ave., NW, Rm. 7226
                                                        Washington, D.C. 20001

                                                        *Counsel for Defendant*

-34-

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that on January 29, 2008, a true and correct copy of the foregoing Defendant's Motion to Dismiss or, in the Alternative, for a Stay of the Proceedings, and Memorandum of Points and Authorities was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the documents are available on the ECF system.

 /s/ Varu Chilakamarri
VARU CHILAKAMARRI
