# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUDICIAL WATCH, INC.,            )
                                    )
             Plaintiff,   )
                                    )
            v.             )    Civil Action No: 07-1987 (PLF)
                                    )
U.S. NATIONAL ARCHIVES AND   )
RECORDS ADMINISTRATION,     )
                                    )
                                    )
             Defendant.  )
_____)

## DECLARATION OF EMILY ROBISON

I, Emily Robison, declare as follows:

1.     I am the Deputy Director of the William J. Clinton Presidential Library.  My background,

training, and experience is as an archivist, having been continuously employed at the Clinton

Presidential Library in the capacity of Supervisory Archivist from February 2002 to August 2004,

Deputy Director from September 2004 to May 2007, Acting Director from May 2007 to

November 2007, and currently as Deputy Director.   In my current capacity, I assist the Director

in supervising the staff of the Clinton Presidential Library, which currently include:  one

supervisory archivist who supervises eight archivists, one archives specialist, one archives

technician, and a part-time student; one curator who supervises 4.6 full-time equivalent ("FTE")

museum staff, one education specialist, 2.3 FTE audiovisual museum staff, and 3.5 FTE

admissions clerks; one IT contractor; and five administrative staff members of the Library.

2.      Pursuant to Title 44 of the U.S. Code, Chapter 21, the Clinton Presidential Library is a component of the National Archives and Records Administration ("NARA"), and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.

3.      Due to the nature of my official duties, I am familiar with the procedures followed by the Clinton Presidential Library in responding to requests for Presidential records from its files pursuant to the provisions of the Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and Executive Order 13233.  NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing. See 36 C.F.R. § 1250.22.

4.      Specifically, I am familiar with the treatment which has been afforded the April 4, 2006 FOIA request submitted by Judicial Watch, Inc., seeking "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton (hereafter "Task Force"), to include but not limited to any and all sub-elements of the Task Force." (See Exhibit 1).  That April 4, 2006 FOIA request was assigned FOIA case number 2006-0885-F.  That request also sought a waiver of search and duplication fees.

5.      This Declaration is based on my personal knowledge, as well as facts supplied to me by NARA staff as known to them in the course of their duties.

**PRESIDENTIAL RECORDS ACT OF 1978**

6.      The PRA sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records.  See 44 U.S.C. §§ 2201, 2207.  "Presidential records" covered by the PRA include "documentary materials, or any reasonably segregable portion thereof, created or

received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). Included among "Presidential records" are documentary materials created or received by the Office of the First Lady, when those materials meet the above definition.

7.      Documentary materials deemed Presidential records are the property of the United States, 44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA. Id. § 2204. The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative duty to make [Presidential] records available to the public as rapidly and completely as possible consistent" with limitations under the PRA. Id. § 2203(f)(1). However, there is no public access to Presidential records under FOIA until the earlier of (a) five years after the date on which the Archivist obtains custody of the records, or (b) NARA's completion of processing and organization of integral file segments of records. Id. § 2204(b)(2). In addition, the President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" within one of six enumerated categories:  (1) classified information designated by Executive order; (2) documents relating to appointments to Federal office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers; or (6) personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal

3

privacy. See 44 U.S.C. §§ 2204(a)(1) – (a)(6). Thus, Presidential records falling into one of the six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA request. The PRA provides that the Archivist's decision to withhold a record within the 12 year period under one of the six enumerated restrictions of the PRA "shall not be subject to judicial review." Id. § 2204(b)(3).

8.      During his time in office, President William J. Clinton asserted the six enumerated restrictions in 44 U.S.C. § 2204(a)(1) – (a)(6) for the full 12 year period. In a letter dated November 6, 2002, President Clinton provided additional guidance to the Archivist, explaining that he intended to ease, for NARA's review and processing purposes, the application of two of the enumerated restrictions of the PRA, namely:  § 2204(a)(2), which concerns documents relating to appointments to Federal office; and § 2204(a)(5), which concerns confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers. (See Exhibit 2). President Clinton did not, however, waive these restrictions in their entirety, nor did he eliminate the need for NARA to review and process records under all six of the PRA's enumerated categories. Accordingly, NARA must withhold documents covered by the six restrictions as currently defined in consultation with the former President. Any documents covered by one of the six Presidential restrictions on disclosure are not releasable until January 22, 2013, at which time those processed and restricted records that are not also subject to a FOIA exemption will be proposed for release.

9.      In addition, subject to the limitations on access imposed by § 2204(a) & (b), the PRA incorporates the provisions of the FOIA, including the enumerated exemptions from public access contained in 5 U.S.C. § 552(b), subject to the exception that the (b)(5) exemption, 5

U.S.C. § 552(b)(5), is unavailable.  See 44 U.S.C. § 2204(c)(1).  Applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. §§ 552(b)(2) & (b)(7), respectively, may apply to records not otherwise covered by one of the PRA restrictions.  Such FOIA exemptions, which are applicable in the twelve year period, may also be applied to Presidential records beyond the 12 year PRA restriction period.  See 44 U.S.C. § 2204(c)(1).  The Archivist may therefore withhold documents from disclosure under FOIA exemptions even when they are not subject to restriction under the PRA.

10.    Once a Presidential Library intends to disclose Presidential records, NARA must notify the incumbent and the former President, through their designated representatives, in order to provide them an opportunity to review the records for any constitutionally-based privileges that may apply.  36 C.F.R. § 1270.46; see also Executive Order 13233, § 3; 44 U.S.C. §§ 2204(c)(2), 2206.

11.    In light of the constitutionally-based provisions of the PRA and Presidential Executive Order 13233, including the requirement of a Presidential notification period, NARA's regulations provide that the agency "cannot expedite requests for Presidential records." 36 C.F.R. § 1250.28(b).[1]  Additionally, Judicial Watch did not request that NARA expedite its FOIA request.

---

[1] NARA's regulations at § 1250.28(b) reflect the provisions of prior Executive Order 12667.

5

12.     NARA has been following the requirements of Executive Order 13233[2] by notifying the representatives of the former and incumbent Presidents of its intent to release non-exempt records, and by providing the representatives an opportunity to review such records.

### FOIA PROCESSING AT THE CLINTON PRESIDENTIAL LIBRARY

13.     NARA received legal custody of the Presidential records of former President Clinton, including records from the Office of the First Lady, on January 20, 2001.  These records included approximately 78 million pages of textual records and over twenty million electronic email records and over 60 other Clinton Presidential electronic systems.

14.     Between January 20, 2001 and January 20, 2006, the Clinton Library staff was involved in establishing initial intellectual control over both presidential records and artifacts.  Archivists prepared a master location register, combining numerous inventories and in-house databases in preparation for moving all materials to the Library site which opened November 18, 2004, and to assist Library staff in being able to respond to PRA and FOIA requests.  Library staff also began to create more detailed "finding aids," which collectively provide a rough index to the holdings of the Clinton Administration at the Clinton Presidential Library, and they responded to numerous special access requests and subpoenas.  Library staff also proceeded in this period to process and release over a million pages of Clinton Presidential records systematically.   In anticipation of the opening of Clinton Presidential Library records to FOIA processing on January 20, 2006, two archivists on my staff traveled in 2005 to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Presidential Library's handling

---

[2] The Clinton Presidential Library is aware of the recent decision in *American Historical Association v. NARA*, Civ. No. 01-2447, -- F. Supp. 2d --, 2007 WL 2822027 (D.D.C. Oct. 1, 2007) (CKK), which enjoined NARA from relying on section 3(b) of Executive Order 13233, but left intact all other provisions of the Executive Order.  The Library will not take any action that is

of FOIA requests under the Presidential Records Act.  Clinton Presidential Library staff also participated in one or more training exercises held in person and via phone conferencing with NARA headquarters staff familiar with FOIA processing issues in general, including being briefed by NARA's Presidential Materials Staff, as well as by various other NARA FOIA officials.

15.     On January 20, 2006, the five-year moratorium on disclosure mandated by the PRA expired, thus triggering the period for public access requests to Presidential records through FOIA requests.  See 44 § 2204(b)(2). Hence, on that date the Clinton Presidential Library began receiving and accepting FOIA requests.

16.     Between January 20, 2006, and April 4, 2006 (the date of the present FOIA request), the Library received 210 FOIA requests for Clinton Presidential records totaling a rough estimation of 5,260,000 pages.  As of January 24, 2008, a total of 430 FOIA requests have been received by the Library since the five-year moratorium expired.  As of January 24, 2008, archivists at the Library have processed 72 FOIA requests, representing a total of approximately 225,094 pages of textual and electronic records, and 44,363 audio-visual records.  We currently have 303 pending FOIA requests, which we roughly estimate will involve the processing of at least 10,500,000 pages of Presidential records.

17.     To be as fair as possible to the public seeking access to Clinton Presidential records, the Clinton Presidential Library has established 17 separate access queues, 16 for FOIA requests and one for mandatory review requests of classified documents in accordance with Executive order 12958, as amended.  The queues are divided by the type of records requested, as follows: (1) textual unclassified; (2) textual classified; (3) electronic classified; (4) electronic unclassified;

inconsistent with the court's order.                                7

and (5) audio-visual (AV). Requests normally include multiple types of records. Requests such as these are placed in the queue based on the majority of the record type being requested, except in the case of audiovisual material which is segregated into its own separate queues. Requests in categories (1) through (5) identified above are then further divided by the volume of records initially estimated to be responsive: (1) large, i.e., over 5000 pages; (2) medium, i.e., 501-5000 pages; or (3) small, i.e., 500 or less pages. (In the case of the AV queues, the three queues are similarly organized by small, medium, or large request, by number of records rather than pages.) Within each of these fifteen queues, the FOIA cases are organized by date received. The Clinton Library rotates through each of the queues, as well as through a sixteenth queue for records subject to multiple requests, as described in more detail, *infra,* ¶ 25. As the next-in-line FOIA request is selected from each queue, that queue will then go to the end of the queue line. The Clinton Presidential Library queue structure has been continually evolving in order to ensure both fair and efficient processing, given the limited archival resources at the Clinton Library. In an attempt to better serve our requestors, we have added additional queues and adjusted queue requirements, and intend to continue to make further refinements as circumstances warrant. We further believe that continued flexibility is needed to handle future processing of certain extremely large requests (generally in the range of 50,000 pages and up) if such requests are not otherwise narrowed by the requestor. Accordingly, the Library reserves the right to consider treating these types of large requests as consisting of multiple segments, so as to limit initial processing to a subset of the request. Processing such large requests in this manner minimizes the impact on Library staff resources and does not otherwise unduly interfere with the rights of other FOIA requestors. Our current queue structure is the result of experience gained by

conducting many FOIA request searches as well as discussions between staff at the Clinton

Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in

Washington, D.C.  In response to Executive order 13392 on Improving Agency Disclosure of

Information, NARA prepared a FOIA improvement plan in 2006.  One of the proposals for the

PRA Presidential Libraries was to establish the additional queue for records that are the subject

of multiple FOIA requests.  This new multi-request queue was added in July 2007.  See

*infra*, ¶ 25.

18.     The Clinton Presidential Library can allocate no more than six archivists for processing

all of its pending FOIA requests for textual and electronic records, which comprise thirteen

queues and exclude the three AV queues.  Counting each archivist as a "full time equivalent" or

"FTE" position in government, we estimate that from January 20, 2006 until January 4, 2008,

approximately 51.5% of total archival FTE time was available to process FOIA requests.  (See

¶ 19 for an explanation of the remainder of FTE time.)  This processing requires not only a page-

by-page, line-by-line review to ensure that all exempt information is properly identified and

redacted, but also the time-consuming tasks of searching for, arranging, describing, and

performing basic preservation on the responsive records.  Also included is time required to

conduct re-reviews of records as needed in response to ongoing negotiations with representatives

of the former President.

19.     Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent

on reference services, including answering all incoming general reference requests from the

public, as well as requests received from places such as the White House, the Clinton

Foundation, the former President, government agencies, and others.  In that time, archivists have

responded to 3,600 separate reference inquiries.  Archivists staff the Library's textual and audio-

visual research rooms when researchers are present, and the Clinton Library has had 432 visits to

its research room in this period (including from representatives of Judicial Watch).  Archivists

also spend time responding to what are called "special access" requests under 44 U.S.C. § 2205,

including since January 20, 2006, four significant special access requests from the incumbent

President, one from Congress, and one from a federal court.  These requests are often time-

sensitive in nature and require intensive, detailed searching and review on the part of the archival

staff.  Also, these are often requests for the more sensitive and/or classified records in the library,

adding additional complexity to the work done by the archivists.  Additionally, archivists spend

time improving the functionality of access to electronic records, including working with

contractors on upgrades to the Presidential Electronic Record Library, known as "PERL."

Finally, archivists spend time working on museum exhibit issues, assisting the curator with

writing text, and dealing with a variety of administrative issues as they arise.

20.     NARA has separate fee authority for its archival records.  See 44 U.S.C. § 2116.  Thus,

the Clinton Presidential Library is not governed by the FOIA fee and fee waiver provisions per 5

U.S.C. § 522(a)(4)(A)(vi).  We do not provide any fee waivers for copying, although researchers

can view documents in a research room for free.  However, we do not charge any search fees for

the time that the Library's staff searches for records responsive to FOIA requests.

## UNANTICPATED DELAYS IN FOIA PROCESSING AND DUE DILIGENCE

21.     Notwithstanding all of our attempts at due diligence, the sheer total volume of records

held at the Clinton Presidential Library has contributed to unanticipated delays in the Library's

ability to process FOIA requests after January 2006.  For example, the Clinton Presidential

Library holds an estimated 78 million pages of textual Presidential records, whereas in contrast the Reagan and Bush Presidential Libraries hold 43.8 million and 33.7 million pages of textual records governed by the PRA, respectively. The Clinton Presidential Library also holds an estimated 20 million presidential electronic mail records, two million electronic cables, and 60 other electronic systems, which is orders of magnitude greater than similar electronic records holdings in these other Libraries and, if printed in a textual format, would rival in size the entire volume of Presidential records generated during the eight years of the Reagan Administration. This increase both in the volume of holdings and variety of formats necessarily requires more complex and time-consuming searching and pulling of records, and also demands greater efforts to maintain intellectual control over this vast collection of records through traditional hard copy finding aids and electronic indices of various kinds.

22.      As the first Presidential Library to have a significant volume of born-electronic records, the Clinton Presidential Library has received FOIA requests for more than one million emails in the two years since Clinton Presidential records became subject to FOIA. NARA is currently expending significant resources to address the explosion in volume of electronic records through its Electronic Records Archives program, which, when operational, will give us the means to preserve, process, and provide sustained access to electronic records including Presidential electronic records. See www.archives.gov/era. Additionally, upgrades in functionality have been made to PERL, which is the current system that the Library uses for holding and accessing Clinton Presidential electronic records. However, given the limitations of the PERL system (e.g., it has no on-screen redaction capabilities), the Clinton Presidential Library must print electronic records to paper prior to arranging, describing and reviewing them. Additionally, the Clinton

11

Presidential Library staff has spent large amounts of time on an unanticipated process known as "de-hexification," which involves converting attachments to individual email records that cannot be read due to an unknown or unreadable file into something approaching readable form.

23.     In the first year of FOIA processing alone, the Library experienced an unexpected jump in the volume and complexity of the incoming FOIA requests themselves compared to the first year at other Libraries.  In contrast to what transpired at the Reagan and Bush Presidential Libraries, we received 336 FOIA requests in the first calendar year of FOIA processing, between January 20, 2006 and December 31, 2006 – a three-fold increase over the approximately 100 FOIA requests received during the first year of FOIA processing at the Reagan and Bush Presidential Libraries.  Also, in contrast to the experience of NARA staff at those libraries, and despite the best efforts of Clinton Presidential Library staff, we have not been particularly successful in convincing FOIA requestors at our Library to work with us in substantially narrowing, either by date, content, or by some other reasonable means, what often have been extremely far-ranging requests for "all" records on a number of topics.

24.     NARA is aware of the unprecedented number and volume of FOIA requests received by the Clinton Presidential Library to date and has been working to address this issue.  Most significantly, NARA's Office of Presidential Libraries expects that the President's budget submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist of the United States for funding 15 new archivists for processing Presidential records.  If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this staff would be dedicated to reducing the FOIA backlog at the library.

25.     Apart from seeking additional funding for positions, we also have taken concrete steps to

12

address our FOIA backlog.  For example, as noted in ¶ 17, as part of a government-wide effort undertaken in response to Executive Order 13392 to improve the disclosure of government information, NARA's PRA libraries created "multi-request FOIA queues."  As referenced above, FOIA requests are moved to this queue when a library receives multiple requests for significant portions of the same series or sub-series of records.  Once the requests are transferred to the multi-request queue, the library will begin systematically processing an entire segment of records, as opposed to individual folders. Because systematic processing is faster than individual FOIA processing, this assists in responding more rapidly to FOIA requestors who wish to gain access to the same or similar files. Systematic processing is faster because it entails processing records in their archival and historical context; in contrast, FOIA processing requires archivists to find, pull and track records from many different file series.  Systematic processing also has had the effect of opening up more materials to access, because in lieu of making individual folders available, researchers can gain access to larger groups of records.  By opening an entire series or sub-series, we will enable access to these records to future researchers without the necessity of filing a FOIA request, which would ultimately add to the existing FOIA backlog. We have not yet had occasion to process extremely large requests in this queue; however, the Library will face at some point (including, perhaps, in this case) the issue of how to reasonably limit these requests so as to be fair to all other FOIA requestors.

26.    Additionally, NARA's Office of Presidential Libraries, after discussions with the Supervisory Archivists of the three PRA libraries, decided to undertake an in-house study in the spring of 2007 to review ways to achieve faster processing of Presidential records.  As a result of this study, a one-year pilot project was initiated to implement the most promising proposals.

Such proposals include halting what has been a time-consuming process of routinely referring to the originating and/or equity agencies those classified items processed in response to FOIA requests.

27.     In sum, NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints and the ever-increasing demand for Presidential records, to address the important issue of improving FOIA request processing.

### FOIA CASE LOG NUMBER 2006-0885-F

28.     On April 4, 2006, Judicial Watch submitted its FOIA request ("Request") for "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton . . . to include but not limited to any and all sub-elements of the Task Force." The Task Force on National Health Care Reform was established by President Clinton on January 25, 1993.  The President named First Lady Hillary Rodham Clinton as the chairman of the Task Force, and appointed as its other members the Secretaries of the Departments of Health and Human Services, Treasury, Defense, Veterans Affairs, Commerce, and Labor, as well as the Director of the Office of Management and Budget, and three White House advisers.  President Clinton charged this body with the task of listening to all parties and then preparing health care reform legislation to be submitted to Congress within 100 days of President Clinton taking office.  See 29 Weekly Comp. Pres. Doc. 96-97 (Feb. 1, 1993).

29.     After receiving Judicial Watch's Request, archivists at the Clinton Presidential Library conducted what we term a "preliminary search" to determine the approximate volume of records that could be responsive, in order to place the request in the appropriate FOIA queue.  The

preliminary search for records responsive to Judicial Watch's Request consisted of searching a series of databases in the nature of finding aids, as supplemented by the institutional knowledge of our Clinton Presidential Library staff archivists. Most of the databases are consolidated in the aforementioned PERL system. One of the applications searched is a database known as CDSS (the Clinton Document Search System), which allows Clinton Presidential Library archivists to search the description of Clinton Presidential records retired and filed in the White House Office of Records Management (WHORM) Subject Files, or folder titles of Staff Member Office Files entered into the WHORM system. This database serves as a finding aid to millions of pages of textual Clinton Presidential records. Other applications searched include databases originally created by the Clinton White House Photo Office and the White House Communications Office, which allow searches of Clinton Presidential photographs, videotapes, and audiotapes. Additionally, a search was conducted of an MS Access database created by the Clinton Presidential Library staff, consisting of Clinton Presidential folder title lists. Finally, the preliminary search also included a search of e-mails captured by the Clinton Automated Records Management System (known as "ARMS"), for potentially responsive e-mail records.

30.    Part of the preliminary search for FOIA requests entails examining finding aids and the MS Access database to determine if potentially responsive records have been previously released and, therefore, are already available. It is known to the Clinton Presidential Library staff that approximately 550,000 pages of records from the White House Health Care Interdepartmental Working Group ("Working Group") had previously been made publicly available in 1994. In fact, the Clinton Library has more records opened on the subject of health care than on any other single topic. The Working Group was created by President Clinton at the same time as the Task

15

Force. Both were a part of his Health Care Reform initiative. The Working Group was created to gather information, generate ideas, and formulate alternative options for consideration by the Task Force. Therefore, library archivists conducted a basic search of the folder titles of the Working Group finding aids, as well as the MS Access database, for previously released potentially responsive records related to the Health Care Task Force. It was determined that 134 folders totalling an estimated 13,400 pages of these previously released public papers of the Working Group specifically contained the terms "Health Care Task Force," or were specifically the files of Ira Magaziner, and as such were potentially more specifically responsive to the plaintiff's Request than the entire 550,000 pages of available material of the Working Group.

31.     By letter dated April 10, 2006, the Clinton Presidential Library's Supervisory Archivist notified Judicial Watch that its Request had been received and assigned case number 2006-0885-F.  The preliminary search of the Library's electronic finding aids and databases revealed that there were an estimated 3,022,030 pages of unprocessed textual records, 2,884 pages of unprocessed electronic records, 1,021 unprocessed photographs, three unprocessed videotapes, and three unprocessed audiotapes that were potentially responsive to the Request.  However, our letter also indicated that the "page total is an estimate and that all pages processed might not be relevant to [the] specific topic."  (See Exhibit 3).  We also explained that "[t]here are approximately 13,400 pages of the White House Health Care Interdepartmental Working Group papers concerning the Task Force open and available for research."  We then provided an overview of our review process, outlining how the Library processed FOIA requests for records covered by the PRA and placed the request in the queue.

32.     On July 25, 2006, Judicial Watch corresponded with the Library, requesting an estimated

completion date for the Request.  (See Exhibit 4).  On August 9, 2006, the Supervisory Archivist

responded that the Request had been placed into a processing queue and that approximately 155

requests preceded the Request, requiring processing and review of over 2,000,000 pages of

records pursuant to the PRA, FOIA, and Executive Order 13233.  (See Exhibit 5).  She also

noted that, "[b]ecause the Clinton Library has only been processing records in response to FOIA

requests for less than seven months, we do not yet have a sense of how long it will take us to

process the [pending requests] . . . nor how long it will take us to process [the Request] once [it]

reach[es] the front of our queue."  Upon receipt of further inquiry by Judicial Watch on January

16, 2007 (see Exhibit 6), the Supervisory Archivist responded on February 9, 2007 that the

Request had moved up in its processing queue, but that it had not yet reached the front of its

queue.  (See Exhibit 7).  The Supervisory Archivist explained that the archivists "must complete

a page-by-page review of all records to determine if this material can be released or if it requires

withholding under one of the six [PRA] restrictive categories and/or the eight applicable FOIA

exemptions that apply to Clinton Presidential records," and that "[w]e are working diligently to

make these records available as soon as possible."

33.     Because we received other requests involving records relating to the Health Care Task

Force prior to receipt of the request from Judicial Watch, Judicial Watch's request has been

placed in the Library's multi-request queue, which as explained in ¶ 25 was implemented to more

efficiently process requests or portions of requests for significant portions of the same series or

sub-series of records.  Prior to receiving Judicial Watch's request, the Clinton Presidential

Library received two other FOIA requests that are relevant to, if not subsumed within, Judicial

Watch's request.  Because we believe that all the records that are responsive to these third party

17

requests are relevant to Judicial Watch's request, in actuality, a portion of Judicial Watch's

request will be processed with each of the following requests.  The first health care request that

met the test for the multi-request queue is for records for "Ira Magaziner files on Health Care

Task Force/Health Care Reform."  This request will have records that fall within or relate to

Judicial Watch's request, as Mr. Magaziner was a senior advisor to the Health Care Task Force

and one of only three White House advisors that were also members of the Task Force. That

request is currently at the front of the multi-request queue.  There are currently three other queues

which have cases that must be processed before we next reach the multi-request queue.  We

estimate that out of the approximately 154,330 pages of records responsive to this request,

approximately 72,000 represent Ira Magaziner Health Care Task Force records that are also

responsive to the present Judicial Watch request and that will, therefore, be processed first.  This

request is the fourth case in line to be processed.[3]  The second health care request that met the

test for placement in the multi-request queue was made for "Hillary Clinton files on Health Care

Task Force/Health Care Reform."  We estimate that of the approximately 90,000 pages of

records responsive to this second request, 30,000 pages deal with Ms. Clinton's Health Care

Task Force Records, and thus form the universe of pages to be processed as part of the second

request in the multi-request queue dealing with the subject of health care -- which also happen to

be responsive to the Judicial Watch request.  There are a total of 43 FOIA requests pending

before this second health care request (not including requests in the separate AV queues).

34.      The remainder of the Judicial Watch request not processed in response to the two

previous health care-related FOIA requests is currently the sixth FOIA case pending in the multi-

_____

[3] Currently, the twelve FOIA requests totaling approximately 93,720 pages are being processed
by Clinton Presidential Library archival staff.  As each of these FOIA requests is completed,

request queue and, under the queue structure process described in ¶¶ 17 and 18, in which we rotate through each of the 13 non-AV FOIA queues, there are a total of 82 FOIA requests pending ahead of the remainder of Plaintiff's request.   Given that the remainder of the Judicial Watch request (approximately 2,900,000 pages, representing the original estimate of 3,000,000 pages, minus a combined 100,000 or so pages processed as part of the two earlier requests in the multi-request queue, per ¶ 33, *supra),* it is clear that this represents just the type of extremely large request that will likely best be handled by the Library in segments, so as to allow us to allocate our scarce staff resources in a manner that is fair to other FOIA requestors.

35.   Once processing of each third-party request, or segments of each request, is completed, pursuant to the terms of the PRA, NARA's regulations, and Executive Order 13233, NARA will notify the representatives of the former and incumbent President of the Clinton Presidential Library's proposed release of the records.   Once that review process has been completed, NARA will inform both the third party requestor and Judicial Watch of the Clinton Presidential records that are available and whether any records are being withheld.

36.   Once the remainder of Judicial Watch's request reaches the top of its queue and the Library begins processing it, the Library intends to allow for presidential review of the materials as the Library completes its review of portions of the responsive documents.   Therefore, presidential review of the documents can occur incrementally and, as reasonably segregable sub-collections of documents have undergone that review, NARA will inform Judicial Watch of the Clinton Presidential records that are available and whether any records within that portion are being withheld.

---

archival staff will pull the next FOIA request to be processed from its respective queue.

### ADDITIONAL OBSERVATIONS ON PROCESSING AND ON THE OVERBREADTH
### OF THE PRESENT REQUEST

37.   We continue to be confident that the present, unnarrowed Judicial Watch request involves in the range of three million pages.  At an estimated three million pages, the size and scope of Judicial Watch's present FOIA request makes it the largest FOIA request that the Clinton Presidential Library has received to date.  Further, the request is greater than any FOIA request ever received to date at any of the Presidential Record Act libraries (i.e., the Reagan and George H.W. Bush Presidential Libraries).   The largest FOIA request that the Clinton Presidential staff has processed, in its entirety, to date, was a segment of a FOIA for material relating to Native Americans, totaling 56,639 pages.

38.   As stated above, ¶ 16, in the two years since we began receiving FOIA requests, Clinton Presidential Library staff have processed approximately 225,094 pages of records.  The historical experience of Presidential Library staffs has been that the rate of FOIA processing increases over time, as archivists work with materials and become more familiar with the overall presidential record collections, as well as with the nature of FOIA exemptions and processing.  However, given the continuing uncertainty as to how much faster we can accomplish the processing of our current backlog of FOIA requests because of resource and budget constraints, we are not in a position to provide a reasonable estimate at this time as to how long it may take to process a FOIA request of three million pages in scope – a request orders of magnitude beyond what the staff at the Clinton Presidential Library has experienced to date.   As stated above, ¶ 33 & n.3, with 93,720 pages ahead of the first of the health care related requests in our multi-request queue, we believe that Clinton Presidential Staff will be in a position to begin working on a significant

portion of Judicial Watch's request during this calendar year.

39.   Prior to the onset of the present litigation, the Clinton Presidential Library did not, during the administrative process, elect to pursue active negotiations with the requestor aimed at attempting to narrow the scope of what is clearly an immensely large FOIA request.  Nor, however, did Judicial Watch approach the Library with a proposal for narrowing its request prior to initiating the present litigation.  Although plaintiff's past correspondence with the Clinton Presidential Library indicates some level of familiarity with the Library's holdings, it is not clear whether representatives of plaintiff have availed themselves of the Health Care Task Force materials that are currently open and available to the public at the Library, or other of the Library's resources, for the purpose of narrowing their request.  For the reasons stated in this Declaration, even a substantially narrowed request must await its time in the queue.  However, it is also clear that if plaintiff is willing to substantially narrow its request, the ultimate processing time may be significantly reduced.

40.   The Clinton Presidential Library and NARA take their responsibilities with regard to the administration of the Presidential Records Act and the FOIA very seriously, and all reasonable efforts are being made to comply with statutory deadlines.  It is regrettable that the Library is without greater resources at its disposal, and that the processing of presidential records for opening to the public is necessarily delayed.  Nevertheless, as a matter of equity, and to ensure that each requestor receives the attention he or she deserves, the Library must be able to process its pending FOIA requests based on the sound administrative policies and practices developed to date.  It would simply be unfair to judicially assign plaintiff's request for processing ahead of other requests in the various queues.  Each court order that requires that one request be given

21

priority ahead of others invariably works to the detriment of other, more patient requestors, and thereby encourages other requestors to seek relief in the courts, thereby undermining the Library's (and NARA's) attempts at managing the many FOIA requests received annually in a fair and consistent fashion. This is even more true in the present case, given the mammoth size and scope of the plaintiff's request, where a court order requiring the immediate halt of all other FOIA processing in favor of processing the present request will effectively deny FOIA access to all requestors of Clinton Library presidential records for many years to come.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2̲3̲ day of January, 2008.

_Emily Robison_____

EMILY ROBISON<br>
Deputy Director<br>
Clinton Presidential Library