EXHIBIT 3

— ADVERTISEMENT —

HRC 38.4    OBMA 18.9 +2.36    EDL

PREDICT. BUY. SELL. WIN. NJPSE

— ADVERTISEMENT —

NationalJournal.com Home • National Journal Magazine • The Hotline • CongressDaily • Technology Daily

**News Features**

Feb. 25, 2008

| | |
|---|---|
| **National Journal Group** Learn more about our publications and sign up for a free trial. | Ad Spotlight |
| | Almanac |
| | Buzz Columns |
| | Campaigns |
| | Daybook |
| **E-Mail Alerts** Get notified the moment your favorite features are updated. | Earlybird |
| | Markup Reports |
| | News Features |
| | Poll Track |

**Q&A: SHARON FAWCETT**
## Inside The Clinton Archives

© National Journal Group Inc.
Monday, Dec. 17, 2007

> "These are the most important records... of the government. And yet we can't provide sufficient staff to process presidential records in as timely a manner as everyone would like."
> — *Sharon Fawcett*

**Need A Reprint?** Click here for details on reprints, permissions and back issues.

Search

**Advertise With Us**
Details on advertising with National Journal Group -- both online and in print -- can be found in our online media kit.

Are **Bill** and **Hillary Rodham Clinton** locking away records from their years in the White House while Sen. Clinton seeks the presidency, or are they eager for speedy release of materials from the William J. Clinton Presidential Library in Little Rock, Ark. -- as they have argued in recent weeks?

*National Journal*'s Alexis Simendinger asked expert **Sharon Fawcett**, assistant archivist for presidential libraries at the National Archives and Records Administration. The following is a complete transcript of the Nov. 30 interview about President Clinton's instructions to the Archives, how the former first lady's records are handled, and how presidential records have been treated under the law ever since **President Nixon** left office. For previous Insider Interviews, click here.

**Go Wireless**
Get daily political updates on your handheld computer.


GOVERNMENT
EXECUTIVE.com

**Q: There are journalists, bloggers and political commentators -- even Karl Rove, President Bush's former White House political adviser -- who recently have suggested that President Clinton's actions tied to his records and those of his wife have been secretive or unusual. Right or wrong?**

> **Fawcett:** This matter has provoked a lot of questioning, but the National Archives believes there has been some misunderstanding about where we are in processing the Clinton records. No one is doing anything extraordinary or outside of the realm of what their statutory rights are. And another thing to

remember is that executive privilege is a constitutional right, and not just a statutory right. The Presidential Records Act is a statutory right, but executive privilege is a constitutional right.

It's really been useful to have this discussion about the opening of presidential records and to call attention to the major issues, and the complexity of reviewing and opening these files. These are the most important records, the highest policy records of the government. And yet we can't provide sufficient staff to process presidential records in as timely a manner as everyone would like to see them processed. I'm hoping that through all of this discussion, we are able to raise the awareness of the need for more resources for the National Archives in order to open these and other very important historical materials.

The statute, the Presidential Records Act, allows the president to impose certain restrictions on his records during the first 12 years after he leaves office.

Interestingly, he has to impose that restriction while he is still in office. If he neglects to send the Archivist a letter saying, "I wish to exercise my rights under the Presidential Records Act to impose these six categories of restrictions on my records for the first 12 years I'm out of office," he doesn't have the right. He has to do it while he's in office. So, normally presidents, usually in their first couple of months they're in office, will send a letter to the Archivist so designating that, and naming his or her representative.

**Q: And the National Archives seeks that letter [PDF] from the president?**

**Fawcett:** We meet with the incoming administration, with their general counsel's office, and we brief them on the Presidential Records Act, and we do let them know that this is something they need to pay attention to.

**Q: By law enacted after the clash over President Nixon's papers, who owns the records created by a president and his White House?**

**Fawcett:** The records that represent the constitutional and statutory roles of the president belong to the government, and the Archivist of the United States takes legal custody of those records at 12 noon on January 20 of the inaugural year.

**Q: President Clinton left office in early 2001, and by early 2005, it appears that he began to release some of his documents to the public, as the law allows. Is that right?**

**Fawcett:** In November 2002, President Clinton sent a second letter [PDF] to the Archivist which provided guidance to the NARA staff on the processing of his records -- a letter we requested -- specifically outlining what "easing of the restrictions" categories the president would be interested in applying to his records. I mean, they came to us and they were fairly open about what they wanted to open, and he listed

several categories in the letter.

And those categories have widely been interpreted to mean he was closing everything, for example, related to Mrs. Clinton, his communications with Mrs. Clinton. What he really said was that he would want to consider some material for withholding, but he wanted to see it first. It didn't mean he was closing it outright. But he did not want us to open anything regarding his communications with Mrs. Clinton -- and several other categories of information, including, for example, communications with former presidents -- without first being aware of it, seeing it, and giving it a pass. He encouraged NARA staff to consult with his designated representative on questions and concerns with respect to these categories.

**Q: When you say "easing of the confidential advice category," that is under President Clinton's own say-so, right?**

**Fawcett:** That's under his own say-so.

**Q: Whom did President Clinton designate as his representative?**

**Fawcett:** He designated the first lady and attorney **Bruce Lindsey** as his representatives.

**Q: Do people misunderstand the law that the president is following?**

**Fawcett:** The restriction category [to close some records] specifically at issue in this case is from the Presidential Records Act, is a category that we at the National Archives call "P5 confidential advice." It allows for the restriction of confidential advice between the president and his advisers, or between his advisers, for a period of time not to exceed 12 years after the president leaves office.

One of the reasons why President Bush revised and issued a new executive order [in 2001] on presidential records, is that at the end of the 12-year period of the [**Ronald**] **Reagan** records -- Reagan is the first president to have completed a 12-year period -- there was no longer an applicable FoIA exemption. Because once presidential records move out of the 12-year-Presidential-Records-Act restriction period, they can be restricted under the FoIA exemptions, and those apply to all executive agency governmental records, except for the FoIA exemption on the "deliberative process." Congress, in the Presidential Records Act, specifically exempted the presidential records from that provision of the FoIA. So, that provision could no longer apply to presidential records, which means that the only way a president can withhold material of a confidential nature -- not security classified, but of a confidential-advice nature -- is to claim executive privilege. And that's the whole heart of why the executive order was revised by President Bush.

Now, there are provisions in the executive order that made other changes that many groups found objectionable, but the major reason for issuing the executive order was because of the

loss of that confidential-advice exemption, and the need to expand the time in order to review for privilege claims.

**Q: Has President Clinton indicated to the archivists that there are any requests received at his library that he is particularly sensitive about?**

**Fawcett:** Only what's in his [1994] letter. That is the only communication we have regarding that.

**Q: The only other communications on this topic that you know about are the ones President Clinton has made publicly?**

**Fawcett:** Right.

**Q: During Senator Clinton's presidential campaign, have either President Clinton or Mrs. Clinton tried to contact the Archives, or through anyone else, to clarify anything having to do with the records, or to issue new instructions?**

**Fawcett:** Well, one of the things that President Clinton noted is that sometimes the Archives may be issuing notice [for records clearance]. This is a hypothetical example: 25,000 pages and the [Clinton] representative has finished reviewing 20,000 pages. And they've wanted to go forward with the pages that have been completed: "Let's notice those 20,000 pages, let's get that out there. And we'll continue to work on the remaining pages."

That put a little bit of an administrative burden on NARA to separate that out, but we understood the need to get the material out there, and we immediately changed our processes so that we could notify incrementally, as records came through the formal review processes. That's been in the last few months.

**Q: When President Clinton told the Archives he wanted to see the communications with Mrs. Clinton before he considered releasing them, was he going the extra mile? In other words, are all communications between a president and his or her spouse considered personal?**

**Fawcett:** In the National Archives, while many family communications are personal, the first lady [or first spouse] has a role. And when a first lady is representing the government in that role, we would consider the communications between her and the president to be governmental.

Now, if there are communication exchanges between the president and first lady about whether she should consider running for the Senate, those would be personal. If they talked about a health-care task force, she was playing a governmental role and representing the president in that role and those communications would be official.

**Q: What other records of a president are considered personal?**

**Fawcett:** The personal records are materials that are personal to the president's private life -- financial information; information about his family, his children; also, political information --

information about his role as head of the political party. Information about his campaign is considered political, and therefore personal, and not governmental.

**Q: Did President Clinton and Mrs. Clinton issue any special instructions to release political records, since political records can be held back as personal?**

> **Fawcett:** The Presidential Records Act suggests that those records should be separated. In reality, it's very difficult to separate the records because events are complex. For example, a presidential trip to a disaster area is partly constitutional and statutory, because the president is inspecting a disaster, but perhaps on the way to or from he went to a fundraising dinner, and that part of the trip was political.
>
> So it is very hard to keep the files completely separate. That ends up being a responsibility of the Archives to work through with the president's representative when we start reviewing. And, in fact, if there is a document and it includes both political and presidential material, that document is in fact presidential, although the political material may be closed under the privacy restriction. That's when we would redact. But we would consider that [as a whole] to be a governmental record. We are not going to start cutting up records and say, "Here, you get page one, and we get page two."

**Q: Is there anything the Clintons have done of note to expand the open holdings of the Clinton library?**

> **Fawcett:** I would say this: In the five-year period before the records were open to FoIA, certainly the president was interested in what the Archives could do about systematic review, and even requested that we review materials. And we agreed together that we should try to systematic-review many of the domestic policy files. So the Clinton library has done some systematic review of the domestic policy files because the president, through his representative, requested that we consider doing that. They were very interested in processing and opening the domestic policy files.

**Q: When President Clinton says, as he has in several interviews recently, that he wants to get more records out as soon as possible about Senator Clinton and her contributions as first lady, can he wave a wand and tell the Archives to dump the information out?**

> **Fawcett:** To an extent. He could waive all of his interests in reviewing the records, if he chose, but it would not automatically result in the dumping of this information out there for everyone to see. The Archives still has to conduct a review for other restrictive categories: for national security, for third-party privacy information. These records will be highly sought after when they come out, so we need to go through and redact phone numbers and Social Security numbers, and other information that could be damaging to a person's personal privacy, so those are the kinds of things that slow down the

process.

[For example,] we are in the current process of reviewing Mrs. Clinton's schedules [as first lady]. If her schedules indicate information about the Secret Service, we redact that information because it's critical and substantive to the protection of president. So that's the kind of information that we go through page by page and look at.

It would make the process slightly faster to not be concerned about a [presidential] representative's review of this material, however, it doesn't mean that he can wave the wand and automatically, the National Archives will open all this material. And you have to remember, too, that he [President Clinton] has a statutory right to review this material.

**Q: Some people believe that because there has been increased interest in Senator Clinton's records as first lady, prompted by her presidential campaign, those document requests should leap to the head of the line for expedited processing and release by the Archives. Is there a specified way in which the Archives must process requests for presidential records?**

**Fawcett:** The law specifies that people can file a Freedom of Information Act request for presidential records. And in the administration of FoIA, it's "first in and first out."

However, we have been permitted through court actions over the litigation about FoIA requests in general, not just FoIAs involving presidential records, to make the process more efficient. And one of the efficiencies in the process is to develop different queues. So you might have a complex queue, where the records come from many sources. You have a simple queue, where the record is one file; it's a few pages.

If you just had one long queue, if somebody had a request for 3 million pages, and you had a request for five pages, and you were behind the 3-million-page requester, it would be a long time before you would get your request. So, by having different queues, and the [Archives] staff rotating across the queues when they picked the next case to process, they are able to answer more of these simple requests and can turn some of them around fairly quickly.

We have several different queues at the [Clinton] library. There's a queue for classified records. There's a queue for audio-visual records. There's a complex queue where there's more than 10,000 pages.

**Q: Where are Mrs. Clinton's health care task force records, and have any of those records been processed and released?**

**Fawcett:** The records are at the Clinton presidential library in Little Rock, Ark. About 500,000 pages were processed and released while the president was still in office -- I think they were released in 1994 -- in response to litigation in the early

part of the Administration. These are records that directly related to the task force. There are many other records at the presidential library that relate to health care reform, that are outside of the purview of that task force, and those are not open, but there are FoIA requests pending for those records.

**Q: If the Little Rock library gets a request for documents that the archivists know were released while the president was in office, but the researcher is not aware of that, what does the library do?**

**Fawcett:** We just let the researcher know that. They would have to go to the library in Little Rock to review those records or order copies at their expense.

**Q: To clarify, a former first lady does not have executive privilege rights?**

**Fawcett:** No, that's right. Some people think it is Senator Clinton who is claiming executive privilege. She has no claim of executive privilege over these records. It is her husband who would have the claim of executive privilege over any of these records. And actually, since we are within the 12-year period, he wouldn't need to assert executive privilege. He would just close them as confidential advice, if he chose.

**Q: Has President Clinton done that?**

**Fawcett:** We have many things closed in library in that category. As of last February there were about 28,000 pages closed in all categories of restrictions, including confidential advice.

**Q: President Clinton has total control over that, within the 12-year window under the law?**

**Fawcett:** Right, although I would say sometimes the Archives makes the first cut of that and then provides the material to them to look at.

**Q: Have there been occasions when the Archives made the first cut and thought it was "confidential advice," and the president reviewed it and said, "Oh, no, put this out"?**

**Fawcett:** Oh, that happens with all the presidents. It goes both ways. You know, reviewing is not a science, it's an art form. And one day an archivist may feel a lot more conservative than on another day. You have to use your judgment, and you have different archivists.

**Q: How do the archivists treat first lady's records?**

**Fawcett:** It's interesting because of how that has evolved, because there is no constitutional role for the first lady, or any governmental role -- but we all know that the first lady travels and represents the president, performs at official functions, plans official social events. And all those functions have come to be regarded as official governmental records.

> It is interesting that we have a FoIA for her schedules [at the Clinton library]. Her schedules will be, in part, her representation of the government as the first lady, her travel with president in an official capacity, but other parts of her schedule will be completely personal, being a mom, a wife. She might have lunch with her daughter on her schedule. She could be getting her hair done, or she could be attending a school concert for her daughter -- that sort of thing. Those are not presidential events. I doubt that those [schedule] materials [of a personal nature] will be open.
>
> Eventually, and it's too soon after President Clinton left office for this to have happened yet, but eventually presidents are usually willing to deed over to the National Archives those personal records that we've had to redact. So, many of them may eventually be opened under guidelines set for review of personal records.
>
> It's very much like the records found in libraries where presidents deeded all their materials to us, that is, presidents before Reagan.

**Q: Can you describe the FoIA requests pending at the library related to Mrs. Clinton?**

> **Fawcett:** There are about 30 or so pending requests for records related to Hillary Clinton. Some of them are for one or two pages, or one document, or a photograph. Others are requests for extensive numbers of materials, including several requests for records related to health care.

**Q: How long do you think it will take for archivists there to complete the process of reviewing those records and have President Clinton review them, etc.?**

> **Fawcett:** I think we are talking about 3 million or more pages, a substantial number of pages, so undoubtedly those will not be completed before the Democratic convention [next August]. There may be some that are done. We will process incrementally to open as much as we can. I'm not sure what's next in the queue to come up; I do not know that.
>
> I know what's being processed now at the library are her schedules, about 10,000 pages of her schedules. That was in response to a FoIA request, and it is anticipated that the Archives will complete our part of the process in January.

**Q: When did the FoIA request for Mrs. Clinton's schedules come in, to give everyone an idea how long the Archives process takes?**

> **Fawcett:** The records at the Clinton library became available to FoIA on January 20, 2006. And I think early on in the process there were FoIA requests submitted for her schedules. It was fairly early, in the first few months [of 2006]. Since the archivists are processing it now, I must say, it must be one of the early ones to come in.

**Q: How long will it take to process and release a majority of the Clinton materials?**

**Fawcett:** We have approximately 70 million pages of textual material.

**Q: And e-mails?**

**Fawcett:** We're guessing 48 million pages, and we're basing that on an average of three pages per message, because of attachments. So, that leaves us with 118 million pages.

We are working on ways to make our process for processing these records at the Clinton library a little more efficient, and next year, we hope to process 200,000 pages.

**Q: And how many pages have you processed so far?**

**Fawcett:** About 100,000 pages under FoIA [Freedom of Information Act]. Now, there's more than that open. I think we have around a million pages open in the Clinton library.

So, just doing the math on it, you'll see there's a huge time lag. Now, as the records age, the process becomes a little more efficient. At the Reagan library, NARA archivists are now processing about a million pages a year. But not all of those are presidential records; some of them are other donated collections. So, the process does get more efficient, especially as you emerge from the periods of time that are covered by the Presidential Records Act of 1978 -- that 12-year period after a president leaves office, when certain restrictions apply.

**Q: And why does the processing move faster after that time?**

**Fawcett:** Some of the categories [exceptions for certain documents included in the 1978 law] -- the "confidential advice" category -- no longer applies. In the case of President Clinton, while there has been considerable easing of the confidential advice category, it still requires consultation with the president or his representative to clear documents for public release.

**Q: If President Clinton says, "This is what I want out," does the sitting president, President Bush, have the authority to review the materials?**

**Fawcett:** He can apply his own level of scrutiny. The [Bush] White House has indicated that any request that has gone through the former president's review -- I think they are immediately passing on it. But they certainly have the right by law to review it. That is part of the statute and the [2001 Bush] executive order. There certainly hasn't been a claim of executive privilege by the White House over any Clinton records.

**Q: President Bush's 2001 executive order, which Congress is now considering revoking with legislation, permits sitting presidents and**

> previous presidents or their heirs to weigh in on records release. Can you explain what President Bush ordered?
>
> > **Fawcett:** What the new executive order did that was different than the previous [Reagan-era] executive order is that it removed the discretion of the Archivist to make a call when there was a difference between the former president's view and the incumbent president on opening records.
> >
> > [Previously], if the former president wanted to close something -- wanted to claim executive privilege -- and the current president did not uphold the claim of executive privilege, it would be the Archivist's call to make a decision. This meant that if the former president wanted to dispute that call, he would have to litigate it.
> >
> > What the new executive order did was remove that discretion from the Archivist. And essentially Bush said in that executive order that, barring the most unusual of circumstances, he would uphold a former president's claim of privilege, which put the litigation responsibility onto the researcher, or the requester. That meant that if someone wanted to dispute the claim of executive privilege and take it to court, it would be the responsibility of the requester. And the Archivist was removed from that equation.
> >
> > Now, just to close the loop, if the former president wanted to open something, and the incumbent president claimed privilege -- this is under both executive orders -- it would remain closed, because the incumbent's claim of privilege trumps everyone else's claim. Now, we never put any of that to the test because at the end of 12-year period [in the Presidential Records Act] there was a hiatus on the opening of records, as the Bush administration held up everything until they issued the new executive order.
>
> **Q: Congress is trying to legislate away that Bush executive order?**
>
> > **Fawcett:** Right, but that has been ongoing for several years now. There is legislation before Congress that would basically terminate the requirements of the Bush executive order and go back to the requirements of the first one.
>
> **Q: Under existing law and practice, when the 12-year clock to open President Clinton's records tolls -- and if his wife is elected president in 2008 and then re-elected -- his records would be opened in the first year of her second term in 2013, and both the former president and the incumbent president, related by marriage, could hold sway over release of some materials. Does this system really work?**
>
> > **Fawcett:** [Laughs.] It's very similar to the situation in which President Bush became responsible for the records of the end of his father's 12-year term. The Presidential Records Act sets this up, and as it turns out, I don't think the Presidential Records Act ever anticipated that relatives would be responsible. But certainly, either a member of the same party or a member of the

opposite party could be in power. As I said, I doubt that the framers of the Presidential Records Act anticipated that there would be sons and spouses running for president.

We just follow the law.

**Q: Has the Archives recommended any changes related to the fact that it has encountered this situation, with relatives responsible for presidential records?**

**Fawcett:** In terms of checks and balances? If we restored the first executive order and gave the Archivist back his discretionary authority to mitigate between the incumbent and the former presidents on claims of executive privilege, that [change] would certainly assist. There has been a lot of concern about Bush's executive order, which gave the continuing right of executive privilege to family members of deceased presidents. That's also been a major point of concern.

The issue of executive privilege was litigated in regard to the Nixon papers, and the Supreme Court found that former presidents had a right of executive privilege. But the Supreme Court recognized that the privilege diminished over time.

You look at the Presidential Records Act, and this one modification to consider in the future is, how long is it necessary to continue noticing a White House? We still notice [notify for records review] the White House when we want to open records that go beyond the 12-year period. So we're noticing on Reagan records. Will we still be noticing on Reagan records in the year 2030, in the year 2050, in the year 2080? That's a question that needs to be addressed.

**Q: When would you have the clock stop on notification?**

**Fawcett:** There's always a tension in that. And I think if you have the clock stop too soon, it's difficult for people to let go. I think you have to come up with a time where you can really have the clock stop. It's like the executive order on declassification -- 25 years is really not enough time. The fact is that 25 years ago, some of the same leaders were in power that are still in power, and that makes declassification difficult.

So if you put a long enough time frame on it, then you can get out of questioning this. So maybe you could say 50 years is enough time, or maybe 40 years is enough time. It's unlikely that people who were prominent in an administration 40 years ago, or 50 years would still be prominent today, so there's no reason to keep noticing and worrying about executive privilege claims.

**Q: What kind of manpower and resources does the National Archives have at the Clinton library?**

**Fawcett:** We have 10 archivists there. Sixty-five percent of their time is spent processing FoIAs. Somebody might say, "What's the other 35 percent spent on?" There are

special-access requests, there's reference -- there are other duties that archivists have. There's preparing catalog entries. But 65 percent of their time is spent processing the actual FoIA requests. That's the searching, pulling the records, administering the queues, and reviewing the records.

**Q: Would it speed things up if President Clinton broadened the manpower his designated representative has available to review records processed by the Archives?**

**Fawcett:** If there were more people on President Clinton's staff looking at what we're proposing to open, it would be of incremental help. The big delay is really how long it takes the Archives to process this material.

We get a request; it's for a broad subject, like health care reform. That requires going through thousands of files to pluck out those files from 36,000 boxes that relate to health care. And then arranging those files, and reviewing them, and removing the personal information and the other restricted information, preparing withdrawal sheets, preparing notifications and submitting them for review.

In addition, there's the search of the electronic mail, and the electronic mail system is not a system that we can review online. We have to do searches, using [advanced] search terms just like people do when they search the Internet, and we get many, many hits on these things. You have to look at your hits and figure out how you narrow the search terms to get to the specifics you want. And then, if there are attachments, there is a process. In order for the archivists to read the attachments, they have to put them through a very complex process called dehexification -- don't ask me to explain it, I just know it's complicated and takes time -- in order for the archivists to even view the attachment on the screen. Then they have to print all that to paper, put it in a file, and prepare that for processing. There was e-mail in previous administrations, but not to the extent of this e-mail. President Clinton took office in 1993 and it helps to understand the magnitude of the e-mail if people think about when they first started using e-mail.

**Q: Do all the presidential libraries have similar Archives staffing, or do you put more archivists on the new libraries?**

**Fawcett:** From about President Johnson on, they all have about the same number. Some of them have one or two more; some have one or two less, and it's between eight to 10 archivists at each of these presidential libraries.

**Q: Considering demand, what would ideal staffing look like to be as rapidly responsive to requests as some people might like?**

**Fawcett:** Well, in an ideal world, I would probably look at having five or six more archivists in a presidential library processing records under the Presidential Records Act. And one of the things that we would attempt to do is far more systematic

processing. Systematic processing is much more efficient than FoIA. If we can identify those areas where there is the most research interest, we could put a portion of our staff to systematically reviewing those files. In other words, they pull a box off a shelf and start processing that box. They're not pulling individual files from all over the library.

I would try to do the processing more comprehensively. If you think of an intersecting line, the FoIA requests would eventually start to intersect with the records that have already been systematically processed, so they would be open and available. That would mean there would be a continuing decline in what people would have to FoIA, and the staff could get the records out in a more timely fashion.

We are making some modifications to our system in that we take a look at our FoIA requests, and we attempt to bundle them, so that if we have a number of FoIA requests on a specific related subject, we will bring them together.

For example, say we had a lot of requests on Afghanistan, but they cover different aspects of Afghanistan, we'd probably try to identify the majority of files that would cover that subject and let researchers know that we're processing that systematically, and then process it that way and notify all the FoIA requesters at the same time when the material is done. They are likely to get the material much more quickly that way. But again, it depends on the subject interest of the FoIAs, and FoIAs really come in based on what's happening. You know, Hillary Clinton is running for president, so we have FoIA requests asking for her records.

**Q: To clarify, the reason the Archives processes material based on FoIA requests is because the process is specified in the law that way?**

**Fawcett:** Right. We have to be responsive to FoIAs.

It will be very hard to ever peddle back against doing FoIA, and I wouldn't even advocate that we not have FoIA for presidential records, because that enables people to request what is of most interest.

It's a resource question. And it's really more about a meeting of minds among the media, the historians and the others who request these records to say, "Let's let the Archives process records in this area, or this area. Let's advise the Archives about the most important records to process." And then, if we have sufficient resources and we could still meet our FoIA obligations, we could do more of the systematic processing. I think we could make a lot of people much happier about the situation in the libraries.

We should do both, and I think that's what we have to be able to do, and if we do both, then the idea is that we are addressing systematically the records of most concern without turning off the ability of people to file individual FoIA requests.

I think what would then happen is that new FoIA requests would be very specific. They would be requests for a specific document or a specific file, as opposed to these massive requests for great quantities of information.

**Q: Has the Archives finished cataloging the records in the Clinton library to know what's there?**

**Fawcett:** We have a pretty good idea of what we have. Most of the boxes have a folder-title list. Sometimes they're a little general, like "correspondence," and you wonder what the correspondence is about. But if you know who the aide is -- that this was the legislative affairs person -- you have a pretty good idea of the type of thing that might be in that box. There are always finer levels of control that we can give to the records, but we have a fairly good knowledge of where to go and look for material.

And because archivists are treasure hunters, once you find a file, it often leads you to other files. So, you might not know everything when you begin the search, but after you examine some files, you recognize, "Oh, you know, so-and-so was also working on this area. I should go check and see what's in his boxes," and then look at that folder-title list and see if anything jumps out at you that might have been too general in your initial search. But now that you know for sure he was working in that area, you decide to go and check.

**Q: Do you discover that some White House officials are particularly efficient record-keepers and others are spottier?**

**Fawcett:** If they sent the records to the White House Office of Records Management, we really have fairly good control over those. It's the records that they might have kept in their office, strewn across the top of their desk or in their file drawers that may be more problematic for us to sort through. But the ones they box up and send to the White House Office of Records Management have been inventoried. And you know what is a real controlling factor for doing that? The offices in the White House are extraordinarily small. The officials can't keep much in their offices. So they tend to send their records to WHORM, and then the records management people make lists, and those are the lists we inherit.

**Q: What about the other libraries covered by the Presidential Records Act? What's open so far?**

**Fawcett:** At the Reagan library, we have 8 million pages open, out of the 43 million pages. And at the George H.W. Bush library, we have about 5.5 million open, out of not quite 34 million pages of records. At the deed-of-gift libraries, some of the older ones, it is nearly 100 percent. Mainly at Ford, Eisenhower, Kennedy, and Johnson, we're completing the review of classified files that we're working on releasing. The Ford library is about 70 percent open. Carter is somewhat less.

[ **Insider Interview Archives** ]

### Need A Reprint Of This Article?
National Journal Group offers both print and electronic reprint services, as well as permissions for academic use, photocopying and republication.
Click here to order, or call us at 877-394-7350.

[ E-mail NationalJournal.com ]
[ Site Index | Staff | Privacy Policy | E-Mail Alerts ]
[ Reprints And Back Issues | Content Licensing ]
[ Make NationalJournal.com Your Homepage ]
[ About National Journal Group Inc. ]
[ Employment Opportunities ]

Copyright 2008 by National Journal Group Inc.
The Watergate · 600 New Hampshire Ave., NW
Washington, DC 20037
202-739-8400 · fax 202-833-8069
NationalJournal.com is an Atlantic Media publication.