IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC. )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>U.S. NATIONAL ARCHIVES AND )<br>RECORDS ADMINISTRATION )<br>)<br>    Defendant. )<br>_____) | Civ. Action No. 07-1987 (PLF) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR A STAY OF THE PROCEEDINGS AND IN SUPPORT OF
PLAINTIFF'S MOTION FOR LIMITED DISCOVERY**

Plaintiff, by counsel, hereby submits this memorandum in opposition to Defendant's Motion to Dismiss Or, In the Alternative, For a Stay of the Proceedings. For the reasons set forth below, (1) Defendant's motion should be denied in its entirety; and (2) Plaintiff's accompanying motion for limited discovery should be granted.

## MEMORANDUM OF LAW

### Introduction

Defendant describes at great length the hurdles it faces in order to respond to Plaintiff's Freedom of Information Act ("FOIA") request. Defendant, however, cannot evade certain realities.

First, more than seven years after taking possession of the records of former President William J. Clinton, and almost two years after receiving Plaintiff's FOIA request, the Clinton

Presidential Library ("Library"), which Defendant controls, has not even begun processing Plaintiff's request.  Moreover, Defendant defiantly refuses to offer even a timetable under which it will begin processing the request.   Instead, Defendant asks this Court to dismiss or stay this case despite Defendant's admission that it wildly underestimated the public's interest in the records, was woefully unprepared when it started receiving FOIA requests, and remains understaffed and entirely unable to comply with its statutory responsibilities.

Serious questions exist concerning how Defendant is handling Plaintiff's FOIA request.  Without its consent, Plaintiff's request apparently has been placed within the Library's byzantine seventeen-part queue structure.  At a minimum, this queue structure is violative of the "first in, first out" principle governing FOIA requests.  In addition, it appears that the Library is using allegedly scarce resources to process FOIA requests concerning subjects such as "Unidentified Flying Objects," ahead of more timely, public interest requests.  *See* Exh. 1 (Fred Lucas, "Clinton Library Answers UFO Theorist, Not USA Today," *Cybercast News Serv.* (Feb. 4, 2008); *see also* Exh. 2 (Clinton Presidential Library, "Inventory for FOIA Request 2006-492-F").  This, along with other issues, raises serious questions as to how processing decisions are in fact being made at the Library.  Accordingly, accompanying this memorandum is Plaintiff's motion to conduct limited discovery regarding the processing procedures of the Library prior to any stay being entered.

At a minimum, Defendant's motion to dismiss or stay this case should be denied.  Not only for Plaintiff, but for the public interest, Defendant must not be allowed to evade its duty to respond to Plaintiff's FOIA request.

**Factual Background**

Judicial Watch is a nonprofit, educational foundation organized under the laws of the District of Columbia.  Judicial Watch seeks to promote integrity, transparency, and accountability in government and fidelity to the rule of law.  In furtherance of its public interest mission, Judicial Watch regularly serves FOIA requests on Federal, state, and local government agencies, entities, and offices, and disseminates its findings to the public.

The Presidential Records Act ("PRA"), 44 U.S.C. § 2201 *et seq.*, establishes a five-year moratorium on the disclosure of presidential records after a president leaves office.  After five years, presidential records become subject to FOIA requests, unless a president expressly designates a longer period of time, not to exceed twelve years.

Defendant received custody of the records of the Task Force on National Health Care Reform ("Task Force") from the departing Clinton administration on January 20, 2001.  *See* Def.'s Mem. of Points and Auth. In Support of Def.'s Mot. to Dismiss Or, In the Alternative, For a Stay of the Proceedings ("Def.'s Mem.") at 7.  Over the course of the next five years, Defendant claims that it provided training to Library staff and otherwise prepared to receive FOIA requests under the PRA.  *Id.* at 7-8.  On January 20, 2006, the five-year moratorium on FOIA requests for the records of President Clinton expired.  According to Defendant, the Library established 17 separate "access queues" for these records, 16 for FOIA requests and one for review of classified documents.  *Id.* at 8.  Each queue is then subdivided based on the type of record requested and volume of responsive records.  The Library then rotates through the "queue structure," processing one request per queue.  *Id.*  After a request is processed, that queue goes to the "end of the line."  *Id.*  Defendant describes the queue structure as "continually evolving" and

that the Library anticipates "continued flexibility" in how requests are assigned to various queues. *Id.* at 9.

According to Defendant, as of January 24, 2008, the Library has processed only 72 of the 430 FOIA requests it has received since it began receiving requests more than two years ago. *Id.* This allegedly represents 225,094 pages of textual and electronic records and 44,363 audiovisual records.[1]  *Id.*  The Library has six archivists who, as only part of their job duties, process FOIA requests. *Id.* at 10.

Plaintiff submitted its FOIA request on April 4, 2006, seeking access to records of the Task Force. *Id.*  The Library responded by stating that approximately three million records may be responsive to the request and further stated that the request was placed in the "complex unclassified processing queue." *Id.* at 11.  In response to Plaintiff's inquiry, on August 9, 2006, Defendant informed Plaintiff that 155 FOIA requests were pending before Plaintiff's request as of that date. *Id.* at 12.  It is unclear how many of these requests were submitted before or after Plaintiff's request. *Id.*  Subsequently, Plaintiff's request apparently was transferred from the "complex unclassified" queue to a newly-created "multi-request" queue. *Id.*  It is unclear what effect these assignments to various queues had upon Plaintiff's overall position in the queue.

Defendant has offered no timetable for when processing of Plaintiff's request will begin, much less be completed, claiming that 82 FOIA requests are currently pending before Plaintiff's request in the "queues in rotation." *Id.* at 12-13.  Defendant does assert, however, that the processing for a third party's FOIA request for the files of Ira Magaziner, a subset of Plaintiff's

---

[1] According to a November 30, 2007 interview with an archivist employed by Defendant, the number of processed records is approximately 100,000. *See* Exh. 3 (*National Journal*, "Inside the Clinton Archives: Q&A: Sharon Fawcett," at 9 (published Dec. 17, 2007)).

4

request, will begin sometime this year, but offers no estimate when that processing will be completed. *Id.* Defendant claims that a third party's request for the files of Mrs. Clinton, which also is a subset of Plaintiff's request, is ahead of Plaintiff's request in the queue structure. *Id.* at 13. Defendant offers no estimate as to when processing of that request will begin. *Id.*

Only 13 days before filing its motion to dismiss or stay this matter and 21 months after receiving Plaintiff's request, Defendant asked Plaintiff to narrow its request. *See* Def.'s Mem. at 23 n.17; Exh. 4. In response to Plaintiff's request for more information with which to try to narrow its request, Defendant identified six general categories of responsive records. The sixth category is described as "Working Files; Staff Office Files and Memoranda" and includes a wide variety of types of records. *See* Exh. 5. By letter dated February 15, 2008, Judicial Watch agreed to narrow its FOIA request to this sixth category of records only, reducing the volume of responsive records by two-thirds. *See* Exh. 6. Judicial Watch expressed its willingness to consider a further narrowing of the request if and when additional detail regarding this category of records becomes available.

Despite Plaintiff's good faith efforts to cooperate with Defendant and narrow its request in an appropriate manner, Defendant nonetheless continues to assert that this action should be dismissed, or, in the alternative, indefinitely stayed, citing *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976). Plaintiff objects to Defendant's failure to provide *any* estimate of the date by which it will complete, or even begin, its processing of even this much narrower set of records. Plaintiff also objects to staying this litigation indefinitely. Defendant has failed to satisfy its burden of demonstrating that a stay is warranted to allow it

additional time to complete its processing of responsive records. Moreover, substantial questions of fact have arisen that justify allowing Plaintiff to conduct limited discovery.

## ARGUMENT

### I. Defendant's Motion to Dismiss Is Moot and Baseless and Should Be Denied.

#### A. Standard of Review.

Under Fed. R. Civ. P. 12(b)(6), a court may only grant a motion to dismiss for failure to state a claim when the moving party has shown "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Warren v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). For this analysis, the Court must construe the complaint "liberally in the plaintiff's favor and . . . grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communication Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdication, a court must also accept as true all of the factual allegations set out in the plaintiff's complaint. *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 572 n.1 (D.C. Cir. 2003). Although a plaintiff has the burden to prove that the court has subject matter jurisdiction, this burden is satisfied if the plaintiff has "affirmatively allege[d]" in its pleadings "facts that show the existence of jurisdiction." *CFTC v. Nahas*, 738 F.2d 487, 492 n.9 (D.C. Cir. 1984).

### B.  Defendant's Motion to Dismiss Is Inappropriate and Is Now Moot.

Defendant asserts that Plaintiff's claims should be dismissed because processing the records of the Task Force would constitute an "undue or unreasonable burden" on the Library. Def.'s Mem. at 15-23.  Defendant's argument is misplaced for the following reasons.

First, this case is very different from all of the cases relied on by Defendant in which a FOIA request was either overbroad or placed an "unreasonable burden" on the agency.  *Id.* at 15-20 (*citing, e.g., Dale v. IRS*, 238 F. Supp. 2d 99 (D.D.C. 2002)).  The underlying rationale of these cases, as noted by Defendant, is that a FOIA request cannot be allowed to distract an agency from its core mission, as "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requestors."  Def.'s Mem. at 18 (quoting *Assassination Archives and Research Center, Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd in part, 1990 WL 123924 (D.C. Cir. 1990) (per curiam)).  The critical difference here is that the Library exists to to hold, process, and make available to the public, presidential records such as those requested by Plaintiff.  Unlike other agencies, this is the Library's primary function.  As the PRA provides, the "Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this Act."  44 U.S.C. § 2203(f)(1); *see also Nixon v. United States*, 978 F.2d 1269, 1277 n.19 (D.C. Cir. 1992) (Congress enacted the PRA to establish public ownership and control of presidential records and to provide public access to presidential records after a president leaves office).  Given that the Library was created to hold, process, and make such records available to the public, it cannot detract from Defendant's core mission if it must perform this very task.

Second, it is significant that while the Task Force was a prominent domestic policy initiative of the Clinton administration, it was not the "complex" government entity that Defendant asserts. Def.'s Mem. at 21. Unlike a typical government agency with thousands of employees and far-flung offices, the Task Force was simply an interagency committee, with a modest complement of 11 members and an existence of less than six months. *AAPS v. Clinton*, 997 F.2d 898, 900 (D.C. Cir. 1993) (Task Force existed from Jan. 25, 1993 through May 30, 1993). Hence, any request for records regarding this committee is entirely reasonable in nature and, therefore, not unduly burdensome. That Defendant may be understaffed and ill-prepared to respond to predictable requests for access to the Task Force records is not a reason for dismissing Plaintiff's claims.

Finally, and most significantly, Defendant's motion to dismiss has been rendered moot by Plaintiff's agreement to narrow its request substantially. Only after it filed its motion to dismiss did Defendant, for the first time, provide Plaintiff with any information regarding how the Library has organized the Task Force records. *See* Exh. 5. According to Defendant, the records are roughly organized into six broad categories, such as correspondence, congressional affairs materials, and reading room materials. Upon receipt of this information from Defendant – provided almost two years after Plaintiff submitted its FOIA request – Plaintiff promptly agreed to narrow its request to only one of the six identified categories, described as "Working Files; Staff Office Files and Memoranda." *See* Exh. 6 (agreeing to narrow request). This sixth category appears to constitute the records most of interest to Plaintiff. Defendant estimates that the category includes approximately one million records. Exh. 5. While Plaintiff offered to try to further narrow its request if additional detail regarding the records in this category was made

8

available, Defendant asserted that it currently is unable to provide any additional information regarding what records are included in this category or how these records are organized. Exh. 6.

Accordingly, Plaintiff's now-revised FOIA request is for only one of six categories of records which, according to Defendant, are only a fraction of all Task Force records. If Defendant had not waited nearly two years following the submission of Plaintiff's FOIA request to provide any information on how the request could be narrowed, this issue might have been avoided. It took this lawsuit to begin discussing the possibility of narrowing the request. There is no reason now to dismiss this lawsuit, especially when it has had a demonstrable result. Defendant's motion to dismiss should be denied.

## II. Defendant's Motion for an Open America Stay Should Be Denied.

### A. FOIA Requires Timely Production.

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA also prevents excessive government secrecy. In enacting FOIA, "Congress sought to open agency action to the light of public scrutiny." *U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989); *see also Department of Justice v. Reporters Comm.*, 489 U.S. 749, 772 (1989); *Department of Air Force v. Rose*, 425 U.S. 352, 372 (1976). Records are "presumptively disclosable unless the government can show that one of the enumerated exemptions applies." *Consumer Federation of Am. v. Department of Agriculture*, 455 F.2d 283, 287 (D.C. Cir. 2006) (quoting *Bureau of National Affairs, Inc. v. U.S. Dep't of Justice*, 742 F.2d 1484, 1498 (D.C. Cir. 1984)).

Equally important to effectuating the purpose of FOIA is ensuring that agency records be disclosed in a timely manner. As the legislative history of FOIA makes clear, Congress recognized that delay in releasing information can be "tantamount to denial" of access. *See* H. Rep. No. 876, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News, 6267, 6271. "The value of information is partly a function of time." *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1041 (9th Cir. 1999). Consequently, agencies are required to determine within twenty days of the receipt of a request for records "whether to comply with such request" and "to immediately notify the person making such request of such determination and the reasons thereof." 5 U.S.C. § 552(a)(6)(A)(i). This time limit can be extended by ten working days if the agency determines that "unusual circumstances" exist. 5 U.S.C. § 552(a)(6)(B).

Although nearly two years have passed since Plaintiff submitted its FOIA request on April 4, 2006, Defendant has not begun processing, much less produced, *any* responsive records to Plaintiff. Defendant's conduct demonstrates a complete disregard for the law.

**B.     Defendant Failed to Satisfy Its Burden of Demonstrating That a Stay Is Warranted.**

FOIA's twenty day time limit may be extended if an agency makes a showing that it is facing "exceptional circumstances" and is "exercising due diligence" in responding to a request. *See* 5 U.S.C. § 552 (a)(6)(C)(I). This "safety valve" provision was "carefully crafted to put a substantial burden on the government to justify to the courts any noncompliance with FOIA time limits." *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 617 (D.C. Cir. 1976). In *Open America*, the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") found that "exceptional circumstances" exist only when an agency meets the following

test:  (1) the agency is deluged with a volume of requests for information "vastly in excess" of that anticipated by Congress; (2) the agency's existing resources are inadequate to deal with the volume of such requests within the time limits set forth by FOIA; *and* (3) the agency can show that it is exercising due diligence in processing the request.  *Open America*, 547 F.2d at 616.

In 1996, Congress passed the Electronic Freedom of Information Act Amendments ("E-FOIA Amendments") to address, in part, "the single most frequent complaint about the operation of the FOIA:  agency delays in responding to FOIA requests."  *See* H. Rep. No. 795, 104th Cong., 2d Sess., *reprinted in* 1996 U.S. Code Cong. & Admin. News, 3448, 3466.  In enacting the E-FOIA Amendments, Congress declared:

> In *Open America* . . . the District of Columbia Circuit Court of Appeals held that exceptional circumstances exist when the agency can show it has inadequate resources to process FOIA requests within statutory time limits . . . Relying upon overly broad dictum in this case, agencies have employed the exceptional circumstances -- due diligence exception to obtain judicial approval for lengthy delays whenever they have a backlog.
>
> Backlogs of requests for records under the FOIA should not give agencies an automatic excuse to ignore the time limits.

*See* H. Rep. No. 795, 104th Cong., 2d Sess., *reprinted in* 1996 U.S. Code Cong. & Admin. News, 3448, 3456-57.  With the E-FOIA Amendments, Congress doubled the time allowed to agencies to respond to FOIA requests, but expressly limited those circumstances previously considered exceptional:

> For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

5 U.S.C. § 552(a)(6)(C)(ii).  Courts have denied stays where agencies have shown no more than predictable workloads or have failed to show reasonable progress in reducing the backlog of pending requests.  *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 259 (D.D.C. 2005); *Wilderness Society v. U.S. Dep't of the Interior*, 2005 U.S. Dist. LEXIS 20042, *32-34 (D.D.C. September 12, 2005); *Hunter v. Christopher*, 923 F. Supp. 5, 8 (D.D.C. 1996).

      **1.**    **Defendant Failed to Demonstrate the Existence of "Exceptional Circumstances" Warranting a Stay.**

Defendant has failed to demonstrate that "exceptional circumstances" exist warranting a stay of this lawsuit, much less a stay of indefinite duration.

First, Defendant has not demonstrated that the volume of requests it has received is "vastly in excess" of anything contemplated by Congress or that this volume is anything more than a predictable agency workload.  Defendant must have been aware that the Library would receive a high volume of FOIA requests, especially considering that:  (1) the Clinton presidency was highly controversial and the subject of an unprecedented degree of media and public scrutiny; (2) President Clinton is one of only two presidents to be impeached in the history of the United States; (3) Mrs. Clinton played a particularly prominent role in her husband's presidency; (4) while First Lady, Mrs. Clinton ran for and was elected to the U.S. Senate and currently is a sitting U.S. Senator for the State of New York; (5) Mrs. Clinton had long been considered a likely candidate for the Presidency of the United States and formally declared her candidacy more than a year ago; (6) the Task Force was one of the most controversial domestic policy initiatives of the Clinton administration; (7) Mrs. Clinton was in charge of the Task Force; and (8) if elected, Mrs. Clinton would be the first female President of the United States and the first

spouse of a former president to be elected.  In short, Defendant should have known that public interest in the records of the Clinton Library, and in particular the records of the Task Force, would be substantial, and it also should have known that the number of requests for records would likely exceed by a substantial margin the number of requests received by the libraries of President Clinton's predecessors.  It simply is not credible for Defendant to assert that it has been "burdened" with an "unprecedented" number of FOIA requests.  A predictable workload yields nothing more than a predictable backlog.

Second, the "sheer total volume of records" of the Task Force does not constitute an "exceptional circumstance" under FOIA, nor should it excuse Defendant's delay in failing to meet FOIA's statutorily mandated time period.  Defendant must have been fully aware, long before the five-year moratorium on the disclosure of Clinton presidential records expired, of the volume of records the Library would be required to review in order to process and respond to FOIA requests.  Under the PRA, Defendant had five years time to coordinate, organize, and index the Library's records in order to prepare for the inevitably large number of FOIA requests the Library would likely receive.  Nonetheless, Defendant admits the Library waited until shortly before the moratorium expired to send two of its archivists to the George H.W. Bush Presidential Library in College Station, Texas to review the Bush Library's handling of FOIA requests.  Def.'s Mem. at 7.  Defendant's assertion that the Library's staff participated in "one or more" training exercises and was briefed via telephone conference by Defendant's staff on "FOIA processing issues" demonstrates a particularly lackluster effort to try to satisfy its FOIA obligations.  *Id.*

Third, "inadequate staff, insufficient funding or a great number of requests are not within the meaning of 'exceptional circumstances' as that language is used in the statute nor were they within the contemplation of its framers as evidenced by the legislative history." *Hamlin v. Kelley*, 433 F. Supp. 180, 182 (N.D. Ill. 1977). Defendant has had years to address this alleged deficiency, but has failed to do so. Hence, Defendant's claim that the Library's resources are insufficient to address the number of FOIA requests it receives does not justify a stay.

In addition to not being able to demonstrate "exceptional circumstances," Defendant has failed to show that the Library is making reasonable progress in reducing its backlog of pending requests. Instead, it appears that the backlog of requests is multiplying at an ever-increasing rate. Defendant asserts that the Library received 210 FOIA requests in the first three months following the expiration of the PRA moratorium, totaling an estimated 5,260,000 pages. Def.'s Mem. at 9. Of these 210 FOIA requests, it has taken the Library more than two years to process only 72 requests. *Id.* Since the first three months, however, the Library received an additional 220 requests, totaling approximately 10,500,000 pages. *Id.* Clearly, the Library has not gained any ground. Rather, it appears to be falling further behind as its backlog is increasing.[2] Defendant's request for a stay should be denied for the additional reason that the Library has failed to demonstrate reasonable progress in reducing its backlog of pending requests.

---

[2] Accordingly to a published interview, the Library anticipates processing only 200,000 pages in 2008. *See* Exh. 3 (*National Journal*, "Inside the Clinton Archives: Q&A: Sharon Fawcett," at 9 (published Dec. 17, 2007)). At this rate, it may be decades before Plaintiff's request is processed.

### 2. Defendant Failed to Demonstrate That it Exercised "Due Diligence" in Responding to Plaintiff's Request.

Defendant's effort to show "due diligence" in responding to Plaintiff's request also is lacking. Defendant appears to try to make this showing by citing budgetary proposals for possible future increases in personnel for Fiscal Year 2009 and a 2007 in-house study conducted by the Office of Presidential Libraries and Defendant's Presidential Materials Staff discussing ways to achieve faster processing. Def.'s Mem. at 30. Neither of these points demonstrate that Defendant has acted with due diligence in processing *Plaintiff's* request. Instead, the possibility of added personnel and "streamlining" of the FOIA request process only demonstrates how the Library *might* treat *future* FOIA requests with greater diligence. Moreover, Defendant has not demonstrated that it exercised "due diligence" *from the outset* in order to qualify for the relief Defendant seeks here. *Oglesby v. Department of the Army*, 920 F.2d 57, 62 n.3 (D.C. Cir. 1990) ("The court [has] authority to allow the agency additional time to examine requested records in exceptional circumstances where the agency was exercising due diligence in responding to the request *and had been since the request was received*.") (quoting H.R. Conf. Rep. No. 1380, 93 Cong., 2d Sess. 11 (1974)) (emphasis added).

The Library has not, in fact, treated Plaintiff's request with due diligence. Defendant admits that, after almost two years, the Library still has not begun processing any part of Plaintiff's request. Def.'s Mem. at 12-13. Such treatment simply cannot amount to due diligence. This is particularly true when the Library apparently has been using its alleged scarce resources to process frivolous FOIA requests. According to one published news account and the Library's own website, the Library has responded to requests on UFOs, "Roswell New Mexico,"

Area 51, and even a surprise birthday party for President Clinton, featuring the music group "Greasy Greens." *See* Exhs. 1, 2. Not only does this fail to demonstrate due diligence, but it raises factual issues concerning how, in fact, FOIA requests are being selected for processing.

Defendant also claims that it is entitled to a due diligence finding because its queue structure allegedly is part of a "larger, complex first-in first-out" queue system. Def.'s Mem. at 30. While an agency may establish due diligence by assigning all requests on a "first in/first out basis" (*Open America*, 547 F.2d at 615), that is not simply not what Defendant has created here. The queue structure created by Defendant is a byzantine and opaque system by which some or all parts of a FOIA request may end up in any one of 17 separate "access queues." Def.'s Mem. at 8. Each of these 17 queues apparently is then subdivided into five subgroups, based on the type of record requested and the volume of responsive records. *Id.* After assigning a FOIA request to one of these queues, the Library then "rotates" through the "queue structure," processing one request per queue. *Id.* After a request is processed, that queue goes to the "end of the line." *Id.* Adding to the uncertainty, Defendant states that the queue structure is "continually evolving" and the Library anticipates "continued flexibility" in how requests are assigned to various queues. *Id.* at 9.

Such a system does not appear to constitute a "first-in first-out" system. As described by Defendant, a request is placed in a particular queue based on the type of records requested, not based on when it was received. Processing of a particular request must wait while the queue system "rotates" back to the particular queue in which the request was placed. As a result, if a request goes into a queue already containing an unusual number of other requests, by the time the system rotates back to that queue, other later-in-time requests will inevitably have been

16

processed. As a result, it appears that a particular request could actually lose substantial ground in the overall queue structure, as other queues fill up with requests and are processed. It is clear, however, that this queue structure is not based on the first-in first out principle, and therefore cannot demonstrate due diligence by Defendant.

In sum, Defendant has failed to carry its burden of demonstrating that "exceptional circumstances" exist or that it has exercised "due diligence" in responding to Plaintiff's request. As a result, Defendant has failed to show that any stay, much less a stay of indefinite duration, is warranted.

**III.     Plaintiff Should Be Allowed to Conduct Limited Discovery.**

Defendant's failure to properly respond to Plaintiff's FOIA request raises significant questions of fact that are directly related to Defendant's request for a stay. Plaintiff has a right to understand fully the Library's "queue" system, and Plaintiff's position in the queue, prior to any stay being entered by the Court. Plaintiff respectfully suggests that the answers to these questions, if Plaintiff is permitted to obtain them through limited discovery, would be in the public interest as well as its own.

Limited discovery regarding certain factual matters is permitted in a FOIA case, and is liberally granted when jurisdiction is at issue. *See, e.g., CREW v. Office of Admin.*, No. 07-964 (D.D.C. Feb. 11, 2008) (CKK) (order authorizing jurisdictional discovery in FOIA/PRA case); *Public Citizen v. FDA*, 997 F. Supp. 56, 72 (D.D.C. 1998) (permitting discovery for "investigating the scope of the agency search for responsive documents, the agency's indexing procedures, and the like"). In this case, significant questions exist as to how the queue system functions, whether Plaintiff's request was properly placed in the queue, whether Plaintiff's

request will be processed on a "first-in first-out" basis, and how the Library's resources are being utilized. The limited discovery proposed by Plaintiff would seek answers to these questions. Only after these questions are answered can Defendant's request for a stay be adjudicated properly. Questions to be answered in discovery would include:

- Have less timely FOIA requests been processed ahead of Plaintiff's request and, if so, how many?

- When Plaintiff's request was transferred from the "unclassified complex" queue to the "multi-request" queue, what effect did this have on the request's "place in line"?

- Of the 155 requests allegedly pending before Plaintiff's request as of August 9, 2006, how many were submitted before and how many were submitted after Plaintiff's request?

- Of the 82 requests allegedly currently pending before Plaintiff's request, how many were submitted before and how may were submitted after Plaintiff's request?

- How many FOIA requests involving "Unidentified Flying Objects" have been received, when were they received, and what is their status in queue structure?

In short, the objective of limited discovery would be to understand exactly where Plaintiff's request falls within the queue structure, how this decision was made, and the effect this has had on the timeliness of the processing of Plaintiff's request.

Plaintiff, and the public, are entitled to understand why Plaintiff's and other FOIA requests are not being processed.  Limited discovery regarding Plaintiff's request will help answer these questions prior to any stay being entered.

### Conclusion

For the foregoing reasons, Defendant's motion to dismiss should be denied, as should Defendant's request for an indefinite stay of this lawsuit pursuant to *Open America*.  At a minimum, Plaintiff should be allowed to conduct limited discovery on the factual issues discussed above before any stay is entered.

Date: February 27, 2008                                    Respectfully submitted,

                                                            JUDICIAL WATCH, INC.

/s/ Paul J. Orfanedes
D.C. Bar No. 429716
James F. Peterson
D.C. Bar No. 450171
501 School Street, S.W., Suite 500
Washington, DC 20024
Tel:  (202) 646-5172
Fax: (202) 646-5199

Attorneys for Plaintiff