## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
JUDICIAL WATCH, INC.,                     )
                                          )
                    Plaintiff,            )
                                          )        Civil Action No. 07-1987 (PLF)
          v.                              )
                                          )
NATIONAL ARCHIVES AND                     )
RECORDS ADMINISTRATION,                   )
                                          )
                    Defendant.            )
_____)

### DEFENDANT'S NOTICE OF FILING SUPPLEMENTAL DECLARATION

Defendant hereby submits the attached Supplemental Declaration of Emily Robison,

Deputy Director of the Clinton Presidential Library, which indicates, *inter alia*:

• The Library has begun processing the first segment of records responsive to Judicial Watch's request, by virtue of the Library's multiple-track FOIA queue system.

• Judicial Watch has benefited from the Library's queue system, and would, in fact, be significantly further back in line if the Library had a single-track queue system.

• Although the Library has requested funds for additional archivists, the Library does not have the resources to complete the processing of Judicial Watch's request within the 20 day FOIA time frame.[1]

• The Library's one million page estimate for records responsive to Judicial Watch's request is based on a standard archival measurement of pages per cubic foot, and is not affected by the factors that went into the initial estimate in the matter before Judge Robertson.

In the matter before Judge Robertson, the Court allowed Judicial Watch to take very

limited discovery to focus exclusively on the Clinton Library's FOIA queue system (the scope of

which Judicial Watch has not contested); Judicial Watch completed its discovery, and did not

---

[1] The FOIA permits <u>Open America</u> stays to be granted to "any agency" that shows due diligence and exceptional circumstances.  5 U.S.C. § 552(a)(6)(c).  Indeed, such stays have been routinely granted to various federal agencies.

request from Judge Robertson to depose any additional agency officials concerning any other information. That discovery, coupled with the attached supplemental declaration fully addresses Judicial Watch's request and puts it on equal footing in both cases. Defendant therefore opposes any further discovery.

Respectfully submitted this 9th day of May, 2008.

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

OF COUNSEL                                          /s/ Varu Chilakamarri
JASON R. BARON                                      VARU CHILAKAMARRI (NY Bar)
(DC Bar No. 366663)                                 Trial Attorney, Federal Programs Branch
Director of Litigation                              U.S. Department of Justice, Civil Division
Office of the General Counsel                        Tel: (202) 616-8489
National Archives and Records Administration         Fax: (202) 616-8470
8601 Adelphi Road, Suite 3110                        varudhini.chilakamarri@usdoj.gov
College Park, MD 20740
Telephone: (301) 837-1499                            Courier Address:
Fax: (301) 837-0293                                  20 Massachusetts Ave., NW, Rm. 7226
jason.baron@nara.gov                                 Washington, D.C. 20530

                                                    *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2008, a true and correct copy of the foregoing was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the documents are available on the ECF system.


 /s/ Varu Chilakamarri_____
VARU CHILAKAMARRI

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                    )
                                         )
                    Plaintiff,           )
                                         )
            v.                           )        Civil Action No: 07-1987 (PLF)
                                         )
NATIONAL ARCHIVES AND                    )
RECORDS ADMINISTRATION,                  )
                                         )
                    Defendant.           )
_____  )

## SUPPLEMENTAL DECLARATION OF EMILY ROBISON

I, Emily Robison, declare as follows:

1.      I am the Deputy Director of the William J. Clinton Presidential Library.  My background, training, and experience is as an archivist, having been continuously employed at the Clinton Presidential Library in the capacity of Supervisory Archivist from February 2002 to August 2004, Deputy Director from September 2004 to May 2007, Acting Director from May 2007 to November 2007, and since then again as Deputy Director.   In my current capacity, I assist the Director in supervising the staff of the Clinton Presidential Library.

2.      I am familiar with the above-captioned case, having previously filed a Declaration in this case on January 28, 2008.  That Declaration is attached hereto as Exhibit 1 and is incorporated herein.  This Supplemental Declaration is based on my personal knowledge, as well as on facts supplied to me by NARA staff as known to them in the course of their duties.

### JUDICIAL WATCH'S FOIA REQUEST NUMBER 2006-0885-F

3.      The treatment of Judicial Watch's FOIA request in this matter was also described in detail in my first Declaration.  See Robison Decl. ¶¶ 28-36.  The following supplemental information is being provided regarding the placement and positioning of Judicial Watch's

request in the Clinton Library's queue system, which, as described in my first Declaration and further explained in paragraphs 15-19, below, consists of multiple tracks.

4.　　Judicial Watch submitted its FOIA request for "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton" to the Clinton Presidential Library on April 4, 2006. After conducting an initial search, the Library originally placed Judicial Watch's request into the queue for "large, unclassified, paper records." Because the Library had several other FOIA requests for health care records, we subsequently moved Judicial Watch's request in June 2007 into the then-newly established multi-request queue.

5.　　As explained in my first Declaration, a function of the multi-request queue is that similar series or subseries will be systematically processed to fulfill those FOIA requests within that queue. There are three FOIA requests within the multi-request queue that relate to the Health Care Task Force: two filed earlier in time than plaintiff's request (2006-0770-F and 2006-0810-F), and plaintiff's request itself (2006-0885-F). Although the three requests have been merged for purpose of processing as part of the multi-request queue, the Clinton Library has determined that due to the size of these requests, they still require processing in at least three separate segments. Robison Decl. ¶¶ 33-34.[1] The first segment is for Staff Member Office Files of Ira Magaziner relating to Task Force records; the second segment is for Hillary Clinton's Task Force records; and the third segment is the remainder of the working files, staff office files, and memoranda of the Task Force.

---

[1] As I noted in my first Declaration, the Library believes that continued flexibility is needed to handle future processing of certain extremely large requests, and such requests may need to be further broken down into multiple segments. See *id.*, ¶ 17.

6.  Per the above, the Clinton Library has now already begun processing the first segment of

records responsive to Judicial Watch's request, which we started working on in late April 2008

because of its placement in the "multi-request" queue.  This segment consists of files from Staff

Member Office Files of Ira Magaziner dealing with the Health Care Task Force.

7.  There are 38 requests that will have to be processed before the Library reaches the second

segment of responsive records to Judicial Watch's request, and 77 requests in line before the

Library reaches the remainder of the Health Care Task Force records in the third and subsequent

segments.

8.  Judicial Watch has unquestionably and significantly benefited from the Library's current

FOIA queue system.  If the Library had just one single FOIA queue, organized by the date

received (as Judicial Watch seems to want), the plaintiff's request would be 116th in line, instead

of currently 78th.  Indeed, if the Library had just one single queue, the first segment of Judicial

Watch's request (for Ira Magaziner records) would at this time be 112th in line, instead of already

currently in process; and the second segment of Judicial Watch's request (for Hillary Clinton's

Task Force records) would be in 113th place, instead of 39th, where it is now.[2]  Accordingly, each

segment of Judicial Watch's request has benefited from the Library's queue system, and Judicial

Watch will receive any records subject to release under the PRA much earlier under our current

FOIA queue system than it would under a single track FOIA queue system.

---

[2]  In response to the questions posed by Judicial Watch in its February 27, 2008, Motion for
Limited Discovery, all of the 155 requests that the Library had advised Judicial Watch were
pending before Judicial Watch's request as of August 9, 2006, were submitted to the Library
before Judicial Watch's request.  Of the 77 requests that have not yet been processed and are
currently ahead of the third segment of Judicial Watch's request, 63 were submitted earlier and
14 were submitted later in time.  Further, if Judicial Watch's request had remained in the queue
for large, unclassified, paper requests, all three segments would be significantly further back in
line than they are now.

9.    It is inherent to any queue system with multiple tracks that requests in one line might be processed ahead of earlier-filed requests that are placed in other lines.  For example, in a basic, two-track system that simply distinguished between small and large requests, a small request could be processed sooner than an earlier-received large request, because small requests move more quickly.  Thus, in response to the question of whether "less timely FOIA requests" have been processed ahead of Judicial Watch's request, the answer is that one request for textual/electronic records has been processed ahead of its request, and that the Clinton Library has begun processing approximately 14 requests for audio-visual records that were received after Judicial Watch's request.  Those 14 requests were all in the queues for audio-visual records, which have moved more quickly because they are a different type of media which reviews more quickly, are on a separate rotation and tend to be smaller in size.  In contrast, as described above, the Library is now processing Judicial Watch's request ahead of a far larger number of other FOIA requests that were submitted before its own.  In fact, there are currently 107 FOIA requests that were submitted to the Clinton Library before Judicial Watch's request for health care records for which processing has not yet begun.

### ESTIMATING RESPONSIVE RECORDS

10.    When a FOIA request is received, the Library must make an initial estimate of the volume and types of records that may be responsive to a request, based on a preliminary search of electronic indices and finding aids.  That preliminary search allows the Library to determine which queue is proper for the request.  The preliminary search also may include an estimate about the number of pages that may be responsive, based on a count of the potential volume (in cubic feet) measured by counting the boxes of records that are deemed responsive.   The initial

4

estimate is meant only to be a very rough approximation, for the purpose of placing the request in

the appropriate line.   More precise estimates are made only at the point when the request reaches

the front of the line and processing actually begins.   At that time, the Library staff will often

contact the requester if there are questions or concerns about the size and nature of the request,

which may lead to a narrowing of a large request.   Thus, the actual number and type of records

that are finally deemed responsive to the request naturally may vary from the initial estimate, and

even from the more precise estimate when processing begins.

11.     Accordingly, the Clinton Library initially estimated that Judicial Watch's original request

– for "all records of the Task Force on National Health Care Reform" – consisted of

approximately three million pages of paper records.   Because of the huge number of pages of

permanent records in the National Archives (roughly estimated at seven to ten billion pages

nation-wide), it is impossible for NARA to count every page.   Instead, NARA literally measures

the volume of its records.   Thus, this initial estimate of three million pages was derived from a

standard archival formula that multiplies the volume of boxes, in cubic feet (the boxes used for

these records measure one cubic foot each) times an average number of pages per cubic foot –

i.e., 2500 pages per box.   Of course, these numbers are only estimates, and any given box may

contain more or fewer than 2500 pages.[3]   In this case, there were approximately 1125 boxes

dealing with the Health Care Task Force (which, per the formula, multiplies out to 2,812,500

pages), plus an estimated 209,500 pages from various White House Staff Member Office Files.

12.     Judicial Watch subsequently agreed to narrow its request to the working files, staff office

files, and memoranda of the Task Force.   This narrower request is still extremely large,

---

[3]  A cubic foot can hold up to approximately 3000 pages.

comprising a known group of approximately 376 boxes of paper records – per the formula above, it now amounts to an estimated 940,000 pages. In this particular case – unlike with many other requests – all of the records within this set of boxes are presumptively responsive to Judicial Watch's current request, because Judicial Watch has identified these 376 boxes as being ones it wants processed. Thus, this estimate of roughly one million pages will not change unless the request is further narrowed.

13.    In contrast, Judicial Watch's other FOIA request (in the matter before Judge Robertson), for the schedules and telephone logs of Hillary Clinton, was originally estimated at the initial intake stage to include large volumes of both paper and electronic records. As is the normal practice when a request comes up for processing, NARA staff examined it more closely and determined that Judicial Watch was only seeking Mrs. Clinton's official schedule. The Library, therefore, did not need to include the many thousands of pages of additional paper records and the thousands of email messages relating to her daily schedule that were included in the original estimate. Accordingly, the actual number of responsive pages was significantly reduced.[4] The factors that led to the large reduction from the initial estimate on the schedules are not applicable to Judicial Watch's FOIA request for health care records, particularly because Judicial Watch has identified the boxes of records that it wants processed.

14.    Judicial Watch's narrowed request remains the largest FOIA request ever received by the Clinton Library. Currently, the entire Clinton Library processes records at a rate of roughly 200,000 pages per year. However, we expect that as our archivists gain greater experience, our rate of FOIA processing will improve over time.

---

[4]    The Library's reduced estimate for the schedules was approximately 10,000 pages. The actual number of pages processed ended up being 11,084.

## THE CLINTON LIBRARY'S FOIA QUEUE SYSTEM

15.    The Clinton Library's FOIA queue system was explained in detail in my first Declaration,

as well as in the deposition of the Library's FOIA Coordinator on April 7, 2008.  Declaration of

Emily Robison ("Robison Decl.") ¶¶ 17, 25.  In summary, the Library has a multiple-track queue

system, as is permitted by the Freedom of Information Act, 5 U.S.C. § 552(a)(6)(D).  The Library

differentiates its FOIA queues based on:  the type of media that is being requested (i.e., paper,

electronic, or audio-visual records); the size of the request (small, medium, or large); and

whether the request is for classified or unclassified material.[5]  In addition, the Library created a

"multi-request" queue.[6]  FOIA requests are moved into this multi-request queue when the library

receives multiple requests for significant portions of the same series or sub-series of records.

This multi-request queue allows the Library to more efficiently and systematically process a set

of records in their full archival context, while simultaneously satisfying multiple requests at once.

In total, there are 16 parallel FOIA queues[7] in our queue system, as is illustrated by the following

chart:

---

[5] As explained in my first Declaration, a "small" request corresponds generally to 500 pages or less, a "medium" request corresponds to 501-5000 pages, and a "large" request corresponds to over 5000 pages.  Audio-visual requests are similarly organized by small, medium, or large request, by number of records rather than pages.  See Robison Decl. ¶ 17.

[6] In of the summer of 2007, in response to Executive Order 13392 on Improving Agency Disclosure of Information, the presidential libraries added the "multi-request" queue to their respective FOIA queue systems.  This queue was added in order to more efficiently and systematically process records for which there are multiple requests.

[7] There is also a 17th queue for requests for mandatory declassification review (MDR) under Executive order 12958, as amended.  MDR requests do not fall under the FOIA, but are a parallel process for the review and disclosure of classified records.

| Queue | Category of Records |
|-------|---------------------|
| 1 | Paper Records, Small, Unclassified |
| 2 | Paper Records, Medium, Unclassified |
| 3 | Paper Records, Large, Unclassified |
| 4 | Paper Records, Small, Classified |
| 5 | Paper Records, Medium, Classified |
| 6 | Paper Records, Large, Classified |
|   |   |
| 7 | Electronic Records, Small, Unclassified |
| 8 | Electronic Records, Medium, Unclassified |
| 9 | Electronic Records, Large, Unclassified |
| 10 | Electronic Records, Small, Classified |
| 11 | Electronic Records, Medium, Classified |
| 12 | Electronic Records, Large, Classified |
|   |   |
| 13 | Audio-visual Records, Small |
| 14 | Audio-visual Records, Medium |
| 15 | Audio-visual Records, Large |
|   |   |
| 16 | Multiple Requests |

16.    Requests are placed into each queue in the order in which they are received by the Library.  Thus, within each queue, requests are placed, and are processed, on a first-in, first-out basis.

17.    Overall, the Clinton Library manages its queue system in the following manner:  the Library rotates through its queues, processing one request per queue before proceeding to the next queue.[8]  Thus, to take an example from the chart above, after a request is processed from Queue 1, the next request to be processed would be the oldest request waiting in Queue 2, and so forth.  Thus, like-in-kind requests are placed in the same queue and are processed on a first-in, first-out basis.

---

[8]  Because of the special equipment required for audio-visual records, these requests are handled separately.

8

18.    Currently, the Library has nine archivists who process FOIA requests as part of their overall archival responsibilities.  This translates into six "full-time equivalent" FOIA archivists. The archivists each work on one or more FOIA requests at any given time.  Therefore, at any given time, a request from each queue is either being processed or is next in line to be processed.

19.    Our current FOIA queue system has evolved in light of the Library's growing experience in conducting FOIA request searches, as well as discussions between staff at the Clinton Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in Washington, D.C.  The system reflects the common understanding and experience among FOIA processors, that processing different types of media, different sized requests, and processing classified information, can all require different amounts of time and work.  The system will continue to evolve as necessary in order to make it as responsive to our requesters as possible.

### NARA RESOURCES

20.    As explained in my first Declaration, the Clinton Library very much needs additional archival resources for PRA/FOIA processing, as do the other Presidential Libraries that respond to FOIA requests.  Due to rising expenses and a shortage of funds in fiscal years 2006 and 2007, the National Archives was compelled to institute a hiring freeze, a reduction in certain hours of operation, and agency-wide belt-tightening.  During fiscal year 2008, the Archivist of the United States submitted a budget request to the Office of Management and Budget to fund 15 new archivists for processing Presidential records.  The President accepted this request and included it in his budget submission to Congress for Fiscal Year 2009, which is now pending with Congress. If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this new staff would be dedicated to reducing the FOIA backlog at the library.

21.     In my first Declaration, I explained how the Clinton Library has received an unanticipated number of FOIA requests as compared to the other presidential libraries whose records are subject to FOIA requests; how the Clinton Library lacks the resources to process all incoming FOIA requests within 20 working days; and how the Clinton Library has exercised due diligence in processing requests by, for example, seeking additional resources, and by undergoing studies to improve the rate of its PRA/FOIA processing.  For further detail on these and other issues, I refer the Court to my first Declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this  9   day of May, 2008.


                                        _Emily Robison_____
                                        EMILY ROBISON
                                        Deputy Director
                                        Clinton Presidential Library

# EXHIBIT  1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                    )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )    Civil Action No: 07-1987 (PLF)
                                         )
U.S. NATIONAL ARCHIVES AND               )
RECORDS ADMINISTRATION,                  )
                                         )
                                         )
                    Defendant.           )
_____ )

## DECLARATION OF EMILY ROBISON

I, Emily Robison, declare as follows:

1.      I am the Deputy Director of the William J. Clinton Presidential Library.  My background,

training, and experience is as an archivist, having been continuously employed at the Clinton

Presidential Library in the capacity of Supervisory Archivist from February 2002 to August 2004,

Deputy Director from September 2004 to May 2007, Acting Director from May 2007 to

November 2007, and currently as Deputy Director.   In my current capacity, I assist the Director

in supervising the staff of the Clinton Presidential Library, which currently include:  one

supervisory archivist who supervises eight archivists, one archives specialist, one archives

technician, and a part-time student; one curator who supervises 4.6 full-time equivalent ("FTE")

museum staff, one education specialist, 2.3 FTE audiovisual museum staff, and 3.5 FTE

admissions clerks; one IT contractor; and five administrative staff members of the Library.

2.    Pursuant to Title 44 of the U.S. Code, Chapter 21, the Clinton Presidential Library is a component of the National Archives and Records Administration ("NARA"), and, therefore, all staff members of the Clinton Presidential Library are also NARA staff members.

3.    Due to the nature of my official duties, I am familiar with the procedures followed by the Clinton Presidential Library in responding to requests for Presidential records from its files pursuant to the provisions of the Presidential Records Act of 1978, 44 U.S.C. § 2201, et seq. ("PRA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and Executive Order 13233. NARA regulations direct that FOIA requests for Presidential records of the Clinton Administration be directed to the Director of the Clinton Presidential Library for processing. See 36 C.F.R. § 1250.22.

4.    Specifically, I am familiar with the treatment which has been afforded the April 4, 2006 FOIA request submitted by Judicial Watch, Inc., seeking "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton (hereafter "Task Force"), to include but not limited to any and all sub-elements of the Task Force." (See Exhibit 1). That April 4, 2006 FOIA request was assigned FOIA case number 2006-0885-F. That request also sought a waiver of search and duplication fees.

5.    This Declaration is based on my personal knowledge, as well as facts supplied to me by NARA staff as known to them in the course of their duties.

## PRESIDENTIAL RECORDS ACT OF 1978

6.    The PRA sets forth a scheme for the preservation and disclosure of Presidential and Vice-Presidential records. See 44 U.S.C. §§ 2201, 2207. "Presidential records" covered by the PRA include "documentary materials, or any reasonably segregable portion thereof, created or

2

received by the President, his immediate staff, or a unit or individual of the Executive Office of

the President whose function is to advise and assist the President, in the course of conducting

activities which relate to or have an effect upon the carrying out of the constitutional, statutory,

or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). Included among

"Presidential records" are documentary materials created or received by the Office of the First

Lady, when those materials meet the above definition.

7.        Documentary materials deemed Presidential records are the property of the United States,

44 U.S.C. § 2202, and may be disclosed to the public under limitations imposed by the PRA. Id.

§ 2204. The PRA imposes upon the Archivist of the United States ("Archivist") "an affirmative

duty to make [Presidential] records available to the public as rapidly and completely as possible

consistent" with limitations under the PRA. Id. § 2203(f)(1). However, there is no public access

to Presidential records under FOIA until the earlier of (a) five years after the date on which the

Archivist obtains custody of the records, or (b) NARA's completion of processing and

organization of integral file segments of records. Id. § 2204(b)(2). In addition, the President

may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be

restricted with respect to information" within one of six enumerated categories: (1) classified

information designated by Executive order; (2) documents relating to appointments to Federal

office; (3) documents specifically exempted from disclosure by statute other than FOIA; (4) trade

secrets and commercial or financial information obtained from a person and privileged or

confidential; (5) confidential communications requesting or submitting advice, between the

President and his advisers, or between such advisers; or (6) personnel and medical files and

similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal

3

privacy. See 44 U.S.C. §§ 2204(a)(1) – (a)(6). Thus, Presidential records falling into one of the

six categories may be withheld for up to 12 years, even if the record is the subject of a FOIA

request. The PRA provides that the Archivist's decision to withhold a record within the 12 year

period under one of the six enumerated restrictions of the PRA "shall not be subject to judicial

review." Id. § 2204(b)(3).

8.      During his time in office, President William J. Clinton asserted the six enumerated

restrictions in 44 U.S.C. § 2204(a)(1) – (a)(6) for the full 12 year period. In a letter dated

November 6, 2002, President Clinton provided additional guidance to the Archivist, explaining

that he intended to ease, for NARA's review and processing purposes, the application of two of

the enumerated restrictions of the PRA, namely:  § 2204(a)(2), which concerns documents

relating to appointments to Federal office; and § 2204(a)(5), which concerns confidential

communications requesting or submitting advice, between the President and his advisers, or

between such advisers. (See Exhibit 2). President Clinton did not, however, waive these

restrictions in their entirety, nor did he eliminate the need for NARA to review and process

records under all six of the PRA's enumerated categories. Accordingly, NARA must withhold

documents covered by the six restrictions as currently defined in consultation with the former

President. Any documents covered by one of the six Presidential restrictions on disclosure are

not releasable until January 22, 2013, at which time those processed and restricted records that

are not also subject to a FOIA exemption will be proposed for release.

9.      In addition, subject to the limitations on access imposed by § 2204(a) & (b), the PRA

incorporates the provisions of the FOIA, including the enumerated exemptions from public

access contained in 5 U.S.C. § 552(b), subject to the exception that the (b)(5) exemption, 5

U.S.C. § 552(b)(5), is unavailable. See 44 U.S.C. § 2204(c)(1). Applicable FOIA exemptions, including but not limited to Exemption 2 for certain internal administrative records, and Exemption 7, for law enforcement records, 5 U.S.C. §§ 552(b)(2) & (b)(7), respectively, may apply to records not otherwise covered by one of the PRA restrictions. Such FOIA exemptions, which are applicable in the twelve year period, may also be applied to Presidential records beyond the 12 year PRA restriction period. See 44 U.S.C. § 2204(c)(1). The Archivist may therefore withhold documents from disclosure under FOIA exemptions even when they are not subject to restriction under the PRA.

10.     Once a Presidential Library intends to disclose Presidential records, NARA must notify the incumbent and the former President, through their designated representatives, in order to provide them an opportunity to review the records for any constitutionally-based privileges that may apply. 36 C.F.R. § 1270.46; see also Executive Order 13233, § 3; 44 U.S.C. §§ 2204(c)(2), 2206.

11.     In light of the constitutionally-based provisions of the PRA and Presidential Executive Order 13233, including the requirement of a Presidential notification period, NARA's regulations provide that the agency "cannot expedite requests for Presidential records." 36 C.F.R. § 1250.28(b).[1] Additionally, Judicial Watch did not request that NARA expedite its FOIA request.

---

[1] NARA's regulations at § 1250.28(b) reflect the provisions of prior Executive Order 12667.

5

12.     NARA has been following the requirements of Executive Order 13233[2] by notifying the representatives of the former and incumbent Presidents of its intent to release non-exempt records, and by providing the representatives an opportunity to review such records.

### FOIA PROCESSING AT THE CLINTON PRESIDENTIAL LIBRARY

13.     NARA received legal custody of the Presidential records of former President Clinton, including records from the Office of the First Lady, on January 20, 2001.  These records included approximately 78 million pages of textual records and over twenty million electronic email records and over 60 other Clinton Presidential electronic systems.

14.     Between January 20, 2001 and January 20, 2006, the Clinton Library staff was involved in establishing initial intellectual control over both presidential records and artifacts.  Archivists prepared a master location register, combining numerous inventories and in-house databases in preparation for moving all materials to the Library site which opened November 18, 2004, and to assist Library staff in being able to respond to PRA and FOIA requests.  Library staff also began to create more detailed "finding aids," which collectively provide a rough index to the holdings of the Clinton Administration at the Clinton Presidential Library, and they responded to numerous special access requests and subpoenas.  Library staff also proceeded in this period to process and release over a million pages of Clinton Presidential records systematically.   In anticipation of the opening of Clinton Presidential Library records to FOIA processing on January 20, 2006, two archivists on my staff traveled in 2005 to the George H.W. Bush Presidential Library in College Station, Texas, to review the Bush Presidential Library's handling

---

[2] The Clinton Presidential Library is aware of the recent decision in *American Historical Association v. NARA*, Civ. No. 01-2447, -- F. Supp. 2d --, 2007 WL 2822027 (D.D.C. Oct. 1, 2007) (CKK), which enjoined NARA from relying on section 3(b) of Executive Order 13233, but left intact all other provisions of the Executive Order.  The Library will not take any action that is

of FOIA requests under the Presidential Records Act.  Clinton Presidential Library staff also

participated in one or more training exercises held in person and via phone conferencing with

NARA headquarters staff familiar with FOIA processing issues in general, including being

briefed by NARA's Presidential Materials Staff, as well as by various other NARA FOIA

officials.

15.    On January 20, 2006, the five-year moratorium on disclosure mandated by the PRA

expired, thus triggering the period for public access requests to Presidential records through

FOIA requests.  See 44 § 2204(b)(2).  Hence, on that date the Clinton Presidential Library began

receiving and accepting FOIA requests.

16.     Between January 20, 2006, and April 4, 2006 (the date of the present FOIA request), the

Library received 210 FOIA requests for Clinton Presidential records totaling a rough estimation

of 5,260,000 pages.  As of January 24, 2008, a total of 430 FOIA requests have been received by

the Library since the five-year moratorium expired.  As of January 24, 2008, archivists at the

Library have processed 72 FOIA requests, representing a total of approximately 225,094 pages of

textual and electronic records, and 44,363 audio-visual records.  We currently have 303 pending

FOIA requests, which we roughly estimate will involve the processing of at least 10,500,000

pages of Presidential records.

17.    To be as fair as possible to the public seeking access to Clinton Presidential records, the

Clinton Presidential Library has established 17 separate access queues, 16 for FOIA requests and

one for mandatory review requests of classified documents in accordance with Executive order

12958, as amended.  The queues are divided by the type of records requested, as follows: (1)

textual unclassified; (2) textual classified; (3) electronic classified; (4) electronic unclassified;

inconsistent with the court's order.                    7

and (5) audio-visual (AV). Requests normally include multiple types of records. Requests such as these are placed in the queue based on the majority of the record type being requested, except in the case of audiovisual material which is segregated into its own separate queues. Requests in categories (1) through (5) identified above are then further divided by the volume of records initially estimated to be responsive: (1) large, i.e., over 5000 pages; (2) medium, i.e., 501-5000 pages; or (3) small, i.e., 500 or less pages. (In the case of the AV queues, the three queues are similarly organized by small, medium, or large request, by number of records rather than pages.) Within each of these fifteen queues, the FOIA cases are organized by date received. The Clinton Library rotates through each of the queues, as well as through a sixteenth queue for records subject to multiple requests, as described in more detail, *infra,* ¶ 25. As the next-in-line FOIA request is selected from each queue, that queue will then go to the end of the queue line. The Clinton Presidential Library queue structure has been continually evolving in order to ensure both fair and efficient processing, given the limited archival resources at the Clinton Library. In an attempt to better serve our requestors, we have added additional queues and adjusted queue requirements, and intend to continue to make further refinements as circumstances warrant. We further believe that continued flexibility is needed to handle future processing of certain extremely large requests (generally in the range of 50,000 pages and up) if such requests are not otherwise narrowed by the requestor. Accordingly, the Library reserves the right to consider treating these types of large requests as consisting of multiple segments, so as to limit initial processing to a subset of the request. Processing such large requests in this manner minimizes the impact on Library staff resources and does not otherwise unduly interfere with the rights of other FOIA requestors. Our current queue structure is the result of experience gained by

8

conducting many FOIA request searches as well as discussions between staff at the Clinton

Presidential Library, the Office of General Counsel, and the Presidential Materials Staff in

Washington, D.C.  In response to Executive order 13392 on Improving Agency Disclosure of

Information, NARA prepared a FOIA improvement plan in 2006.  One of the proposals for the

PRA Presidential Libraries was to establish the additional queue for records that are the subject

of multiple FOIA requests.  This new multi-request queue was added in July 2007.  See

*infra,* ¶ 25.

18.     The Clinton Presidential Library can allocate no more than six archivists for processing

all of its pending FOIA requests for textual and electronic records, which comprise thirteen

queues and exclude the three AV queues.  Counting each archivist as a "full time equivalent" or

"FTE" position in government, we estimate that from January 20, 2006 until January 4, 2008,

approximately 51.5% of total archival FTE time was available to process FOIA requests.  (See

¶ 19 for an explanation of the remainder of FTE time.)  This processing requires not only a page-

by-page, line-by-line review to ensure that all exempt information is properly identified and

redacted, but also the time-consuming tasks of searching for, arranging, describing, and

performing basic preservation on the responsive records.  Also included is time required to

conduct re-reviews of records as needed in response to ongoing negotiations with representatives

of the former President.

19.     Since January 2006, the remaining 48.5% portion of cumulative FTE time has been spent

on reference services, including answering all incoming general reference requests from the

public, as well as requests received from places such as the White House, the Clinton

Foundation, the former President, government agencies, and others.  In that time, archivists have

responded to 3,600 separate reference inquiries. Archivists staff the Library's textual and audio-visual research rooms when researchers are present, and the Clinton Library has had 432 visits to its research room in this period (including from representatives of Judicial Watch). Archivists also spend time responding to what are called "special access" requests under 44 U.S.C. § 2205, including since January 20, 2006, four significant special access requests from the incumbent President, one from Congress, and one from a federal court. These requests are often time-sensitive in nature and require intensive, detailed searching and review on the part of the archival staff. Also, these are often requests for the more sensitive and/or classified records in the library, adding additional complexity to the work done by the archivists. Additionally, archivists spend time improving the functionality of access to electronic records, including working with contractors on upgrades to the Presidential Electronic Record Library, known as "PERL." Finally, archivists spend time working on museum exhibit issues, assisting the curator with writing text, and dealing with a variety of administrative issues as they arise.

20.    NARA has separate fee authority for its archival records. See 44 U.S.C. § 2116. Thus, the Clinton Presidential Library is not governed by the FOIA fee and fee waiver provisions per 5 U.S.C. § 522(a)(4)(A)(vi). We do not provide any fee waivers for copying, although researchers can view documents in a research room for free. However, we do not charge any search fees for the time that the Library's staff searches for records responsive to FOIA requests.

## UNANTICPATED DELAYS IN FOIA PROCESSING AND DUE DILIGENCE

21.    Notwithstanding all of our attempts at due diligence, the sheer total volume of records held at the Clinton Presidential Library has contributed to unanticipated delays in the Library's ability to process FOIA requests after January 2006. For example, the Clinton Presidential

Library holds an estimated 78 million pages of textual Presidential records, whereas in contrast

the Reagan and Bush Presidential Libraries hold 43.8 million and 33.7 million pages of textual

records governed by the PRA, respectively. The Clinton Presidential Library also holds an

estimated 20 million presidential electronic mail records, two million electronic cables, and 60

other electronic systems, which is orders of magnitude greater than similar electronic records

holdings in these other Libraries and, if printed in a textual format, would rival in size the entire

volume of Presidential records generated during the eight years of the Reagan Administration.

This increase both in the volume of holdings and variety of formats necessarily requires more

complex and time-consuming searching and pulling of records, and also demands greater efforts

to maintain intellectual control over this vast collection of records through traditional hard copy

finding aids and electronic indices of various kinds.

22.    As the first Presidential Library to have a significant volume of born-electronic records,

the Clinton Presidential Library has received FOIA requests for more than one million emails in

the two years since Clinton Presidential records became subject to FOIA. NARA is currently

expending significant resources to address the explosion in volume of electronic records through

its Electronic Records Archives program, which, when operational, will give us the means to

preserve, process, and provide sustained access to electronic records including Presidential

electronic records. See www.archives.gov/era. Additionally, upgrades in functionality have been

made to PERL, which is the current system that the Library uses for holding and accessing

Clinton Presidential electronic records. However, given the limitations of the PERL system (e.g.,

it has no on-screen redaction capabilities), the Clinton Presidential Library must print electronic

records to paper prior to arranging, describing and reviewing them. Additionally, the Clinton

11

Presidential Library staff has spent large amounts of time on an unanticipated process known as "de-hexification," which involves converting attachments to individual email records that cannot be read due to an unknown or unreadable file into something approaching readable form.

23.    In the first year of FOIA processing alone, the Library experienced an unexpected jump in the volume and complexity of the incoming FOIA requests themselves compared to the first year at other Libraries.  In contrast to what transpired at the Reagan and Bush Presidential Libraries, we received 336 FOIA requests in the first calendar year of FOIA processing, between January 20, 2006 and December 31, 2006 – a three-fold increase over the approximately 100 FOIA requests received during the first year of FOIA processing at the Reagan and Bush Presidential Libraries.  Also, in contrast to the experience of NARA staff at those libraries, and despite the best efforts of Clinton Presidential Library staff, we have not been particularly successful in convincing FOIA requestors at our Library to work with us in substantially narrowing, either by date, content, or by some other reasonable means, what often have been extremely far-ranging requests for "all" records on a number of topics.

24.    NARA is aware of the unprecedented number and volume of FOIA requests received by the Clinton Presidential Library to date and has been working to address this issue.  Most significantly, NARA's Office of Presidential Libraries expects that the President's budget submission to Congress for Fiscal Year 2009 will include a recommendation from the Archivist of the United States for funding 15 new archivists for processing Presidential records.  If funded, the Clinton Presidential Library would receive the largest number of these archival resources, and this staff would be dedicated to reducing the FOIA backlog at the library.

25.    Apart from seeking additional funding for positions, we also have taken concrete steps to

12

address our FOIA backlog.  For example, as noted in ¶ 17, as part of a government-wide effort

undertaken in response to Executive Order 13392 to improve the disclosure of government

information, NARA's PRA libraries created "multi-request FOIA queues."  As referenced above,

FOIA requests are moved to this queue when a library receives multiple requests for significant

portions of the same series or sub-series of records.  Once the requests are transferred to the

multi-request queue, the library will begin systematically processing an entire segment of

records, as opposed to individual folders. Because systematic processing is faster than individual

FOIA processing, this assists in responding more rapidly to FOIA requestors who wish to gain

access to the same or similar files. Systematic processing is faster because it entails processing

records in their archival and historical context; in contrast, FOIA processing requires archivists to

find, pull and track records from many different file series.  Systematic processing also has had

the effect of opening up more materials to access, because in lieu of making individual folders

available, researchers can gain access to larger groups of records.  By opening an entire series or

sub-series, we will enable access to these records to future researchers without the necessity of

filing a FOIA request, which would ultimately add to the existing FOIA backlog. We have not

yet had occasion to process extremely large requests in this queue; however, the Library will face

at some point (including, perhaps, in this case) the issue of how to reasonably limit these requests

so as to be fair to all other FOIA requestors.

26.     Additionally, NARA's Office of Presidential Libraries, after discussions with the

Supervisory Archivists of the three PRA libraries, decided to undertake an in-house study in the

spring of 2007 to review ways to achieve faster processing of Presidential records.  As a result of

this study, a one-year pilot project was initiated to implement the most promising proposals.

Such proposals include halting what has been a time-consuming process of routinely referring to the originating and/or equity agencies those classified items processed in response to FOIA requests.

27.     In sum, NARA and the Clinton Presidential Library are taking, and will continue to take, reasonable steps, in light of present-day resource and budget constraints and the ever-increasing demand for Presidential records, to address the important issue of improving FOIA request processing.

### FOIA CASE LOG NUMBER 2006-0885-F

28.     On April 4, 2006, Judicial Watch submitted its FOIA request ("Request") for "[a]ny and all records of the Task Force on National Health Care Reform, chaired by First Lady Hillary Rodham Clinton . . . to include but not limited to any and all sub-elements of the Task Force." The Task Force on National Health Care Reform was established by President Clinton on January 25, 1993.  The President named First Lady Hillary Rodham Clinton as the chairman of the Task Force, and appointed as its other members the Secretaries of the Departments of Health and Human Services, Treasury, Defense, Veterans Affairs, Commerce, and Labor, as well as the Director of the Office of Management and Budget, and three White House advisers.  President Clinton charged this body with the task of listening to all parties and then preparing health care reform legislation to be submitted to Congress within 100 days of President Clinton taking office.  See 29 Weekly Comp. Pres. Doc. 96-97 (Feb. 1, 1993).

29.     After receiving Judicial Watch's Request, archivists at the Clinton Presidential Library conducted what we term a "preliminary search" to determine the approximate volume of records that could be responsive, in order to place the request in the appropriate FOIA queue.  The

preliminary search for records responsive to Judicial Watch's Request consisted of searching a series of databases in the nature of finding aids, as supplemented by the institutional knowledge of our Clinton Presidential Library staff archivists. Most of the databases are consolidated in the aforementioned PERL system. One of the applications searched is a database known as CDSS (the Clinton Document Search System), which allows Clinton Presidential Library archivists to search the description of Clinton Presidential records retired and filed in the White House Office of Records Management (WHORM) Subject Files, or folder titles of Staff Member Office Files entered into the WHORM system. This database serves as a finding aid to millions of pages of textual Clinton Presidential records. Other applications searched include databases originally created by the Clinton White House Photo Office and the White House Communications Office, which allow searches of Clinton Presidential photographs, videotapes, and audiotapes. Additionally, a search was conducted of an MS Access database created by the Clinton Presidential Library staff, consisting of Clinton Presidential folder title lists. Finally, the preliminary search also included a search of e-mails captured by the Clinton Automated Records Management System (known as "ARMS"), for potentially responsive e-mail records.

30.     Part of the preliminary search for FOIA requests entails examining finding aids and the MS Access database to determine if potentially responsive records have been previously released and, therefore, are already available. It is known to the Clinton Presidential Library staff that approximately 550,000 pages of records from the White House Health Care Interdepartmental Working Group ("Working Group") had previously been made publicly available in 1994. In fact, the Clinton Library has more records opened on the subject of health care than on any other single topic. The Working Group was created by President Clinton at the same time as the Task

15

Force. Both were a part of his Health Care Reform initiative. The Working Group was created

to gather information, generate ideas, and formulate alternative options for consideration by the

Task Force. Therefore, library archivists conducted a basic search of the folder titles of the

Working Group finding aids, as well as the MS Access database, for previously released

potentially responsive records related to the Health Care Task Force. It was determined that 134

folders totalling an estimated 13,400 pages of these previously released public papers of the

Working Group specifically contained the terms "Health Care Task Force," or were specifically

the files of Ira Magaziner, and as such were potentially more specifically responsive to the

plaintiff's Request than the entire 550,000 pages of available material of the Working Group.

31.    By letter dated April 10, 2006, the Clinton Presidential Library's Supervisory Archivist

notified Judicial Watch that its Request had been received and assigned case number 2006-

0885-F.  The preliminary search of the Library's electronic finding aids and databases revealed

that there were an estimated 3,022,030 pages of unprocessed textual records, 2,884 pages of

unprocessed electronic records, 1,021 unprocessed photographs, three unprocessed videotapes,

and three unprocessed audiotapes that were potentially responsive to the Request.  However, our

letter also indicated that the "page total is an estimate and that all pages processed might not be

relevant to [the] specific topic." (See Exhibit 3). We also explained that "[t]here are

approximately 13,400 pages of the White House Health Care Interdepartmental Working Group

papers concerning the Task Force open and available for research."  We then provided an

overview of our review process, outlining how the Library processed FOIA requests for records

covered by the PRA and placed the request in the queue.

32.    On July 25, 2006, Judicial Watch corresponded with the Library, requesting an estimated

16

completion date for the Request. (See Exhibit 4). On August 9, 2006, the Supervisory Archivist

responded that the Request had been placed into a processing queue and that approximately 155

requests preceded the Request, requiring processing and review of over 2,000,000 pages of

records pursuant to the PRA, FOIA, and Executive Order 13233. (See Exhibit 5). She also

noted that, "[b]ecause the Clinton Library has only been processing records in response to FOIA

requests for less than seven months, we do not yet have a sense of how long it will take us to

process the [pending requests] . . . nor how long it will take us to process [the Request] once [it]

reach[es] the front of our queue." Upon receipt of further inquiry by Judicial Watch on January

16, 2007 (see Exhibit 6), the Supervisory Archivist responded on February 9, 2007 that the

Request had moved up in its processing queue, but that it had not yet reached the front of its

queue. (See Exhibit 7). The Supervisory Archivist explained that the archivists "must complete

a page-by-page review of all records to determine if this material can be released or if it requires

withholding under one of the six [PRA] restrictive categories and/or the eight applicable FOIA

exemptions that apply to Clinton Presidential records," and that "[w]e are working diligently to

make these records available as soon as possible."

33.     Because we received other requests involving records relating to the Health Care Task

Force prior to receipt of the request from Judicial Watch, Judicial Watch's request has been

placed in the Library's multi-request queue, which as explained in ¶ 25 was implemented to more

efficiently process requests or portions of requests for significant portions of the same series or

sub-series of records. Prior to receiving Judicial Watch's request, the Clinton Presidential

Library received two other FOIA requests that are relevant to, if not subsumed within, Judicial

Watch's request. Because we believe that all the records that are responsive to these third party

requests are relevant to Judicial Watch's request, in actuality, a portion of Judicial Watch's

request will be processed with each of the following requests. The first health care request that

met the test for the multi-request queue is for records for "Ira Magaziner files on Health Care

Task Force/Health Care Reform." This request will have records that fall within or relate to

Judicial Watch's request, as Mr. Magaziner was a senior advisor to the Health Care Task Force

and one of only three White House advisors that were also members of the Task Force. That

request is currently at the front of the multi-request queue. There are currently three other queues

which have cases that must be processed before we next reach the multi-request queue. We

estimate that out of the approximately 154,330 pages of records responsive to this request,

approximately 72,000 represent Ira Magaziner Health Care Task Force records that are also

responsive to the present Judicial Watch request and that will, therefore, be processed first. This

request is the fourth case in line to be processed.[3]  The second health care request that met the

test for placement in the multi-request queue was made for "Hillary Clinton files on Health Care

Task Force/Health Care Reform." We estimate that of the approximately 90,000 pages of

records responsive to this second request, 30,000 pages deal with Ms. Clinton's Health Care

Task Force Records, and thus form the universe of pages to be processed as part of the second

request in the multi-request queue dealing with the subject of health care -- which also happen to

be responsive to the Judicial Watch request. There are a total of 43 FOIA requests pending

before this second health care request (not including requests in the separate AV queues).

34.    The remainder of the Judicial Watch request not processed in response to the two

previous health care-related FOIA requests is currently the sixth FOIA case pending in the multi-

---

[3] Currently, the twelve FOIA requests totaling approximately 93,720 pages are being processed
by Clinton Presidential Library archival staff. As each of these FOIA requests is completed,

request queue and, under the queue structure process described in ¶¶ 17 and 18, in which we rotate through each of the 13 non-AV FOIA queues, there are a total of 82 FOIA requests pending ahead of the remainder of Plaintiff's request. Given that the remainder of the Judicial Watch request (approximately 2,900,000 pages, representing the original estimate of 3,000,000 pages, minus a combined 100,000 or so pages processed as part of the two earlier requests in the multi-request queue, per ¶ 33, *supra*), it is clear that this represents just the type of extremely large request that will likely best be handled by the Library in segments, so as to allow us to allocate our scarce staff resources in a manner that is fair to other FOIA requestors.

35.    Once processing of each third-party request, or segments of each request, is completed, pursuant to the terms of the PRA, NARA's regulations, and Executive Order 13233, NARA will notify the representatives of the former and incumbent President of the Clinton Presidential Library's proposed release of the records. Once that review process has been completed, NARA will inform both the third party requestor and Judicial Watch of the Clinton Presidential records that are available and whether any records are being withheld.

36.    Once the remainder of Judicial Watch's request reaches the top of its queue and the Library begins processing it, the Library intends to allow for presidential review of the materials as the Library completes its review of portions of the responsive documents. Therefore, presidential review of the documents can occur incrementally and, as reasonably segregable sub-collections of documents have undergone that review, NARA will inform Judicial Watch of the Clinton Presidential records that are available and whether any records within that portion are being withheld.

---

archival staff will pull the next FOIA request to be processed from its respective queue.

## ADDITIONAL OBSERVATIONS ON PROCESSING AND ON THE OVERBREADTH
## OF THE PRESENT REQUEST

37.   We continue to be confident that the present, unnarrowed Judicial Watch request involves in

the range of three million pages.  At an estimated three million pages, the size and scope of

Judicial Watch's present FOIA request makes it the largest FOIA request that the Clinton

Presidential Library has received to date.  Further, the request is greater than any FOIA request

ever received to date at any of the Presidential Record Act libraries (i.e., the Reagan and George

H.W. Bush Presidential Libraries).   The largest FOIA request that the Clinton Presidential staff

has processed, in its entirety, to date, was a segment of a FOIA for material relating to Native

Americans, totaling 56,639 pages.

38.    As stated above, ¶ 16, in the two years since we began receiving FOIA requests, Clinton

Presidential Library staff have processed approximately 225,094 pages of records.  The historical

experience of Presidential Library staffs has been that the rate of FOIA processing increases over

time, as archivists work with materials and become more familiar with the overall presidential

record collections, as well as with the nature of FOIA exemptions and processing.  However,

given the continuing uncertainty as to how much faster we can accomplish the processing of our

current backlog of FOIA requests because of resource and budget constraints, we are not in a

position to provide a reasonable estimate at this time as to how long it may take to process a

FOIA request of three million pages in scope – a request orders of magnitude beyond what the

staff at the Clinton Presidential Library has experienced to date.   As stated above, ¶ 33 & n.3,

with 93,720 pages ahead of the first of the health care related requests in our multi-request queue,

we believe that Clinton Presidential Staff will be in a position to begin working on a significant

20

portion of Judicial Watch's request during this calendar year.

39.   Prior to the onset of the present litigation, the Clinton Presidential Library did not, during the administrative process, elect to pursue active negotiations with the requestor aimed at attempting to narrow the scope of what is clearly an immensely large FOIA request.  Nor, however, did Judicial Watch approach the Library with a proposal for narrowing its request prior to initiating the present litigation.  Although plaintiff's past correspondence with the Clinton Presidential Library indicates some level of familiarity with the Library's holdings, it is not clear whether representatives of plaintiff have availed themselves of the Health Care Task Force materials that are currently open and available to the public at the Library, or other of the Library's resources, for the purpose of narrowing their request.  For the reasons stated in this Declaration, even a substantially narrowed request must await its time in the queue.  However, it is also clear that if plaintiff is willing to substantially narrow its request, the ultimate processing time may be significantly reduced.

40.  The Clinton Presidential Library and NARA take their responsibilities with regard to the administration of the Presidential Records Act and the FOIA very seriously, and all reasonable efforts are being made to comply with statutory deadlines.  It is regrettable that the Library is without greater resources at its disposal, and that the processing of presidential records for opening to the public is necessarily delayed.  Nevertheless, as a matter of equity, and to ensure that each requestor receives the attention he or she deserves, the Library must be able to process its pending FOIA requests based on the sound administrative policies and practices developed to date.  It would simply be unfair to judicially assign plaintiff's request for processing ahead of other requests in the various queues.  Each court order that requires that one request be given

21

priority ahead of others invariably works to the detriment of other, more patient requestors, and thereby encourages other requestors to seek relief in the courts, thereby undermining the Library's (and NARA's) attempts at managing the many FOIA requests received annually in a fair and consistent fashion. This is even more true in the present case, given the mammoth size and scope of the plaintiff's request, where a court order requiring the immediate halt of all other FOIA processing in favor of processing the present request will effectively deny FOIA access to all requestors of Clinton Library presidential records for many years to come.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of January, 2008.

Emily Robison
EMILY ROBISON
Deputy Director
Clinton Presidential Library